UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

RICHARD LOWERY,

     *Plaintiff,*

v.

LILLIAN MILLS, in her official capacity
as Dean of the McCombs School of
Business at the University of Texas at
Austin; ETHAN BURRIS, in his official
capacity as Senior Associate Dean for
Academic Affairs of the McCombs School
of Business at the University of
Texas-Austin; and SHERIDAN TITMAN, in his
official capacity as Finance Department
Chair for the McCombs School of
Business at the University of Texas-
Austin,

     *Defendants.*

Case No. 1:23-cv-129-LY

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................ii

TABLE OF AUTHORITIES ............................................................................................iii

RULE CV-7(G) STATEMENT ....................................................................................... vi

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ................................................................................................ 1

ARGUMENT ................................................................................................................... 9

    I.    LOWERY IS LIKELY TO SUCCEED ON THE MERITS................................................ 10

        A.    Defendants' threats are causing Lowery to self-censor his speech on matters of public concern.................................................................... 10

        B.    Defendants' threats are causing Lowery to self-censor from commenting on university affairs ............................................................ 14

        C.    Defendants' threats amount to retaliation that is likely to deter others from exercising their rights to speak........................................... 15

        D.    Defendants have removed part of Lowery's job duties by preventing him from commenting on university affairs ........................ 18

    II.    LOWERY WILL SUFFER IRREPARABLE HARM IF DEFENDANTS' CENSORSHIP IS ALLOWED TO CONTINUE .................................................................................... 19

    III.    THE BALANCE OF EQUITIES FAVOR LOWERY ..................................................... 19

    IV.    ENJOINING DEFENDANTS' CENSORSHIP IS IN THE PUBLIC INTEREST ................. 20

    V.    THIS COURT SHOULD FOREGO THE BOND REQUIREMENT ................................. 20

CONCLUSION .............................................................................................................. 20

CERTIFICATE OF SERVICE ......................................................................................... 22

TABLE OF AUTHORITIES

**Cases**

*Alston v. Spiegel*,
   988 F.3d 564 (1st Cir. 2021) ................................................................. 16

*Benison v. Ross*,
   765 F.3d 649 (6th Cir. 2014) ................................................................. 16

*Breaux v. City of Garland*,
   205 F.3d 150 (5th Cir. 2000) ................................................................. 17

*Burlington N. & Santa Fe Ry. v. White*,
   548 U.S. 53 (2006) ................................................................................. 16

*Cole v. Richardson*,
   405 U.S. 676 (1972) ............................................................................... 15

*Constantine v. Rectors & Visitors of George Mason Univ.*,
   411 F.3d 474 (4th Cir. 2005) ................................................................. 17

*Cooksey v. Futrell*,
   721 F.3d 226 (4th Cir. 2013) ................................................................. 12

*Coszalter v. City of Salem*,
   320 F.3d 968 (9th Cir. 2003) ................................................................. 17

*DePree v. Saunders*,
   588 F.3d 282 (5th Cir. 2009) ................................................................. 17

*Founding Church of Scientology, Inc. v. Dir., FBI*,
   459 F. Supp. 748 (D.D.C. 1978) ........................................................... 11

*Gibson v. Kilpatrick*,
   734 F.3d 395 (5th Cir. 2013) ................................................................. 17

*Hous. Cmty. Coll. Sys. v. Wilson*,
   142 S. Ct. 1253 (2022) ........................................................................... 15

*Iancu v. Brunetti*,
   139 S. Ct. 2294 (2019) ........................................................................... 14

*Jackson v. Wright*,
  Civil Action No. 4:21-CV-00033, 2022 U.S. Dist. LEXIS 8684 (E.D. Tex.
  Jan. 18, 2022) ................................................................................................ 11,12

*Jackson Women's Health Org. v. Currier*,
  760 F.3d 448 (5th Cir. 2013) ................................................................................ 20

*Johnson v. Halstead,*
  916 F.3d 410, 421 (5th Cir. 2019) ........................................................................ 17

*Kaepa, Inc. v. Achilles Corp.*,
  76 F.3d 624 (5th Cir. 1996) .................................................................................. 20

*Kessling v. Ohio State Univ.*,
  No. 2:20-cv-1719, 2022 U.S. Dist. LEXIS 211191 (S.D. Ohio Nov. 21, 2022) ........ 19

*Keyishian v. Bd. of Regents*,
  385 U.S. 589 (1967) .............................................................................................. 14

*Ladd v. Livingston*,
  777 F.3d 286 (5th Cir. 2015) ................................................................................ 10

*Levin v. Harleston*,
  966 F.2d 85 (2d Cir. 1992) .................................................................................... 12

*Marshall v. Amuso*,
  571 F. Supp. 3d 412 (E.D. Pa. 2021) .................................................................... 14

*Matrisciano v. Randle*,
  569 F.3d 723 (7th Cir. 2009) ................................................................................ 16

*Minn. Voters All. v. Mansky*,
  138 S. Ct. 1876 (2018) .......................................................................................... 13

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964) .............................................................................................. 10

*Nieves v. Bartlett*,
  139 S. Ct. 1715 (2019) .......................................................................................... 15

*Opulent Life Church v. City of Holly Springs*,
  697 F.3d 279 (5th Cir. 2012) .......................................................................... 19, 20

*Papish v. Bd. Of Curators of Univ. of Mo.,*
    410 U.S. 667 (1973) ............................................................... 14

*Police Dep't of Chi. v. Mosley,*
    408 U.S. 92 (1972) ................................................................. 10

*Sassone v. Quartararo,*
    598 F. Supp. 2d 459 (S.D.N.Y. 2009) ................................... 19

*Socialist Workers Party v. Attorney General,*
    419 U.S. 1314 (1974) ............................................................ 11

*Solid Rock Found. v. Ohio State Univ.,*
    478 F. Supp. 96 (S.D. Ohio 1979)......................................... 14

*Specht v. City of New York,*
    15 F.4th 594 (2d Cir. 2021) .................................................. 16

*Speech First, Inc. v. Fenves,*
    979 F.3d 319 (5th Cir. 2020) ................................................ 11

*Texans for Free Enter. v. Tex. Ethics Comm'n,*
    732 F.3d 535 (5th Cir. 2013) ................................................ 19

*Texans for Free Enter. v. Tex. Ethics Comm'n,*
    No. A-12-CA-0845, 2012 U.S. Dist. LEXIS 188644 (W.D. Tex. Dec. 6, 2012)........ 20

*Texas v. Johnson,*
    491 U.S. 397 (1989) .............................................................. 10

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
    393 U.S. 503 (1969) .............................................................. 10

**Rule**

Fed. R. Civ. P. 65 ..................................................................... 20

**Treatise**

Michael Dolich, *Alleging a First Amendment "Chilling Effect" to Create a*
    *Plaintiff's Standing: A Practical Approach,* 43 Drake L. Rev. 175 (1994)............ 11

RULE CV-7(G) STATEMENT

Plaintiff conferred with a representative of the University of Texas's Office of the
Vice President of Legal Affairs and he indicated this motion for a preliminary
injunction would be opposed.

INTRODUCTION

The First Amendment protects the right of citizens to criticize government officials, including administrators at Texas' flagship state university. It also protects a public university professors' right to engage their colleagues and administrators in debate and discussion concerning academic matters, including what should be taught and the school's ideological direction and balance.

But when University of Texas at Austin (UT) Professor Richard Lowery criticized school officials' actions, engaged in traditional academic campus discourse, and asked elected state-government officials to oversee the school's operation, UT officials campaigned to silence him. They threatened Lowery's job, pay, institutional affiliation, and research opportunities if he did not shut up. In the atmosphere they fomented, one of Lowery's colleagues even asked UT police to surveil the professor because he might contact politicians or other influential people.

Lowery got the message. Fearing retribution, he began self-censoring, throttling his social media use and altering the topics of his academic speeches. That harm is ongoing. This Court should put a stop to it.

STATEMENT OF FACTS

*Professor Lowery's public commentary on university affairs*

Plaintiff Richard Lowery, a professor at UT's McCombs School of Business, has a well-established history of speaking and publishing on controversial public affairs topics, including UT affairs. Lowery Dec. ¶¶ 1-8; Ex. A. Lowery dissents from the

1

political and academic views held by most UT faculty and administrators, often

publicly, and sometimes uses pointed terminology to get his points across. *Id.* ¶¶ 9-

11. He also makes his opinions known to elected officials in Texas, including those

who oversee UT's funding. Ex. E, I.

   In recent years, Lowery has repeatedly criticized UT-Austin's senior officials

(UT's Administration), including President Jay Hartzell, and their approaches to

issues such as DEI (diversity, equity, and inclusion) indoctrination, academic

freedom, competence-based performance measures, and the future of capitalism.

Lowery Dec. ¶¶ 11-34; Exs. D-I.

   *Lowery criticizes the UT Administration's hijacking of the Liberty Institute*

   Lowery has a longstanding commitment to increasing viewpoint diversity on the

UT campus, through his speech on and off campus, and his work as a Senior Scholar

at the school's Salem Center for Public Policy. Lowery Dec. ¶ 16. At the Salem

Center, Lowery reports to business professor Carlos Carvalho, who serves as the

Salem Center's Executive Director. The pair collaborate on evidence-based

approaches to policy issues, including market-based approaches that consider trade-

offs. Lowery Dec. ¶ 3; Ex. B; Carvalho Dec. ¶¶ 1-3. Lowery's affiliation with the

Salem Center affords him additional pay, as well as access to research

opportunities. Lowery Dec. ¶¶ 5-7, Ex. C; Carvalho Dec. ¶ 3.

   In 2021, Lowery and Carvalho decided to pursue funding for a new "Liberty

Institute" at UT, to study classical-liberal, pro-free market viewpoints as a

counterweight to the campus-dominant critical race theory and DEI-based ideology.

Lowery Dec. ¶¶ 17-19; Carvalho Dec. ¶ 4. The two enlisted the support of UT President Jay Hartzell and private donors. Lowery Dec. ¶¶ 17-20. The Texas legislature's 2022-23 state budget allocated $6 million in funding for the Liberty Institute, which also garnered support from private donors. *Id.* ¶ 20. But the enabling legislation's vagueness allowed President Hartzell and his UT Administration allies to hijack the project, remove its independence, re-direct its funding to existing personnel and programs, and change its title to "Civitas." *Id.* ¶ 21; Carvalho Dec. ¶ 5.

On June 8, 2022, the *Texas Tribune* quoted Lowery's criticism of Hartzell and one of his chief deputies for defaulting on "the plan agreed to for bringing needed intellectual diversity to campus and push back against the persistent attacks on free inquiry and academic freedom at UT-Austin." Lowery Dec. ¶¶ 22-23; Ex. F. On July 1, 2022, Lowery again publicly expressed his opinions about the hijacking of the Liberty Institute, criticizing Hartzell's role and that of Richard Flores, an advocate of critical race theory and DEI-ideology. Lowery Dec. ¶¶ 24-25, Ex. G.

Later in July 2022, Lowery appeared on The Center for the Study of Partisanship and Ideology's (CSPI) podcast with its President, Richard Hanania, to discuss the Liberty Institute controversy. Lowery Dec. ¶¶ 26-28; Ex. H. In the podcast, Lowery criticized UT's Administrators, repeatedly opining that Hartzell's job included lying to Republican office holders to minimize UT's viewpoint-diversity problems. Lowery Dec. ¶¶ 27-28; Ex. H (found at 23:00–27:00). Lowery also repeatedly criticized what he termed fake conservatives on campus, whom he

claimed assisted establishment leftists in derailing viewpoint-diversity efforts. Lowery Dec. ¶¶ 27-28; Ex. H (found at 27:15–28:40). He was also generally critical of UT's use of DEI-ideology to filter merit-based candidates for academic and administrative posts.  Lowery Dec. ¶¶ 27-28; Ex. H (found at 09:30–12:30).

Lowery has used his Twitter account, @RichardLoweryTX, to publicly express his views on the UT Administration and other issues. Lowery Dec. ¶¶ 29-32. He sometimes tagged elected officials or social-media personalities in his tweets, alerting his postings to those officials' Twitter accounts. *Id.* ¶ 31. On August 18, 2022, Lowery tweeted about an article regarding new DEI-ideology based job performance reviews in the University of California system, tagging the Twitter accounts of Texas Governor Greg Abbott and Lieutenant Governor Dan Patrick. *Id.* ¶¶ 33-34; Ex. I. He asked why those officials had put Texas on the same path, referencing UT's expanding use of DEI filtering criteria. *Id.*

*Professor Lowery's critiques of the Global Sustainability Leadership Institute*

The McCombs School hosts a Global Sustainability Leadership Institute ("GSLI"), which promotes Environment Sustainability and Governance (ESG) based viewpoints that are consistent with UT's predominant DEI-ideology, but which are often at odds with free-market principles and Lowery's views. Lowery Dec. ¶¶ 35-37, Ex. J. Lowery believes that GSLI trains activists to use corporations to promote DEI-based ideology. Lowery Dec. ¶ 37. He also believes that GSLI promotes a worldview and academic approach that is at least partially antithetical to his own

free-market philosophy and academic approach, and is also hostile to the academic values, approaches, and studies emphasized by the Salem Center. *Id.*

Lowery has criticized GSLI and its events using his Twitter account. *Id.* ¶ 38. On April 11, 2022, he tweeted a photo of a GSLI flyer touting the institute's "Global Sustainability Minor." Lowery Dec. ¶¶ 39-40; Ex. K. Lowery commented that the minor was promoting "left-wing activism" and criticized the perceived hypocrisy of its supporters, stating, "These people are shameless and awful." *Id.* On August 22, 2022, Lowery tweeted a photo of a display promoting a GSLI event called, "Impact Chat: ESG under Attack." Lowery Dec. ¶¶ 41-42; Ex. L. Lowery criticized the featuring of two ESG proponents, and compared the panel's lack of balance with his own efforts to include dissenting views at Salem Center events. *Id.*

### *"We need to do something about Richard"*

Lowery's repeated criticisms of the UT Administration, their DEI initiatives, and GSLI prompted Defendants to pressure Lowery and his friend and ally, Carlos Carvalho, into censoring Lowery's speech. *See* Lowery Dec. ¶¶ 43-45.

In a late July or early August 2022 conversation, Defendant Sheridan Titman, who chairs Lowery's department, told Carvalho, "We need to do something about Richard." He added that President Hartzell and McCombs School Dean Mills were upset about Lowery's political advocacy, and wanted to know if "we can ask him to tone it down?" Carvalho Dec. ¶ 6. Carvalho understood this as an implicit threat, but he refused to do anything, explaining to Defendant Titman that Lowery has a First Amendment right to express himself. *Id.*

5

In mid-August 2022, Defendants Mills and Burris, McCombs' Senior Associate Dean for Academic Affairs, met with Carvalho for a routine discussion of the Salem Center. After about an hour, the tone shifted when Mills and Burris changed the subject to Lowery's speech. *Id.* ¶¶ 7-8. Mills and Burris claimed that Lowery was "crossing the line" in his criticism of school officials, to the point where the UT legal department was allegedly concerned about his speech. *Id.* When Carvalho asked them for examples of such speech, Dean Mills pointed to Lowery's podcast interview about the Liberty Institute controversy, and advised Carvalho to "work with Richard [Lowery]" about his speech. *Id.*

When Carvalho declined to pressure Lowery to modify his speech, the deans' approach shifted to suggestions that Lowery was impeding Carvalho's ability to do his job, and that Lowery's association with Carvalho and the Salem Center was "problematic." *Id.* The deans insisted that something should be done about Lowery, with Burris telling Carvalho, "You have the power to have him not be attached to the center," referencing the fact that Burris and Carvalho must both annually review Lowery's Salem Center contract. *Id.* When Carvalho again resisted calls to discipline Lowery over his speech, Dean Mills threatened to remove Carvalho from his Executive Director post, telling him, "I don't need to remind you that you serve at my pleasure," and stated that she did not care that Carvalho was the one who primarily raised money for the center. *Id.*

In a late August 2022 meeting, Burris asked for Carvalho's opinion about their previous conversation. *Id.* ¶ 9. Carvalho stated that he had felt threatened, to which

Burris responded by attempting to recharacterize the conversation, stating, "No, I wouldn't interpret it that way, he's [Lowery] hurting you." *Id.* Burris did not retract any of his prior threats. *Id.* On or about October 17, 2022, Burris stressed to Carvalho the importance of "civility" while also reminding Carvalho that Burris is the one who must approve Lowery's compensation and ultimately oversees the Salem Center. *Id.* Although he had just renewed Lowery's annual appointment, Burris told Carvalho that he might not approve Lowery's appointment to the center in the future because of his speech. *Id.*

Carvalho understood that Titman, Mills, and Burris all wanted him to pressure Lowery to temper his political and academic speech, and to convey to him that his relationship with the Salem Center was in danger if he did not do so. *Id.* ¶¶ 10-11. He relayed Titman, Mills, and Burris's threats to Lowery, as they requested and expected that he would. *Id.*; Lowery Dec. ¶¶ 44-45.

*The GSLI seeks to suppress dangerous ideas*

On August 22, 2022, GSLI's Managing Director, Meeta Kothare, emailed Lowery's tweet criticizing the institute's ESG event to Dean Mills and GSLI's Executive Director, Jeffrey Hales, adding, "Lil . . . I'm becoming very concerned about the safety of our events at this rate. The tweets start as soon as any poster about us goes up somewhere in the building." Lowery Dec. ¶ 53; Ex. M. Betraying that her true objection to Lowery's tweet was not safety, she added, "Thankfully, this time he has not tagged some politician." *Id.*

Kothare then forwarded the email she had sent to Mills and Hales about Lowery to another finance professor, Laura Starks, asking, "Do our finance colleagues know about this? Should Sheridan [Titman] be told? This is an ongoing story. At what point will he [Lowery] stir up real trouble?" Lowery Dec. ¶ 54; Ex. N. Starks, in turn, forwarded the email chain to defendant Titman. Ex. O. "Please see issue below. Given the political mood in the country today, this is not acceptable and is potentially quite dangerous." *Id.* Titman responded, "We should have a discussion of what is appropriate on twitter – we want to encourage intellectual discourse, but I don't think rude comments are acceptable." *Id.*

Defendant Titman responded to Kothare's censorship demands by forwarding Lowery the original email Kothare sent to Dean Mills, omitting the header so that Lowery could not see the sender. He could tell only that Mills was the recipient, owing to the "Lil" salutation. Lowery Dec. ¶¶ 46-49, 56; Ex. P. To the forwarded email, Titman added, "You don't seem to be making friends. It is probably in your interest to come up with a class for the Spring that is likely to be popular . . . In any event, the appropriate response is to jointly sponsor a panel discussion on ESG." *Id.* Lowery responded, "I consider this a threat. I can certainly criticize events." *Id.*

As a result of Defendants' threats, Lowery set his Twitter account to "private," meaning that only his followers, not the public, could see his activity. Lowery Dec. ¶¶ 58-59. He stopped tweeting altogether as of late August 2022, although he has not deleted his account and would like to resume tweeting, re-tweeting, replying to other posts, and otherwise commenting on matters as before. *Id.* ¶¶ 60, 72-73.

8

*The Sustainability Institute asks UT police to surveil Lowery's speech*

Two days after Kothare lobbied for Lowery's censorship, GSLI employee Madison Gove emailed UT police officer Joseph Bishop, referencing a conversation that they had about Lowery and requesting that the police review Lowery's speech on social media. Lowery Dec. ¶ 57; Ex. Q. Gove copied Kothare and other UT administrators on her email requesting surveillance of Lowery's speech. Ex. Q.

*The impact of Defendants' threats on Lowery's speech*

Due to Defendants' threats to punish him for his political commentary and criticism of the UT Administration, Professor Lowery does not believe he is free to continue expressing his views openly. Lowery Dec. ¶¶ 60-74. Lowery reasonably fears that if he continues to offer public commentary that is critical of the UT Administration and its policies, Defendants will not renew his appointment to the Salem Center, costing him the $20,000 annual stipend that comes with that position and access to research opportunities, or worse. *Id.* ¶¶ 60-63. In addition to stopping his tweets and other public commentary in online publications, Lowery has avoided criticizing the UT Administration and its policies in other venues where he would like to speak more freely, including at academic conferences. *Id.* ¶¶ 65-71. In addition, Lowery is not free to speak on campus affairs on terms equal to his peers. *Id.* ¶¶ 68-71; Ex. R.

ARGUMENT

A successful preliminary injunction applicant must demonstrate: (1) a likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the

threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest. *Ladd v. Livingston*, 777 F.3d 286, 288 (5th Cir. 2015).

I.    LOWERY IS LIKELY TO SUCCEED ON THE MERITS

      A.    Defendants' threats are causing Lowery to self-censor his speech on matters of public concern

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). Government officials may not prohibit speech based on the "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509 (1969).

Our First Amendment protects uninhibited debate, and it has long been recognized that such debate "may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). The First Amendment prohibits government officials from restricting expression based on its message or ideas. *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95-96 (1972). "The essence of this forbidden censorship is content control." *Id.*

Of course, the censors and enforcers of orthodoxy rarely admit what they are doing. They sometimes obscure their actions with talk of "civility" and "safety." And they look for creative ways to prevent people from expressing disfavored views. But

10

whatever form the government's censorship may take, it is well-established that the chilling of a plaintiff's speech is a cognizable constitutional harm. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330-31 (5th Cir. 2020).

Moreover, a justiciable chilling effect may arise from any government conduct, and not just from actions that are regulatory, proscriptive, or compulsory in nature. For example, a proposed FBI surveillance of a student political convention presented a justiciable claim that it might dissuade potential attendees from participating. *Socialist Workers Party v. Attorney General*, 419 U.S. 1314, 1318-19 (1974) (Marshall, J., as circuit justice); *see also Founding Church of Scientology, Inc. v. Dir., FBI,* 459 F. Supp. 748, 760-61 (D.D.C. 1978) (religious group had alleged justiciable claim regarding government use of informants and infiltrators); Michael Dolich, *Alleging a First Amendment "Chilling Effect" to Create a Plaintiff's Standing: A Practical Approach,* 43 Drake L. Rev. 175, 176 (1994).

Accordingly, the Eastern District of Texas recently found that a state university professor stated a viable chilled-speech claim where administrators had investigated and essentially froze his involvement with an academic journal he had created, owing to a controversial article. *Jackson v. Wright*, Civil Action No. 4:21-CV-00033, 2022 U.S. Dist. LEXIS 8684, at *19-20 (E.D. Tex. Jan. 18, 2022). Specifically, the plaintiff had defended a long-dead music theorist from charges of racism, by suggesting that one such critic might be anti-Semitic. *Id.* at *4-5.

The court recognized that there "was no unequivocal policy proscribing his intended conduct," but found that the administrator's "implicit policy" of creating a

11

stagnant journal arguably proscribed plaintiff's intended speech. *Id.* at *19-20. Moreover, the plaintiff had stated a First Amendment injury even in the absence of an explicit threat that disciplinary charges would be brought against him if he continued to express his views. *Id.* at *24-25. "It is the chilling effect on free speech that violates the First Amendment, and it is plain that an implicit threat can chill as forcibly as an explicit threat." *Id.* (quoting *Levin v. Harleston*, 966 F.2d 85, 89-90 (2d Cir. 1992) (University president's criticisms of academic's speech and suggestion that it might constitute "conduct unbecoming" were sufficient to credibly chill speech even in absence of explicit threat of discipline)); *see also Cooksey v. Futrell,* 721 F.3d 226, 236-37 (4th Cir. 2013) (blogger chilled when "told, in effect, that he would remain under the watchful eye of [a] State Board").

Lowery's claim that his speech is being chilled is even stronger than those in *Jackson, Levin,* or *Cooksey* because Defendants' threats to Lowery's career were explicit. Defendants wanted "to do something about Richard" because powerful people at UT were upset about Lowery's political advocacy. Carvalho Dec. ¶ 6. And they did. They threatened to end Lowery's affiliation with the Salem Center, which would cost him his stipend, access to research opportunities, and work that was personally meaningful to him. Lowery Dec. ¶¶ 5-16. For good measure, they also threatened Carvalho's role as Executive Director, lest he fail to facilitate their efforts to get Lowery to "tone it down." Carvalho Dec. ¶¶ 2, 6-9.

And when GSLI director Kothare felt unduly criticized by Lowery, she aggressively lobbied Titman and others to take action against him, Lowery Dec. ¶¶

43-44, 52; Exs. M-P, leading Titman to threaten Lowery. Lowery Dec. ¶ 47; Ex. P. It also led a GSLI employee to ask UT police to surveil Lowery's speech on Twitter. Ex. Q. That email betrayed the core concern: "As mentioned, we are more worried about the people he reaches than him. Some of his supporters are authors, podcasters, and politicians." *Id.* The sender wasn't concerned about violence so much as negative attention being brought to the Sustainability Institute.

Lowery's tweets, and his other public criticisms of the UT administration, including its DEI policies, use of public funds for ideological indoctrination, and the hijacking of the Liberty Institute, all constitute speech on matters of public concern. Moreover, that speech was all online, with the articles and podcast video being available to anyone with a browser and an internet connection. His tweets were also previously available to any Twitter user and some were directed at elected officials in Texas state government. Lowery Dec. ¶¶ 29-33; Ex. I, K,L.

Given the threats to reduce Lowery's pay, and strip him of his Salem Center affiliation, it is reasonable that Lowery felt compelled to self-censor his speech and advocacy. Lowery Dec. ¶ 62. He did so by switching his account to protected mode and stopped tweeting altogether. *Id.* ¶ 60. He has also avoided voicing the same unwanted criticisms in public settings. *Id.* ¶¶ 64-71. That harm is ongoing, and will only be mitigated by issuing a preliminary injunction.

In addition, in-so-far as the Defendants apply an unwritten "civility code" to faculty speech, its terms are vague and subject to excessive enforcement discretion. *See Minn. Voters All. v. Mansky,* 138 S. Ct. 1876, 1891 (2018) (discretion restricting

speech must be guided by objective, workable standards); *Marshall v. Amuso*, 571 F. Supp. 3d 412, 424 (E.D. Pa. 2021) ("Allowing little more than the presiding officer's own views to shape 'what counts' as irrelevant, intolerant, abusive, offensive, inappropriate, or otherwise inappropriate under the policies openly invites viewpoint discrimination"). Moreover, it is irrelevant that Lowery's commentary offended some UT administrators or faculty. State officials cannot discriminate against ideas that offend. *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019).

B.   Defendants' threats are causing Lowery to self-censor from commenting on university affairs

"[T]he mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973). "Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). The university is the quintessential marketplace of ideas. *Id.; Solid Rock Found. v. Ohio State Univ.*, 478 F. Supp. 96, 102 (S.D. Ohio 1979) ("The college campus is peculiarly suited to serve as a marketplace of ideas and a forum for the robust exchange of different viewpoints").

These constitutional guideposts apply no less to speech about university affairs than they do to speech occurring in the classroom or in a research paper. As a UT academic, Lowery has a right to speak about university affairs, including criticizing the UT administration or dissenting from the promotion of DEI ideology on campus.

Indeed, not only does UT allow DEI proponents to freely promote their views on campus, it provides monetary incentives for them to do so. Ex. R.

For well over 50 years, it has been established that public universities may not enforce political orthodoxy through the utilization of loyalty oaths. *Keyishian,* 385 U.S. at 609-10. "We have made clear that neither federal nor state government may condition employment on taking oaths that impinge on rights guaranteed by the First and Fourteenth Amendments respectively, as for example those relating to political beliefs." *Cole v. Richardson*, 405 U.S. 676, 680 (1972). While UT does not yet require dissenters like Lowery to affirm an express oath of loyalty to President Hartzell and UT's DEI ideology, the message defendants sent is clear: you will exhibit loyalty in your public speech, or else there will be negative consequences. But Defendants can no more require adherence to an unwritten loyalty oath than to a written one.

C.   Defendants' threats amount to retaliation that is likely to deter others from exercising their rights to speak

In addition to a forward looking claim to prevent the ongoing chilling of his speech, Lowery also presents a separate retaliation claim, asking that this Court enjoin Defendants from making good on their threats for his past speech. It is well accepted that the First Amendment prohibits state officials from taking "'retaliatory actions' after the fact for having engaged in protected speech." *Hous. Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1259 (2022) (citing *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019)).

The Supreme Court has yet to decide definitively just how adverse an action must be in order to make out a viable free-speech retaliation claim. *Id.* at 1261-62. But in the Title VII context, a "plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006). And the majority of circuits apply some variation of this test in First Amendment retaliation cases. *See Alston v. Spiegel*, 988 F.3d 564, 575 (1st Cir. 2021) ("[T]he pertinent question here is whether [the employee's] action constituted the kind of action that would deter a reasonably hardy individual from exercising his constitutional rights."); *Specht v. City of New York*, 15 F.4th 594, 604 (2d Cir. 2021) (citation omitted) ("[A]n adverse employment action is one that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights."); *Benison v. Ross*, 765 F.3d 649, 659 (6th Cir. 2014) (citing *Burlington Northern*, 548 U.S. at 68) ("To demonstrate that he has suffered an adverse action, a plaintiff must show that the action would chill or silence a person of ordinary firmness from future First Amendment activities."); *Matrisciano v. Randle*, 569 F.3d 723, 730 (7th Cir. 2009) (requiring a plaintiff to show that "he suffered a deprivation likely to deter free speech"); *Couch vs. Bd. of Trs. Of the Mem. Hosp.*, 587 F.3d 1223, 1238 (10th Cir. 2009) (citing *Burlington Northern* to find that the appropriate standard is whether "specific actions would deter a reasonable person from exercising his First Amendment rights"); *Constantine v.*

16

*Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005) ("[F]or purposes of a First Amendment retaliation claim under § 1983, a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness form the exercise of First Amendment rights"); *Coszalter v. City of Salem*, 320 F.3d 968, 970 (9th Cir. 2003) (the "reasonably likely to deter test" means "an adverse employment action is an act that is reasonably likely to deter employees from engaging in constitutionally protected speech"); *Suppan vs. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000) (using "deter a person of ordinary firmness" standard).

Historically, the Fifth Circuit maintained a rather cramped view of what may qualify as adverse employment action for purposes of free speech retaliation, holding that mere threats are insufficient. *Breaux v. City of Garland*, 205 F.3d 150, 159 (5th Cir. 2000). But the court has since acknowledged that the question of what qualifies as an adverse employment action in the First Amendment context is now open, in light of the Supreme Court's opinion in *Burlington Northern. See Johnson v. Halstead,* 916 F.3d 410, 421 n.5 (5th Cir. 2019) (it is not clearly established whether *Burlington's* standard applies to retaliation for protected speech); *DePree v. Saunders*, 588 F.3d 282, 288 (5th Cir. 2009). "[T]his court has not yet decided whether the *Burlington* standard for adverse employment actions also applies to First Amendment retaliation cases…" *Gibson v. Kilpatrick*, 734 F.3d 395, 400 n.4 (5th Cir. 2013), *judgment vacated on other grounds,* 573 U.S. 942, 134 S. Ct. 2874 (2014).

The Fifth Circuit's opinions in *Halstead, Gibson,* and *DePree* implicitly recognize *Breaux*'s obsolescence. The more reasonable *Burlington Northern* standard thus governs free-speech retaliation cases, as it does in the eight circuits that have confronted the issue. After all, were it legal to retaliate against unwanted speech by threatening someone's pay or job, censorial officials would do so, reasonably calculating that most employees would rather keep quiet than take the chance.

Under *Burlington Northern*'s common-sense test, Defendants' threats to reduce Lowery's pay and end his Salem Center affiliation suffice to constitute adverse actions for purposes of free-speech retaliation. Lowery is not overreacting. He did not silence himself for no reason. Such threats would clearly deter any reasonable employee in Lowery's shoes from expressing himself, and they are now in fact actively deterring him from speaking.

> D.   Defendants have removed part of Lowery's job duties by
>       preventing him from commenting on university affairs

Effectively, Defendants have already taken an ultimate adverse employment action against Lowery by removing his ability to comment on university affairs and participate in the university's intellectual life on a basis equal to his peers'. As in *Jackson,* where the district court found that it was sufficient that the plaintiff was "de facto removed from the Journal in retaliation for the symposium's criticisms of Professor Ewell," 2022 U.S. Dist. LEXIS 8684, at *46, Defendants have curtailed Lowery's academic freedom and barred him from fulfilling his full role as a professor. *See also Kessling v. Ohio State Univ.,* No. 2:20-cv-1719, 2022 U.S. Dist.

18

LEXIS 211191, at *52-53 (S.D. Ohio Nov. 21, 2022) (viable speech retaliation claim for threat to withdraw academic appointment, restriction of privileges, and reassignment of duties); *Sassone v. Quartararo*, 598 F. Supp. 2d 459, 466 (S.D.N.Y. 2009) ("diminished job responsibilities" form basis of an adverse employment action).

II.   LOWERY WILL SUFFER IRREPARABLE HARM IF DEFENDANTS' CENSORSHIP IS ALLOWED TO CONTINUE

Lowery has been self-censoring since August 2022. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (footnote omitted). Defendants' threats continue to irreparably harm Lowery.

III.   THE BALANCE OF EQUITIES FAVOR LOWERY

The balancing of the hardships weighs in Lowery's favor. Denying injunctive relief would leave Lowery's First Amendment rights violated. Because Lowery's harm would be irreparable, UT Administrators "would need to present powerful evidence of harm to [their] interests to prevent" Lowery from showing that the threatened injury outweighs any harm UT Administrators would suffer. *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 297 (5th Cir. 2012). Here, Lowery is unable to interact with the public and elected officials on his Twitter account, nor can he fulfill his role as a professor by participating in the campus discourse, without fearing for his job. Some UT Administrators may mask their

displeasure with Lowery's comments by claiming that his actions pose a safety concern. But vague assertions concerning safety "do not constitute 'powerful evidence of harm to its interests.'" *Id.*

IV.  ENJOINING DEFENDANTS' CENSORSHIP IS IN THE PUBLIC INTEREST

It is within the public's interests to protect constitutionally guaranteed rights. *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2013) (citation omitted). "[I]njunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter.*, 732 F.3d at 539 (citation omitted).

V.  THIS COURT SHOULD FOREGO THE BOND REQUIREMENT

The amount of security required under Fed. R. Civ. P. 65(c) "is a matter for the discretion of the trial court." *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (citation omitted). The court has the discretion to require no security at all. *Id.* Lowery presents strong claims of stifled speech. The risk of harm imposed on the UT Administrators for respecting Lowery's free speech rights is nonexistent, and this Court should therefore impose no bond requirement. *See Texans for Free Enter. v. Tex. Ethics Comm'n*, No. A-12-CA-0845, 2012 U.S. Dist. LEXIS 188644, at *21-22 (W.D. Tex. Dec. 6, 2012), *aff'd*, 732 F.3d 535 (5th Cir. 2013) (citation omitted) ("Where the district court determines that the risk of harm is remote, the court has discretion to require only a nominal bond or no bond at all.").

CONCLUSION

This Court should grant Lowery's motion for preliminary injunction.

Respectfully submitted,

  *s/Stephanie M. Brown*
Stephanie M. Brown
State Bar No. 24126339
Endel Kolde
(admission pending)
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW
Suite 801
Washington, D.C. 20036
Tel: (202) 301-1664
Fax: (202) 301-3399
sbrown@ifs.org
dkolde@ifs.org


*Attorneys for Richard Lowery*

Dated: February 17, 2023

  *s / Michael E. Lovins*
Michael E. Lovins
State Bar No. 24032555
LOVINS | TROSCLAIR, PLLC
1301 S. Cap. Of Texas
Building A Suite 136
Austin, Texas 78746
Tel: 512.535.1649
Fax: 214.972.1047
michael@lovinslaw.com

CERTIFICATE OF SERVICE

I hereby certify that that I served this motion on all defendants via email to Adam Biggs with the UT Office of the Vice President of Legal Affairs, who agreed to accept service on their behalf, including a SharePoint folder containing all supporting declarations and exhibits.

Executed under penalty of perjury on Feb. 17, 2023.

 *s/Stephanie Brown*

22