# Exhibit 10



Home › Policy Library

UT System Policy Library

Policy Library     UTS Policies     HOP     Disposition     Contact

# UTS 138 Gift Acceptance Procedures

## Sec. 1 Purpose

Private sector support is critical to The University of Texas System. Contributions from individuals, foundations, corporations, and other entities are vitally important to the fulfillment of the institution's mission and to the provision of high-quality educational opportunities. The purpose of these procedures is to clarify and facilitate the process for making gifts to the U. T. System and the U. T. institutions (collectively referred to hereafter as "U. T.").

## Sec. 2 Procedures

As authorized by the Board of Regents' Rules and Regulations, Rule 60101 these procedures are designed to outline administrative processes associated with the acceptance, administration, and investment of gifts processed or administered by the Office of External Relations, Communications, and Advancement Services (OERCAS), as the designee of the Vice Chancellor for External Relations, Communications, and Advancement Services in a prudent and efficient manner, with fundamental fiduciary responsibilities kept firmly in mind. These procedures also cover gifts given for current purposes, including gifts of securities, gifts of family limited partnerships, bequests, trust distributions, personal property, life insurance and retirement plan assets. These procedures are also intended to ensure that staff members are able to function in a timely, effective, and professional manner in the context of institutions that are engaged in energetic and comprehensive fundraising efforts. When these procedures do not indicate an appropriate course of action or if they are inappropriate in light of all aspects of a specific situation, staff members are directed to consult with the relevant offices as outlined in these procedures to establish an appropriate course of action.

Item 3 provides definitions for terms used throughout the Gift Acceptance Procedures.

The Acceptance of Gifts Conforming to Policy Matrix summarizes the review and acceptance process.

## Sec. 3 Responsibility to Donors

3.1 Donor's Expectations.  U. T. staff should make reasonable efforts to be aware of and sensitive to donors' expectations.

3.2 Legal and Professional Advice.  U. T. representatives shall not provide legal and/or tax advice and will advise all prospective donors in writing to seek such advice from their own counsel and professional consultants. Each U. T. representative should be knowledgeable about gifts and should disclose to the donor advantages and disadvantages that could reasonably be expected to influence the decision of the donor to make a gift to U. T. In particular, planned gift items that may have adverse tax implications to the donor or are subject to variability (such as market value and income payments) should be discussed fully.

3.3 Donor's Best Interests.  U. T. will not knowingly accept a gift that it believes to be contrary to the donor's best interests and there must be a reasonable expectation that accepting the gift will ultimately benefit U. T.

## Policy Details

**Responsible Office(s)**
External Relations, Communications and Advancement Services

**Date Approved**
MARCH 21 2005

**Dates Amended or Reviewed**
APRIL 1 2009
OCTOBER 6 2011
OCTOBER 4 2012
MAY 8 2013
NOVEMBER 11 2014
JUNE 28 2016
APRIL 21 2017

**Contact Information**
Office of External Relations, Communications, and Advancement Services

### Related Information

**Relevant System Policies, Procedures, and Regents' Rules**
Rule 60101: Acceptance and Administration of Gifts
Rule 60103: Guidelines for Acceptance of Gifts of Real Property
Rule 60202: Endowed Academic Positions, Endowed Student Support, and Other Endowments
Rule 70301: Matters Relating to Interests in Real Property
Rule 80103: Solicitation
Rule 80307: Naming Policy
UTS 122 Guidelines for Web Site Solicitations
UTS 161 Environmental Review for Acquisition of Real Property

3.4 Appraisals and Valuations.  U. T. will not furnish property appraisals or valuations to donors for tax purposes or any other purpose. U. T. will not knowingly participate in a transaction in which the value of a gift is inflated above its true fair market value to obtain a tax advantage for a donor.

3.5 Written Acknowledgment and Disclosure.  In accordance with best stewardship practices and the provisions of the Internal Revenue Code of 1986, as amended (the "Code"), and related regulations, U. T. will provide a timely written statement or acknowledgment of a donor's contribution that includes the institution's name; amount of cash contribution or description (but not value) of non-cash contribution; and a statement that no goods or services were provided by the institution in return for the contribution (if that was the case) or description and good faith estimate of the value of goods or services, if any, the institution provided in return for the contribution. The U. T. System and the U. T. institutions are agencies of the State of Texas and are described in Sections 170(b)(1)(A)(v) and 170 (c)(1) of the Code. Contributions to the U. T. System and the institutions are deductible by donors under Section 170 of the Code provided such contributions are made exclusively for public purposes. Gifts or grants that must be given to a 501(c)(3) organization may be made to The University of Texas Foundation, Inc.

3.6 Tax Filing.  In accordance with the provisions of the Code, and related regulations, proper gift records will be kept and required tax returns filed by the OERCAS for all gifts processed and/or administered by the OERCAS, as designee of the Vice Chancellor for External Relations, Communications, and Advancement Services. The Vice Chancellor for External Relations, Communications, and Advancement Services or the Vice Chancellor's designee(s), or, with respect to real property, the Executive Director of Real Estate, shall execute all necessary Internal Revenue Service (IRS) forms that relate to gifts processed or administered by the OERCAS, including IRS Forms 8283 and 8282. Forms 8283 and 8282 will otherwise be executed by the Chancellor or the appropriate officer at the beneficiary institution.

3.7 Confidentiality.  U. T. staff will adhere to strict confidentiality with regard to any information, records, and personal documents pertaining to donors and gifts. All gift records will be released only when authorized by the donor or as required by law. A limited exception to the disclosure of the name of the donor is provided in Section 552.1235 of the Texas Government Code.

3.8 Anonymity.  U. T. shall respect the wishes of donors wishing to support U. T. anonymously and will take reasonable steps to safeguard those donors' identities.

## Sec. 4 Review and Acceptance of Proposed Gifts

4.1 Authority to Accept Gifts.  The authority to accept gifts to U. T. is vested in the Board of Regents of The University of Texas System (Board) and delegated by the Board as specifically set out in Board of Regents' Rules and Regulations, Rule 60101.  Except as provided in Rule 60101 or any other Rule in the Regents' Rules and Regulations or approved institutional policies, no member of the staff of any U. T. institution has the authority to accept gifts. All gifts must be made payable or placed in the name of the Board, The University of Texas System or a U. T. institution as applicable. Gifts made payable to a U. T. employee are not deductible as a charitable contribution and benefit the employee personally, not U. T.

4.2 Designate a High Level Responsible Receipt Party.  The President of each U. T. institution and the Vice Chancellor for External Relations, Communications, and Advancement Services must appoint a Designated Receipt Executive. It is anticipated the Designated Receipt Executive will usually be the Chief Development Officer of each institution. The Designated Receipt Executive may designate another staff member to assume day-to-day responsibility for the receipting process. Each institution must develop written receipt procedures. The Designated Receipt Executive shall ensure all gift receipts are handled in accordance with the receipt procedures set out by each institution without exception.

4.3 Procedures.  The institutions shall submit for consideration gifts to be processed or administered by the OERCAS to the OERCAS as soon as practical, following the procedures outlined below. Prior to acceptance by the OERCAS, the OERCAS must review all gift assets processed or administered, other than cash or marketable securities. Such review will be done in conjunction with other U. T. System Administration offices and, as appropriate, with The University of Texas Investment Management Company (UTIMCO) or other financial managers authorized by the Board. Each proposed gift shall be reviewed to determine whether it should

**Related Forms**

For assistance with a gift, naming, or endowment template, please reach out to Andria Brannon.

**Relevant Federal and State Statutes**

Internal Revenue Code of 1986, as amended

Texas Education Code Section 65.36(f) Donations for Professorships and Scholarships

Texas Government Code Chapter 552 Texas Public Information Act

Texas Property Code Chapter 163 Management, Investment, and Expenditure of Institutional Funds

be accepted, including consideration of any required cash expenses, liabilities, contingent liabilities, unrelated business income taxes, donor requirements that may result in risk of loss, and other sources of funds available to cover expenses and liabilities. This review process shall determine whether the economic risks are appropriate prior to acceptance of the gift. Examples of assets requiring review include limited partnership interests, stock of closely-held corporations, stock of S Corporations, stock options, warrants, and intellectual property.

4.4 Unrelated Business Income Tax.  Assets to be processed or administered by the OERCAS that create potential unrelated business income tax liability must be reviewed by the OERCAS and the institution's chief business officer (CBO) in conjunction with UTIMCO for economic implications and by the Office of General Counsel (OGC) for legal implications.

4.5 Real Property.  Gifts of real property shall comply with the Board of Regents' Rules and Regulations, Rule 60103, Guidelines for Acceptance of Gifts of Real Property and the U. T. System Environmental Review for Acquisitions of Real Property, UTS161. These and additional documents may be found on the Real Estate Office's (REO's) website at http://www.utsystem.edu/reo.

4.6 Signatures.  Any gift agreement or other gift documentation to be signed by a representative of the Board shall be signed by a properly delegated representative, after review of the gift as provided in these procedures and any applicable institutional policy.

4.7 Institutional Policies.  The presidents of the institutions must develop and implement Handbook of Operating Procedures policies consistent with these procedures for the review and acceptance of gifts for which responsibility for acceptance has been delegated to presidents.

4.8 Nonconformance with Procedures.  Recommendations regarding the acceptance of gifts or other actions that do not conform to these procedures shall be made through the Vice Chancellor for External Relations, Communications, and Advancement Services to the Board after review by appropriate offices of the terms of the gifts, the nature of the donated assets, and/or the requested action.

## Sec. 5 Gift Counting Guidelines

U. T. will comply and all gifts will be counted in accordance with Council for the Advancement and Support of Education ("CASE") gift counting guidelines as published in the CASE Reporting Standards & Management Guidelines for Educational Fundraising, 4th edition, and subsequent editions. Before entering into a capital campaign, a U. T. institution must develop written campaign counting guidelines, which conform to CASE. U. T. System will follow CASE standards as the official guide for campaign counting and for reporting progress to CASE and to the public toward institutional campaign goals. This will allow for parity when measuring performance against institutional peers involved in campaigns.

## Sec. 6 Gift Processing

6.1 Cooperation.  Institution business offices and development offices, the Office of Academic Affairs (OAA), the Office of Health Affairs (OHA), the Office of Business Affairs (OBA), the REO, University Lands (UL), the OERCAS, and the OGC will cooperate as necessary to process proposed gifts promptly.

6.2 Valuation.  Gifts are valued as of the date transferred to the Board in accordance with the provisions of the Code and applicable regulations. The amount received from the sale of a noncash gift may be more or less than the value of the gift.

6.3 Real Property.  Gifts of real estate must be reviewed and evaluated by the REO and/or UL as provided in the Board of Regents' Rules and Regulations, Rule 60103, Guidelines for Acceptance of Gifts of Real Property.

6.4 Securities.  Gifts of securities that are donated to an institution must be reviewed and processed by the OERCAS. The Board of Regents' Rules and Regulations authorize only certain U. T. System Administration and UTIMCO personnel to purchase, exchange, sell, assign, and transfer securities on behalf of the Board. No other person or entity may execute or instruct others to execute a transaction involving any securities in the name of the Board. When securities are to be given to an institution, the institution shall contact the OERCAS

immediately for instructions, even if the gift is for current purpose use at the institution. For current purpose gifts, sale proceeds will be transferred to the institution after receipt and processing by the OERCAS.

Sale of the security will take place as soon as possible after the transfer. The OERCAS will notify the institution of the receipt and sale of securities as early as practicable. Acknowledgment of the gift shall be provided to the donor by the institution that the gift benefits, and will be in compliance with the provisions of the Code and regulations thereunder.

6.5 Gifts of Closely-Held Stock.

(a) An effort should be made to obtain nonbinding repurchase provisions when the gift involves securities for which the donor or related parties are the primary market.

(b) To the extent applicable, the following criteria, in addition to those outlined in Section 6.4 above, must be met for the OERCAS to approve or accept gifts of closely-held stock:

- The OERCAS must assure there is a written gift agreement indicating the donor's intent to make the gift and its purpose.
- Prior to acceptance, the donor must provide to the OERCAS financial and valuation information on the stock, including appraisals and/or statements of value.
- Copies of any applicable shareholder agreements and buy-sell agreements must be provided by the donor for review by the OERCAS, the OGC, and UTIMCO, especially those that include any restrictions on the transfer of the stock, i.e., rights of first refusal, formulas for determining stock price.
- The donor must provide to the OERCAS a written copy of any related offer to purchase the stock, including the purchase price per share.
- The ownership of the stock must be properly assigned by the donor to the Board.

6.6 Gifts of Interests in Limited Partnerships.

(a) The OERCAS or the institution's president, as appropriate, may accept gifts of interests in limited partnerships, subject to a thorough analysis of all available information by the OERCAS, with the assistance and advice of the institution's CBO, the OGC, and UTIMCO. At a minimum, the U. T. System Administration should receive copies of the limited partnership agreement, the proposed assignment of interest, and financial documentation sufficient to describe the assets of the partnership and their valuation.

(b) The OERCAS, the OGC, the CBO, and UTIMCO will analyze a proposed gift of an interest in a limited partnership to confirm that there is a real benefit to be derived by the institution that is commensurate with any potential risks and costs associated with the gift. Among the factors that will be considered are the following:

- The donor's relationship to the institution designated to benefit from the gift, the history of demonstrable charitable intent, and whether the limited partnership is merely a tax accommodation for the donor.
- Administrative obligations to be assumed by the U. T. System, such as monitoring the partnership for unrelated business income tax.
- Guaranteed annual distribution from the partnership interest sufficient to U. T. to justify the administrative costs or a cumulative payment made in the form of a preferred return before distributions to other partners at the termination of the partnership.
- Whether the partnership agreement provides for a defined distribution/ termination event or date.
- Whether the U. T. System has any obligation to make capital contributions to the partnership.
- Whether the U. T. System would be held liable for debts of the partnership.
- Whether the partnership appears to be adequately capitalized in light of its activities and maintains liability insurance.

(c)  All confidentiality requirements must allow release of information as required by the Texas Public Information Act.

(d) The U. T. System should receive a full accounting for the partnership annually, as well as copies of any tax returns filed or required to be provided to partners pursuant to the Internal Revenue Code.

6.7 Gifts of Interests in General Partnerships or Joint Ventures. U. T. will not accept interests in general partnerships or joint ventures due to the State constitutional limitations on incurring State debts and the risk of future liability or debt.

6.8 Gifts of Personal Property (Other than Outdoor Works of Art). Gifts of personal property, other than outdoor works of art, donated to an institution must be reviewed for approval and processed by the OERCAS prior to acceptance only if used to establish or make additions to an endowment or charitable remainder trust. Gifts of outdoor works of art must comply with Board of Regents' Rules and Regulations, Rule 60101, Section 4.1.

6.9 In some instances, gifts are made to U. T.-affiliated external entities for benefit of the U. T. System Administration or a U. T. institution. Such gifts include charitable gift annuities, those that must be given to a 501(c)(3) organization, or others that the Board, as a state agency, cannot accept or process. Such gifts must be handled exclusively by the external entity, from deposit of the funds to acknowledgment. Any gift agreement, receipt or other gift documentation must be signed by an authorized representative of the external entity. No member of the staff of any U. T. institution has the authority to accept gifts made to an external entity.

## Sec. 7 Current Purpose Gifts

In general, current purpose or expendable gifts are accepted by the institution president, or his/her designee, or by the Chancellor, or his/her designee, for such gifts made to U. T. System Administration. Exceptions include, but are not limited to, marketable and closely-held securities, partnership interests, and real property. These gifts must be reviewed, evaluated, and processed by the appropriate U. T. System office as set out in Sections 4 and 6. Current purpose gifts of real property are accepted by the Executive Director of Real Estate. Gifts of securities are accepted by the OERCAS via delegated authority from the respective institution president. For further information regarding the acceptance process for current purpose gifts, please contact the OERCAS.

## Sec. 8 Gifts of Personal Property

U. T. may consider gifts of personal property, which can be tangible or intangible. Gifts of personal property, other than outdoor works of art, given for current purpose use are accepted by the U. T. institution president, or his/her designee. Exceptions include, but are not limited to, marketable and closely-held securities and limited partnerships, which must be reviewed, evaluated, and processed by the appropriate U. T. System office. In addition, the OERCAS have exclusive authority to handle matters related to estates and trusts, including those that provide for a current use gift for a U. T. institution.

The Development or University Advancement Office at each U. T. institution must be made aware of all personal property gifts, also known as gifts-in-kind. The president or chief development officer shall provide instructions to staff campus-wide regarding proper procedures for handling gifts of personal property. The U. T. institution must agree to be responsible for any carrying costs associated with the gift (e.g., the cost of insuring a gift of art that will be retained).

The IRS requires that donors seeking to claim a charitable tax deduction for a personal property gift with a fair market value in excess of $5,000 obtain a qualified appraisal. To avoid any conflict of interest, a U. T. institution can neither pay for nor reimburse a donor for his or her appraisal costs. The qualified appraisal must be completed no earlier than 60 days prior to the date of the gift and must be received no later than the date of the filing of the donor's gift tax return for the year of the gift. If no appraisal is required for the donor's purposes, a U. T. institution may seek its own independent appraisal of the property. In such case, the U. T. institution will bear all costs of the appraisal for U. T. institution purposes only.

Appraisals are not required for gifts of $5,000 and less, but the donor may obtain a qualified appraisal if he or she chooses. The institution may value the gift based on the donor's appraisal, a value declared by the donor (a copy of either a paid bill of sale or invoice and a copy of a check or credit card statement showing payment is recommended), or a value determined by a qualified expert on the faculty or staff of the institution. This value should be used for the institution's purposes only.

IRS Form 8283, Noncash Charitable Contributions, is required to be submitted to the donee organization for signature when the donation is greater than $5,000 and consists of property other than publicly traded securities. It is the responsibility of the donor to complete all applicable sections of the form except for the Appraiser and Donee acknowledgement sections. Once the donor has completed the applicable sections, the form should be submitted to the appropriate U. T. institution officer, as set out in the U. T. institution's Handbook of Operating Procedures, for completion of the Donee acknowledgement section.

IRS Form 8282, Donee Information Return, is required to be completed by a donee that sells or disposes of a non-cash gift within three years of the receipt of the donation by the organization. This includes any donated property (other than money or publicly traded securities) if the claimed donation value exceeds $5,000 per item or group of similar items donated by the donor to one or more donee organizations.

The term "gift-in-kind" is generally used for personal property, both tangible and intangible, that will be retained and used by a U. T. institution, rather than sold. Retained property must complement the core mission of the U. T. institution. Gifts in kind shall be valued at their full fair market value. Gifts with fair market values in excess of $5,000 will be reported at the values placed on them by qualified independent appraisers as required by the IRS. Gifts of $5,000 and under may be reported at either the value declared by the donor or the value placed on them by a qualified expert on the faculty or staff of the U. T. institution. If a price is not determined, the value shall be recorded at $1.

Examples of tangible assets include, but are not limited to:

- personal collections of art, books, coins or movies;
- animals, such as livestock;
- cars, boats and aircraft;
- equipment;
- developed software;
- printed materials; and
- food or other items for hosting dinners.

Examples of intangible assets include, but are not limited to, various intellectual property such as:

- patents;
- copyrights of cultural, artistic and literary works; and
- computer software under development.

For equipment and software gifts, report the educational discount value if one is offered, i.e., the value the U. T. institution would have paid had it purchased the item outright from the vendor. Many software donations are licenses and are not considered as gifts. The U. T. institution must ascertain whether the software is a gift, partial interest or exchange transaction according to the IRS. Partial interests and exchange transactions are not gifts and, therefore, are not countable/reportable. A donor must irrevocably transfer ownership of the property to a U. T. institution for the property to be considered a gift.  Gifts of hardware and software may only be counted if they are irrevocable.

## Sec. 9 Gifts to Establish Permanent Endowments Held and Administered by the Board of Regents

Endowments will be established with gifts that have been completed for tax purposes or with a combination of such gifts, pledges, and other funds at a minimum funding level of $10,000. Endowments may be established to fund scholarship programs and other educational activities as well as the endowed academic positions specified in the Board of Regents' Rules and Regulations, Rule 60202 concerning endowed academic positions. All endowments must be reviewed and approved by the OERCAS and must meet minimum funding levels as set out in Board of Regents' Rules and Regulations, Rule 60101 and Rule 60202. With the approval of the appropriate Executive Vice Chancellor and Vice Chancellor for External Relations, Communications, and Advancement Services, each institution may set minimum funding levels that are higher than those set by the Board. The required minimum funding level will be determined by the total value of gifts from donors and transfers of funds, valued as of the gift date or date of transfer, respectively. Reinvestment of endowment distributions, which would be considered a transfer of funds, may be used to determine the total funding value.

Example:  A donor contributes $20,000 a year for five years to fund a professorship at a total contribution value of $100,000. At the end of the five-year period, the endowment may have reached a market value of $250,000 due to capital appreciation. However, the contributed value remains at $100,000. This endowment cannot be redesignated as a distinguished professorship until the contribution amount reaches $250,000 from additional gifts or transfers of funds.

Negotiations and fundraising for an endowment are permitted prior to its formal approval and establishment by the Board or its designee(s). However, an endowment will not be announced as having been established prior to its approval by the Board or its designee(s). New endowments shall not be created and existing endowments shall not be increased using accumulated distributions from existing permanent endowments. However, under rare and special circumstances, such distributions may be used to create or add to an endowment with the approval of the Vice Chancellor for External Relations, Communications, and Advancement Services, provided the terms of the new endowment(s) are consistent with the terms of the endowment agreement governing the existing endowment.

9.1 Endowment Agreements.

(a) A written endowment agreement signed by the donor(s) is required for each new permanent endowment established. (See Item 5 for sample endowment agreements.) This instrument must, absent compelling reasons, include the following language:

- donor name(s);
- gift description and/or amount;
- pledge description, amount, and due date;
- endowment name;
- college, school, and/or department to benefit;
- a statement setting out the intended use or purpose for funds distributed from the endowment;
- a statement that the funds shall never become a part of the Permanent University Fund, the Available University Fund, or the General Fund of the State of Texas;
- a statement that, in the opinion of the Board, if (a) a restriction contained in the endowment has become impractical or wasteful, or it impairs the management or investment of the fund, or, because of circumstances not anticipated by the donor, a modification of the restriction will further the purposes of the fund or (b) a restriction contained in the endowment on the use of the fund becomes unlawful, impracticable, impossible to achieve, or wasteful, the Board may modify the restriction or purpose of the endowment to further the purposes of the fund in a manner consistent with the original charitable purpose expressed in the endowment;
- a statement providing that all future additions to the endowment, including those made by the Board or the institution administration, shall be subject to the provisions of the endowment agreement and shall be classified as permanent endowment funds; and
- other provisions the responsible development officer and the OERCAS determine are necessary or appropriate.

(b) In cases where an endowment is established pursuant to an institution's solicitation or campaign, the solicitation letter or document sent to prospective donors may be used as the endowment agreement to evidence the donative intent and purposes. If the solicitation materials do not contain the provisions required in bulleted paragraphs above, a separate gift agreement memorandum containing the required provisions and signed by the appropriate institution representative should be provided to the OERCAS by the U. T. personnel responsible for the solicitation.

(c)  A gift agreement memorandum should also serve as the endowment agreement in situations where funding is from multiple donors with no primary donor or donors. (See Item 5 for a sample endowment agreement entitled "Newly Created Endowment with Multiple Donors.")

9.2 Custody of Assets.  The assets donated to fund a new endowment may be delivered to the OERCAS or UTIMCO for custody and investment by UTIMCO pending acceptance. A request for acceptance of the endowment should be submitted to the OERCAS by the institution as soon as possible after delivery of the assets. Once an endowment has been officially established, the donated assets must be delivered to the OERCAS or UTIMCO as soon as possible for custody and investment by UTIMCO.

9.3 Selection Criteria for Scholarship and Fellowship Recipients.

(a) A donor may specify or require that

- the scholarship or fellowship be for institution-wide use;
- the recipient be registered in a particular college, school, or department within the institution or the recipient be limited to students studying in a specific academic major or a certain area of study or concentration;
- the recipient have a specified class standing or have completed a specified number of semester hours of college work;
- consideration of recipients be conditioned on academic performance;
- consideration of recipients be based on financial need;
- a preference be exercised in association with the renewal of the award;
- recipients be students from a particular geographic area (city, school district, county, or state). The population of U. T. students from the named geographic area should be large enough to allow for consistent use of the scholarship and to avoid an allegation that the funds were "targeted" to a particular individual or individuals;
- the recipient be a U.S. citizen or legal resident of the United States. Any gift to be designated for U.S. citizens must also include permanent residents as federal courts have ruled that state entities must give equal consideration to U.S. citizens and to individuals admitted to permanent residency; or
- recipients have received part or all of their preparatory education from a particular geographic area or region outside of the U.S. It is generally illegal to give or deny benefits based on a person's national origin. Therefore, requiring recipients to be from a particular country is not permissible.

(b) If consistent with the Board of Regents' Rules and Regulations, U.S. Department of Education regulations, Office of Civil Rights recommendations, and interpretations of the Texas Higher Education Coordinating Board, the donor may specify certain other selection criteria as a preference for recipient selection, but not as a restriction. U. T. will make reasonable efforts to honor preferences specified by a donor as provided in this paragraph; however, as provided by applicable law, no person shall be excluded from participation in, denied the benefits of, or be subject to discrimination under, any program or activity sponsored or conducted by the U. T. System Administration or any U. T. institution, on the basis of race, color, national origin, religion, sex, age, veteran status, or disability. It is not appropriate to provide scholarships based on a student's position on a political or social issue.

(c) Endowed scholarship or fellowship awards should be based on the funds distributed from the endowment, rather than a specific amount. The size and number of awards will be determined by the appropriate scholarship committees at the institution or under the scholarship program applicable to the endowment. Scholarship or fellowship amounts may also be referred to in more general terms such as "tuition and required fees" in the endowment agreement.

(d) The IRS will not recognize a contribution for charitable tax deduction if the donor retains control over the gift funds or how they are used. In accordance with that understanding, the donor may not participate in the final selection of scholarship recipient(s), name a non-U. T. employee to any final selection committee, or structure the criteria so narrowly as to limit selection to a small population comprised solely or primarily of individuals related to the donor or that the donor would choose. In rare and special circumstances, such as gift funds contributed by a foundation, an exception to this provision may be granted by the Vice Chancellor for External Relations, Communications, and Advancement Services.

9.4 Endowed Academic Positions.  There are six categories of endowed and named academic positions with minimum funding levels as set forth in Board of Regents' Rules and Regulations, Rule 60202. With the specific approval of the Board, an endowed academic position may be established without the required minimum funding level only in accordance with agreements recommended by the Chancellor, the appropriate Executive Vice Chancellor, and the Vice Chancellor for External Relations, Communications, and Advancement Services.

No initial appointment will be made to an endowed academic position without prior approval as a Request for Budget Change by the president of an institution after review and approval by the appropriate Executive Vice Chancellor. Subsequent new or continuing appointments to

endowed academic positions may be approved as a part of the annual operating budget. As the IRS will not recognize a contribution for charitable tax deduction if the donor retains control over the gift funds or how they are used, a donor may not participate in the final selection of the appointment or name a specific individual as the holder of an endowed academic position. In rare and special circumstances, such as gift funds contributed by a foundation, an exception to this provision may be granted by the Vice Chancellor for External Relations, Communications, and Advancement Services.

9.5 Pledge Policy.  Pledges from donors that follow these procedures may be accepted to fund endowments of any level recognized by the Regents' Rules and Regulations.

   (a) At least 20% of the donor's total required minimum funding amount prior to the acceptance of an endowment must be received prior to the acceptance of an endowment, i.e., before the endowment will be established.

   (b) The pledge for payment of the remaining required minimum funding shall not extend beyond five years after the date of execution of the endowment agreement; however, with the approval of the Vice Chancellor for External Relations, Communications, and Advancement Services, the pledge period may be longer than five years under rare and special circumstances. A pledge for any amount beyond the required minimum funding is not bound to a five-year pledge period. As an example, for an endowed scholarship that is fully funded with a $25,000 gift, an additional $75,000 pledge may be extended reasonably longer than five years.

   (c)  All funds that otherwise would be distributed from the endowment will be reinvested as a permanent addition to the endowment until the endowment is funded with the then required minimum funding level for the endowment or is dissolved as provided in Section 8.5(e) below, except in the case of endowed academic positions with the approval of the Vice Chancellor for External Relations, Communications, and Advancement Services or the Vice Chancellor's designee.

   (d) Funding levels will not be determined by the amount of net sale proceeds received from a noncash gift or by the current market value of the investment held in an endowment. As an illustration, a donor gives a gift of stock valued at $10,000 to create a new endowment. The stock is sold for net sales proceeds of $9,500. The $10,000 endowment may still be created because the donor contributed a gift valued at $10,000, although the endowment's value is only $9,500.

   (e) If the donor is unable to fulfill the pledge by the end of the five-year period, the institution shall notify the OERCAS to determine an appropriate course of action. Typically, the endowment will either be dissolved or redesignated as follows:

* If there are insufficient funds held in the endowment to reach the minimum funding level required for an endowment, the endowment may be dissolved by the Board or its designee(s) and the president of the beneficiary institution shall have the discretion to designate an existing endowment to which to transfer the funds, or expend the funds for the general purposes of the institution, taking into consideration the original intent.
* If there are sufficient funds held in the endowment to reach the minimum endowment funding level for an endowment, but insufficient funds to reach the required funding level for the endowment as originally established, the endowment may be redesignated to the highest level of endowment category possible based upon the book value of funds held and the original intent, with the approval of the Board or its designee(s)

9.6 The IRS will not recognize a contribution for charitable tax deduction if the donor retains control over the gift funds or how they are used. In accordance with that understanding, the donor may not be given any control over the management or distribution of, or any other matters concerning said endowments. In rare and special circumstances, such as gift funds contributed by a foundation, an exception to this provision may be granted by the Vice Chancellor for External Relations, Communications, and Advancement Services.

## Sec. 10 Establishment of Quasi-Endowments Held and Administered by the Board of Regents

All quasi-endowments must be reviewed and approved by the OERCAS and must meet minimum funding levels as set out in the Board of Regents' Rules and Regulations, Rule 60101 and Rule 60202. The required minimum funding level will be determined by the total value of

transfers of funds to the endowment, valued as of the date of transfer. Reinvestment of endowment distributions may be used to determine the total funding value. An endowment will not be announced as having been established prior to its approval by the Board or its designee(s). New endowments shall not be created and existing endowments shall not be increased using accumulated distributions from existing permanent endowments. However, under rare and special circumstances, such distributions may be used to create or add to an endowment with the approval of the Vice Chancellor for External Relations, Communications, and Advancement Services, provided the terms of the new endowment(s) are consistent with the terms of the endowment agreement governing the existing endowment.

A written agreement, signed by the institution's president or the appropriate dean or department head, is required for each new quasi-endowment established. (See Item 5 for a sample endowment agreement entitled "Newly Created Quasi Endowment.") This instrument will, absent compelling reasons, include the following language, as applicable:

- information and provisions described in Section 8.1; and
- amount and source or description of the funding. Funds must be identified as either restricted or unrestricted.

## Sec. 11 Classification of Endowment Funding

11.1 Permanent and Quasi-Endowments.  When mixed sources of funds (both gifts given specifically for endowed purposes and current funds) are used to establish an endowment, separate but related permanent and quasi-endowments will be created. (See Item 5 for a sample endowment agreement entitled "Newly Created Quasi/Perm Endowment.") Each endowment account must be funded with at least the minimum endowment funding level of $10,000, (i.e., there would need to be at least $20,000 total to establish separate endowment accounts). If the endowment is initially funded with less than $20,000 from mixed sources (both endowed and current funds), the entire endowment will be classified as a permanent endowment. When funding permits, a separate but related quasi-endowment shall be created.

11.2 Additional Contributions.  If only a permanent endowment account is in existence at the time of an additional contribution to an endowment established with mixed sources of funds, the institution will review the source(s) and amounts of funds to be added to determine if a separate, but related quasi-endowment account should be established. Administrative approval of the related quasi-endowment is not needed if there is no re-designation of endowment level or other amendment. Alternatively, if only a quasi-endowment is in existence at the time of an additional contribution, administrative approval of a related permanent endowment is not needed if there is no re-designation of endowment level or other amendment.

11.3 Additional Contributions to Separate Accounts.  If separate permanent and quasi-endowment accounts exist at the time of an additional contribution, the institution will review the source(s) of funds to determine the correct allocation.

11.4 Transfer of Current Funds.  When a transfer of current funds is to be combined with a donor's pledge, the OERCAS will consider the total of the donor's pledge, rather than the amounts of payments received, to determine whether separate permanent and quasi-endowment accounts should be established.

11.5 Reinvestment of Distributions.  Any reinvestment of endowment distributions will be classified in the same manner as the corpus of the endowment.

11.6 Permanent Endowment Funds.  Notwithstanding any of the above, any additional funds from any source will be classified as permanent endowment funds where the existing permanent endowment is governed by a donor-executed endowment agreement that contains language that "all future additions to the endowment, made by the donor or others, including those made by the Board of Regents or the institution, shall be subject to the provisions of the endowment agreement and shall be classified as permanent endowment funds."

## Sec. 12 Investment, Payout, and Reinvestment Policy for Endowments

12.1 UTIMCO.  As authorized by law, the Board has contracted with UTIMCO to invest all funds donated to U. T. that are under the sole control of the Board.

12.2 Investment Restrictions.  No matching funds or other funds of U. T. may be held or managed by a party selected by the donor. No endowment shall be accepted in which the donor directs the investment transactions or holdings or may approve investment policy or strategy or on which the donor places any other investment restrictions.

12.3 Standard for Investment Decisions.  The primary and constant standard for making investment decisions for endowments shall be "that standard of judgment and care that prudent investors, exercising reasonable care, skill, and caution, would acquire or retain in light of the purposes, terms, distribution requirements, and other circumstances of the fund then prevailing taking into consideration the investment of all the assets of the fund rather than a single investment."

12.4 Collective Investments.  All endowment gifts should be eligible for commingling for investment purposes with other endowment funds. The Board has established the U. T. System Long Term Fund, governed by and invested according to the U. T. System Long Term Fund Investment Policy Statement, to provide for the collective investment of endowment funds. This commingling permits enhancement of long-term investment programs, affords appropriate risk control through diversification, and provides for optimization of asset mix through time.

12.5 Long Term Fund.  Specific language that allows endowment funds to be invested in the U. T. System Long Term Fund or otherwise pooled for investment purposes should be included in all endowment agreements.

12.6 Agreement Terms.  An endowment agreement shall not include terms regarding endowment payout that conflict with either the payout policies established by the Board or the payout provisions of the Texas Uniform Prudent Management of Institutional Funds Act, as amended.

12.7 Charge of Certain Expenses.  To acknowledge the Board's ability to charge certain expenses against the endowment funds for administration, management, and compliance, the endowment agreement should specify one of the following:

(a) donor(s) acknowledge(s) and agree(s) that in connection with administration and management of the endowment funds, the Board may charge certain expenses against the endowment funds for administration, management, and similar charges; or

(b) the Board may not charge certain expenses against the endowment for administration and management.

12.8 Management of Payout and Reinvestment.  To ensure the Board has the ability to manage payout and reinvestment policies, the endowment agreement should specifically allow the following:

(a) funds distributed during a year may be retained by the institution and expended for the purposes of the endowment in subsequent years; and

(b) the reinvestment of some portion of the payout as a permanent addition to the principal of the endowment at the discretion of the Board or institution's administration.

In rare and special circumstances, such as when gift funds are contributed by a foundation, an exception to these payout and reinvestment policies may be granted by the Vice Chancellor for External Relations, Communications, and Advancement Services.

12.9 Endowments Funded with Mineral Interests in Real Property.  In accordance with the Texas Trust Code and the Uniform Principal and Income Act (UPIA), a certain percentage of mineral royalty proceeds must be allocated to endowment principal. Because complex and numerous depletion calculations would be required to determine the correct amount to allocate to endowment principal and consistent with requirements for the Permanent University Fund, 100% of mineral royalty proceeds, including bonuses, rentals, and royalties, should be allocated to principal for ease of administration. An institution may request a lesser allocation of principal by submitting a written request to the OERCAS. Such request must be reviewed and approved by the UL in consultation with the OERCAS and the OGC.

## Sec. 13 Amendment or Termination of Endowments

13.1 Authorization for Changes. Once a permanent endowment is created, the terms, purpose, or existence of that endowment may be changed only if authorized by the terms of the endowment agreement, Board policy, or applicable laws.

13.2 Review of Amendments. Any request received or initiated by an institution to amend the terms or purpose of a permanent endowment or to terminate an endowment must be sent to the OERCAS for review and approval with the legal advice of the OGC. The OGC will determine whether the endowment may be modified judicially or nonjudicially pursuant to the Texas Uniform Prudent Management of Institutional Funds Act or Texas Education Code Section 65.36(f).

13.3 Requests to amend or terminate a quasi-endowment must be sent to the OERCAS for review and approval. Upon termination of a quasi-endowment, the OERCAS will coordinate the disbursement of the endowment's proceeds with UTIMCO.

## Sec. 14 Endowments Held and Administered by External Trustees

U. T.'s interest in any endowment held and administered by an external trustee must be reviewed and approved by the OERCAS.

In addition to provisions set out in Sections 8, 9 and 12 above, to the extent practicable, the Board requires the following for endowments held and administered by external trustees.

14.1 Endowment Agreements. A written endowment agreement signed by the donor(s) is required for each endowment. Endowments held and administered by U. T.-affiliated external foundations must, absent compelling reasons, include language as set out in Section 8.1 above consistent with Board-held endowments.

14.2 Distributions. A predictable stream of distributions from an endowment held by an external trustee, consistent with the Board's endowment payout policy and not in conflict with the payout provisions of the Texas Uniform Prudent Management of Institutional Funds Act, as amended. U. T. System Administration prefers that any U. T. institution receives such payout on a quarterly basis, but no less often than annually.

14.3 Appreciation. That all appreciation from an endowment held by an external trustee be maintained in the endowment, except that distributed for the purpose(s) of the endowment.

14.4 Annual Reports. That the external trustee provides annual reports to the OERCAS that detail the value of the assets of the endowment and the annual receipts and expenditures.

14.5 Accounting Records. That separate accounting records be maintained for each such endowment so that investment performance can be accurately analyzed over time.

14.6 Appointments to Endowed Academic Positions. That all appointments to endowed academic positions be selected by the institution.

14.7 Acceptance of Interest. That a request for acceptance of U. T.'s interest in the endowment be submitted by the institution to the OERCAS as soon as possible after delivery of the gift to the external trustee or notification by the external trustee that the endowment has been established.

## Sec. 15 Planned Gifts

15.1 Solicitation and Negotiation.

    (a) The OERCAS and the OGC must review and approve

- an initial or new advertisement or planned giving brochure; and
- an existing advertisement or planned giving brochure that has been materially modified since last approved by the OERCAS and the OGC to be mailed or otherwise furnished to potential donors before distribution to donors. Minor modifications to existing planned giving advertisements or brochures require review by the OERCAS prior to distribution to potential donors.

(b) Negotiation, execution, and acceptance of any planned gift shall follow procedures outlined in these procedures. All agreements shall include language previously approved by the OGC unless otherwise approved in accordance with the processes set forth in these procedures.

(c)  It is the responsibility of each U. T. representative to keep detailed written notes to supplement written correspondence to demonstrate ethical practices in negotiations with each donor.

(d) The institution's representative working with a donor who desires to make a planned gift shall contact the OERCAS as soon as the institution's representative becomes aware of the potential gift.

(e) Payout rate guidelines for charitable remainder trusts are provided below in Section 15.4(d) for use by all U. T. staff members authorized to enter into negotiations concerning planned gift agreements to assist them during discussions with donors.

(f)  Donors should be informed that payout rate guidelines may be adjusted if market conditions change significantly before an agreement is finalized.

15.2 Restrictions on Acceptance of Planned Gifts and Donated Assets.

(a) In accordance with Texas law, the Board cannot accept gift annuities and deferred gift annuities. Inquiries concerning gift annuities and deferred gift annuities will be referred to appropriate external foundations established to benefit the U. T. System or U. T. institutions.

(b) Consistent with Board policy, the Board may serve as trustee of trusts for which the donor retains the right to change the charitable beneficiary only if:  (a) U. T. System or U. T. institution(s) will receive irrevocably at least 50% of the total funding of the trust; and (b) the value of the U. T. System or institution's irrevocable interest equals the minimum requirements established below in Section 15.4(d) for accounts that cannot be pooled for investment purposes.

(c)  Consistent with Board policy, the Board may serve as trustee of trusts that allow for invasions of principal only if:  (a) the standards for invasion of principal are objective and nondiscretionary; (b) the U. T. System or institution will receive irrevocably at least 50% of the total funding of the trust; and (c) the value of the U. T. System or institution's irrevocable interest equals the minimum requirements established below in Section 15.4(d) for accounts that cannot be pooled for investment purposes. To avoid conflicts of interest, the Board will not serve as trustee of a trust that allows income beneficiaries to invade the principal of the trust at the discretion of the trustee.

(d) Consistent with Board policy, the Board may serve as trustee of a charitable remainder trust with multiple charitable remainder beneficiaries only if:  (a) the U. T. System or institution will receive irrevocably at least 50% of the remainder; (b) the value of the U. T. System or institution's interest will be at least the minimum trust gift levels established below in Section 15.4(d); and (c) the other charities agree to provisions deemed appropriate by the OGC.

As an example, a donor may fund a charitable remainder trust with assets that may not be pooled for investment purposes, such as real estate or restricted stock, name the Board as trustee and a 50% irrevocable remainder beneficiary for further benefit of one or more institution(s), and name a non-U. T. institution(s) as 50% remainder beneficiary(ies). In this instance, the Board would accept trusteeship if the trust terms were acceptable and the trust was funded at a minimum gift level of $100,000.

(e) To avoid conflicts of interest and to avoid liability issues, the Board cannot serve as the guardian of a person, or as an executor or administrator of an estate.

(f)  Consistent with the Code and related regulations, the Board will not accept a planned gift that is known to have the potential to create unrelated business income tax liability for a charitable remainder trust.

(g) In accordance with the provisions of the Code and related regulations, the Board will not accept stock in an S Corporation to fund a charitable trust without the written consent of all other shareholders.

(h) Exceptions to the requirement that the U.T. System or U.T. Institution(s) will receive irrevocably at least 50% of the total funding of the trust that falls under Sections 14.2 (b), 14.2 (c), or 14.2 (d) must be reviewed by the OERCAS and UTIMCO and approved by the Vice Chancellor External Relations. Exceptions related to trusts containing real estate must first be reviewed and approved by the Executive Director of Real Estate.

15.3 Management and Investments.

(a) The OERCAS is not authorized to administer or manage trusts of which the Board is not trustee.

(b) The U. T. System may request reimbursement from charitable trusts of which the Board is trustee for any third party charges incurred by the trust. Such charges may include, but are not limited to, bank custodial fees, real estate expenses such as appraisals, surveys, environmental assessments, maintenance and repairs, and legal fees. In circumstances where it is deemed inappropriate for the affected trust to bear such expenses, the institution shall reimburse the trust. If multiple institutions are involved, then such costs shall be shared pro rata.

15.4 Types of Planned Gifts.

(a) Wills and Bequests.

- When an institution is notified of the death of a person who has named the U. T. System or an institution as a beneficiary, the OERCAS must be notified immediately and forwarded copies of all available documentation and correspondence. If the OERCAS is notified of the death of a person who has named the U. T. System or an institution as a beneficiary, the OERCAS shall promptly notify the beneficiary of the bequest. The OERCAS have exclusive authority to handle matters related to estates benefiting U. T., including authority to sign partial or complete releases of liability, and will be responsible for promptly supplying documentation to other U. T. System Administration offices as appropriate.
- The OERCAS will provide instructions to estate executors and administrators regarding the disposition of estate assets bequeathed to U. T. All estate distributions will be transmitted as directed by the OERCAS. Any tangible personal property not liquidated by the executor should be shipped directly to the institution. Unless otherwise requested by the institution, the OERCAS will promptly transmit any bequests designated for use as current funds to the institution.
- Any U. T. employee who agrees to serve as executor or administrator of an estate that benefits U. T. System or an institution must immediately notify the OERCAS of his or her appointment. Upon notification, the employee will be furnished a statement advising of the potential for conflicts of interest and directing that all communications pertaining to the estate between the employee and any office of U. T. System Administration or the institution shall be in writing.
- Employees of U. T. should not knowingly act as witnesses to wills in which U. T. System Administration or an institution is named as a beneficiary.
- U. T. will not draft wills and other documents for donors, but, when appropriate, may provide sample language for the donor's consideration.
- If an individual provides a copy of the individual's will to a U. T. employee and the will names U. T. System Administration or an institution as a beneficiary, the institution will promptly send a copy of the will to the OERCAS for review. As necessary, and at the discretion of the OERCAS, the OERCAS will furnish copies to the OGC and the institution development office for further review. Any U. T. employee to whom an individual's will is furnished must protect the confidentiality of its contents to the extent allowed by law.

(b) Charitable Remainder Trusts Held and Administered by the Board.

- All charitable remainder trusts for which the Board would be the trustee must be reviewed by the OERCAS, UTIMCO, and the OGC. A charitable remainder trust of which the Board is proposed to be trustee should have no more than two income beneficiaries, the youngest of which is at least 55 years of age. A term charitable remainder trust (not to exceed 20 years) may have income beneficiaries of any age and is not limited to two income beneficiaries.
- If the charitable remainder trust (a) has acceptable terms, (b) is funded with cash or marketable securities, and (c) may be pooled for investment purposes, the trust must be initially funded at a minimum gift level of $50,000.

- If the charitable remainder trust (a) has acceptable terms, and (b) is funded with assets that may not be pooled for investment purposes, the trust must be initially funded at a minimum gift level of $100,000.
- A unitrust with a net income payout or net income with make-up provision payout should be established for trusts funded with assets other than cash or marketable securities. Other acceptable terms depend upon the standard criteria plus the ability and length of time required to liquidate or manage the asset used to fund the trust.
- The Board will not serve as trustee of charitable remainder trusts funded in whole or in part with real property. However, the Board may serve as successor trustee of such a trust after the real estate is liquidated. U. T. staff will recommend that the donor or other individual or external entity serve as initial trustee and may provide information to the donor on non-U. T. institutions in the donor's locale that may serve as trustee.
- The following are the recommended maximum payout rates for charitable remainder trusts for which the Board would be the trustee:

      For annuity trusts and straight unitrusts with income beneficiaries:

| | |
|---|---|
| Ages 55 to 69 | 5% |
| Ages 70 to 79 | 6% |
| Ages 80 and above | 7% |

      For net income unitrusts with income beneficiaries:

| | |
|---|---|
| All ages | 5% |

      For term charitable remainder trusts:  7%

- Exceptions to Section 15.4(b) must be reviewed by the OERCAS and UTIMCO and approved by the Vice Chancellor for External Relations, Communications, and Advancement Services. Exceptions related to trusts containing real estate must first be reviewed and approved by the Executive Director of Real Estate.
- The annuity payout may not be less than 5% nor more than 50% of the initial fair market value of the property placed in the charitable remainder annuity trust. Also, the remainder interest must be at least 10% of the initial fair market value of all property placed in the annuity trust.
- The unitrust payout may not be less than 5% or more than 50% of the fair market value of the assets, valued annually, of the charitable remainder unitrust. Also, the remainder interest of each property contribution to the unitrust must be at least 10% of the net fair market value of such property as of the date of contribution to the trust.
- A request for acceptance must be submitted by the institution to the OERCAS as soon as possible after receipt of the gift.

    (c)  Charitable Trusts Held and Administered by External Trustees.

- Any U. T. employee who agrees to serve as trustee of a trust benefiting U. T. System Administration or an institution must immediately notify the OERCAS of his or her appointment. Upon notification, the employee will be furnished with a statement advising of the potential for conflicts of interests and directing that all communications pertaining to the trust between the employee and any office of U. T. System Administration or the institutions shall be in writing.
- All charitable remainder trusts for which the Board would be the successor trustee must be reviewed by the OERCAS, UTIMCO, and the OGC. Donors who name the Board as successor trustee of a charitable remainder trust should be advised in writing that the Board will review the terms of the trust, the most recent financial statement, and all tax filings for the trust at the time of succession, and determine then whether or not it will serve as successor trustee.
- The external trustee must provide annual reports to the OERCAS that detail the value of the assets of the trust and the annual receipts and expenditures.
- A request for acceptance must be submitted by the institution to the OERCAS as soon as possible after receipt of the gift. Revocable interests will not be accepted.

    (d)  Charitable Lead Trusts.

- The Board may be designated as a beneficiary of a charitable lead trust if other criteria of this policy are met, but to avoid conflicts of interest, the Board will not serve as trustee of a charitable lead trust. Upon request, U. T. personnel may provide information to the donor on non-U. T. institutions in the donor's locale that may serve as a trustee.
- Consistent with Board policy, a predictable stream of income from a charitable lead trust of which U. T. System Administration or an institution is named as a beneficiary is preferred.

(e) Gift Annuities.  Since the Board cannot accept gift annuities and deferred gift annuities, these types of gifts may be referred to The University of Texas Foundation, Inc. for the benefit of U. T.

(f)  Gifts of Retirement Plan Assets.  The OERCAS or the institution's president, as appropriate, may handle gifts of retirement plan assets, such as IRAs and qualified pension or profit sharing plans, which name the Board as beneficiary, including processing remaining assets, and may execute all necessary documents. UT representatives should provide appropriate language for beneficiary designation forms to ensure proper and prompt receipt of assets. All retirement plan beneficiary designations should be made to the "Board of Regents of The University of Texas System for benefit of [the applicable UT institution]. This gift shall be used for the further benefit of the [specify] college/school/department and shall be used to [specify purpose]." A U. T. institution may be a primary or secondary beneficiary. If the latter, the designation is contingent as the gift depends on the occurrence of another event. A copy of the beneficiary designation form or the portion of the beneficiary designation that pertains to the U. T. institution or other documentation showing the U. T. institution's interest should be requested. A current statement of value from the account or a statement of value signed by the donor may also be requested. Such gifts are revocable.

(g) Life Insurance.

- The OERCAS or the institution's president, as appropriate, may accept gifts of life insurance policies naming the Board as owner and beneficiary and may execute all necessary documents.
- All life insurance beneficiary designations should be made to the "Board of Regents of The University of Texas System for benefit of [the applicable U. T. institution]. This gift shall be used for the further benefit of the college/school/department and shall be used to [ specify purpose]."
- An existing or new life insurance policy may be accepted if the donor names the Board or a U. T. institution as both the irrevocable owner and beneficiary.
- The beneficiary institution is responsible for preserving the value of a life insurance policy owned by the Board pursuant to institution guidelines. The guidelines should cover situations in which the insurance policy is not paid-up and does not have any source of funds for payment of the premiums identified at the time of the gift or thereafter.
- Donors may make additional gifts to pay the premium of permanent policies that are not paid in full. Outright gifts made to a U. T. institution to pay the premiums on these policies may be accepted. If the donor/insured fails to make a gift of a premium payment to a U. T. institution in advance of the premium due date, the U. T. institution, as owner of the policy, reserves the right to cash in the policy or to pay the outstanding premium from policy cash values or from institutional funds.
- When a donor indicates he or she has named the Board or a U. T. institution as beneficiary of a life insurance policy, a copy of the beneficiary designation form or the portion of the beneficiary designation that pertains to the U. T. institution or other documentation showing the U. T. institution's interest should be requested. A current statement of value from the insurance carrier or statement of value signed by the donor should also be requested.
- When a donor names a U. T. institution as beneficiary of a life insurance policy, but does not transfer ownership of the policy, he or she has made a revocable gift. Such a gift is an expectancy. If a U. T. institution is named a secondary beneficiary, the expectancy is contingent as the gift depends on the occurrence of another event.
- U. T. institution group life insurance policies may not be assigned to U. T. System or a U. T. institution, nor may U. T. System or a U. T. institution be named a beneficiary of such policy. A donor may name The University of Texas Foundation, Inc. for benefit of a U. T. institution as the beneficiary of U. T. group life insurance.
- U. T. System has chosen not to endorse any formal charitable life insurance programs or products.

(h) Pooled Income Fund.

- Gifts to the U. T. System Pooled Income Fund may be accepted only if the beneficiaries are age 55 or older and there are no more than two income beneficiaries for each account established in the Fund. The minimum gift needed to enter the Fund is $10,000 or a contribution of $5,000 with a pledge that additional contributions will be made to bring the total dollar share in the Fund to $10,000 within five years.
- All gifts must be made in cash or readily marketable securities.
- A request for acceptance must be submitted by the institution to the OERCAS as soon as possible after receipt of the gift.

    (i)   Gift of a Remainder Interest in Real Property with Retained Life Estate.

- U. T. will not accept a gift of a remainder interest in a personal residence with a life estate reserved by the donor. However, under rare and special circumstances, the Executive Director of Real Estate may grant an exception and allow the REO to review, process and approve such a gift. A request for acceptance of U. T.'s remainder interest in the property must be submitted by the institution to the OERCAS.
- A gift of a remainder interest in a vacation property, farm, or ranch with a life estate reserved, must be reviewed, evaluated, and approved by the REO and the OGC and processed by the REO and the OERCAS prior to acceptance.
- A gift of a testamentary remainder interest in a personal residence, vacation property, farm, or ranch with a life estate reserved will be reviewed and evaluated by the REO. A decision as to whether to accept or disclaim the gift will be made by the REO in consultation with the OGC, the OERCAS, and the institution.
- While the life estate exists, the donor(s) or life tenant(s) will be responsible for all expenses of maintenance, taxes, and insurance. At the time the remainder interest is conveyed to U. T., the donor must sign a separate life estate agreement with the Board to clarify responsibility for maintenance, taxes, insurance, and other issues during the term of the life estate. See Item 5 for a sample form of Life Estate Agreement.
- The REO will coordinate with the benefiting institution to schedule visits with the donor(s) or life tenant(s) at the property. Such visits should take place at least annually.

    (j)   Bargain Sale.

- An individual may transfer an asset to the Board for benefit of an institution and receive less than the fair market value in return. Typically, bargain sales involve the transfer of appreciated property.
- The OERCAS, the OGC, the CBO, and the REO, if applicable, shall analyze a proposed bargain sale to confirm it is in the best interest of the institution.

    (k)   Timeshares

- U. T. will not accept gifts of timeshares.
- A testamentary gift of a timeshare will be disclaimed when possible.

## Sec. 16 Gifts Related to Namings of Facilities and Programs

Any naming of facilities and programs must follow the Naming Policy as set out in Board of Regents' Rules and Regulations, [Rule 80307](). Facilities and programs may be named to memorialize or otherwise recognize substantial gifts and significant donors or individuals designated by donors. Each institution shall develop guidelines for what constitutes substantial and significant donations to warrant a gift-related naming, which must be approved by the Executive Vice Chancellor for Academic or Health Affairs, the Vice Chancellor for External Relations, Communications, and Advancement Services, and the Vice Chancellor and General Counsel.

A written gift agreement signed by the donor(s) is required for each gift-related naming. The OERCAS must be furnished with a fully signed copy of the gift agreement for every gift-related prominent naming. The agreement must, absent compelling reasons, include the following language:

- donor name(s) and address;
- gift description and/or amount;

- pledge description, amount, and due date, which shall not extend beyond five years after the date of execution of the gift agreement;
- name of the institution receiving the gift and/or pledge;
- a statement setting out the intended use or purpose of the gift;
- the proposed naming of the facility or program;
- a statement anticipating changes of circumstances, such as changes in the donor's gift intentions or changes to the facility or program as determined by the Board, thereby allowing for an alternative recognition or removal of the naming; and
- a termination provision that contemplates the unlikely event of a change in circumstances whereby the public image of the donor conflicts with the purpose or mission of the Board or institution or would disparage, impair, or adversely impact the reputation, image, or integrity of the Board or institution in the event of a continued association with donor and the continuation of the naming.

The OER shall provide sample gift agreements to each institution and will review draft agreements prior to execution by the donor and the institution. In the case of a prominent facility or program corporate naming, the institution shall negotiate an agreement with the corporation using the Standard Corporate Naming Gift/Licensing Agreement prepared by the OGC. Any substantive variations to these gift agreements must be approved by the OERCAS and the OGC. If the donor presents a gift agreement for use, its terms must be reviewed by the OERCAS and the OGC to ensure the agreement contains all essential elements as set out above. See sample forms of Gift Agreement for Individual Prominent Facility Naming; Corporate Gift Agreement for Naming of Prominent Facility or Program; Corporate Gift Agreement for Naming of a Less Prominent Facility; and Corporate Gift Agreement for Naming of a Less Prominent Program.

Donors shall demonstrate reasonable and timely pledge payments before a naming is affixed. After a naming is attached, donors will continue pledge payments in accordance with the terms of the gift agreement. The institution shall inform the OER in writing if pledges are not paid on schedule. Upon receipt of such notification, the OERCAS will consult with the institution to determine an appropriate course of action.

Under rare and special circumstances and with the approval of the Vice Chancellor for External Relations, Communications, and Advancement Services, the pledge period may be longer than five years. Removal will be addressed in the gift agreement.

## Sec. 17 Corporate Gifts Related to Website Sponsorships

Acknowledgment of a gift by posting a company logo on an institution's website must comply with the terms and conditions of the institution's policy on website solicitations and U. T. System Guidelines for Web Site Solicitations. Board of Regents' Rules and Regulations, Rule 80103 provides broad authorization for the placement of hypertext links to other websites from U. T. web pages, in accordance with U. T. System and institution guidelines that set forth the restrictions necessary to preserve the space so created for its intended purpose of acknowledging sponsorship, generating revenue, or avoiding costs.

A sample Corporate Gift Agreement Website Sponsorship shall be provided to each institution. The Executive Vice Chancellor for Business Affairs must preapprove both Exhibits A and B of the agreement. Any substantive variations to this agreement must be approved by the OERCAS and the OGC. See sample form of Website Sponsorship Gift Agreement.

## Definitions

Administrative Approval Process - the procedure for accepting gifts to be approved by the Vice Chancellor for External Relations, Communications, and Advancement Services or his/her designee and that conform to U. T. System Board of Regents' policy.

Available University Fund (AUF) - distributions from the Permanent University Fund.

Bargain Sale - when an individual transfers an asset to charity and receives less than the fair market value in return.

Book Value - as pertaining to an endowment, the book value is the original value of all gifts and contributions made to the endowment, as well as reinvestment of earnings and any realized gains or losses resulting from the sale of noncash gifts.

Charitable Lead Trust - a trust in which distributions are paid to one or more qualified charities for a certain period of time, after which the charitable interest terminates and the trust remainder typically reverts to designated non-charitable beneficiaries.

Charitable Remainder Trust - a tax-exempt trust that provides for payment to non-charitable beneficiaries for life (or lives), or a term-of-years not to exceed 20 years, after which the trust remainder goes to one or more qualified charities.

Closely-Held Stock - a corporation the stock of which is held by a few shareholders, often the management or the members of a family. Some closely-held stock is publicly traded. Closely-held stock of a "closed corporation" is not publicly traded.

Completed Gifts - generally, a gift is complete when the donor has parted with dominion and control over the transferred property or property interest, as in the unconditional delivery of the gift to the donee or the donee's agent, leaving the donor without the power to change its disposition, whether for the benefit of the donor or for the benefit of others. A gift that is subject to conditions may not amount to a completed gift at all.

Corporate Naming - the naming of any facility or program after a corporate or other business-oriented entity.

Current Purpose Gifts - non-endowed gifts to be expended for the purposes designated by the donor.

Deferred Gift Annuity - a charitable gift annuity for which payments to the annuitant(s) begin more than one year after property is transferred to the charity. (See Gift Annuity.)

Endowments Held and Administered by External Trustees - funds administered by a trustee other than the U. T. System Board of Regents, from which a U. T. institution receives distributions, or from which the institution will receive distributions at a specified time. Examples of such trustees are banks, individuals, or other charitable entities.

Facilities - all physical facilities and buildings.

Prominent Facilities - buildings; athletic facilities; other prominent facilities, such as wings of buildings, major components of buildings, large auditoria, concert halls, atriums, prominent outdoor spaces, and clinics.

Less Prominent Facilities - facilities such as laboratories, classrooms, seminar or meeting rooms, and patient rooms that the Vice Chancellor for External Relations, Communications, and Advancement Services, in consultation with the Executive Vice Chancellor for Academic or Health Affairs, determines are less prominent and therefore not within the category of Prominent Facilities.

Gift Annuity - a charitable giving device by which a donor transfers money or other property to a qualified charity in exchange for guaranteed lifetime payments, the present value of which is less than the amount transferred.

Gift Value - the value of a gift at the time it is made. Gifts are valued in accordance with the provisions of the Internal Revenue Code and regulations thereunder.

Individual Naming - the naming of any facility or program after an individual or noncorporate entity.

Intellectual Property - creations of the mind:  inventions, literary and artistic works, symbols, names, images, and designs used in commerce. Intellectual property includes inventions, patents, trademarks, and copyrights. (More on intellectual property.)

Limited Partnerships - a limited partnership is an entity in which one or more persons, with unlimited liability (called General Partners) manage the partnership, while one or more other persons only contribute capital; these latter partners (called Limited Partners) have no right to participate in the management and operation of the business and assume no liability beyond the capital contributed.

Market Value - the price that an asset would bring in a market of willing buyers and willing sellers, in the ordinary course of trade.

Mineral Interest in Real Property - rights to gas, oil, and other minerals, whether joined to or severed from the surface estate.

Permanent or True Endowment - a fund created with gifts received from a donor with the restriction that the principal is not expendable. The gifts are invested in perpetuity and only the distributions are expended for the purposes designated by the donor.

Permanent University Fund (PUF) - a State endowment fund that was established by the Texas Constitution of 1876, and that supports 18 institutions and six agencies of The University of Texas System and The Texas A&M University System. The PUF consists of 2.1 million acres in West Texas and the portfolio of assets resulting from the investment of mineral royalties generated by the land. Fiduciary responsibility for managing and investing the PUF is constitutionally assigned to the U. T. Board of Regents. (**More on PUF**.)

Personal Property - anything other than real property that is subject to personal ownership (see CASE Reporting Standards and Management Guidelines, 4th edition, 1.2.5, Gifts-in-Kind). Personal property becomes a gift to a U. T. institution when a transfer of ownership has taken place. A written gift agreement signed by the donor(s) is required for gifts of personal property.

Programs - all nonphysical entities.

Prominent Programs - major entities, such as colleges, schools, academic departments, and prominent academic centers, programs, and institutes.

Less Prominent Programs - academic centers, programs, and institutes that the Vice Chancellor for External Relations, Communications, and Advancement Services in consultation with the Executive Vice Chancellor for Academic or Health Affairs, determines are less prominent and therefore not within the category of Prominent Programs.

Prominent Naming - the naming of prominent facilities or prominent programs.

Quasi-endowment - institution funds functioning as an endowed fund that may be dissolved and returned to the institution with the approval of the U. T. System Board of Regents.

S Corporation - a form of corporation, allowed by the Internal Revenue Service for most companies with 100 or fewer shareholders, none of which can be partnerships, corporations, or nonresident aliens that enables the company to enjoy the benefits of incorporation but be taxed as if it were a partnership. Formerly known as Subchapter S Corporation.

Surface Interest in Real Property - any interest in the surface of real property and improvements, and all other property interests that do not constitute the mineral estate.

Term Endowment - funds for which the donor has stipulated that the principal may be expended after a stated period or on the occurrence of a certain event.

The University of Texas Foundation, Inc. (U. T. Foundation) - a nonprofit corporation established in 1967 to accept and manage gifts in support of U. T. The U. T. System and its institutions are the beneficiaries of the U. T. Foundation, but the Foundation functions independently under its own Board of Directors and pursues its own investment policies in the management of its portfolios. (**More on U. T. Foundation**.)

The University of Texas Investment Management Company (UTIMCO) - an investment management corporation created in March of 1996 solely for the purpose of managing the investment of assets under the fiduciary care of the U. T. System Board of Regents. The Board controls UTIMCO and appoints all nine members of the UTIMCO Board. (**More on UTIMCO**.)

The University of Texas System Board of Regents - the governing body for The University of Texas System. It is composed of nine members who are appointed by the Governor and confirmed by the Senate. Terms are of six years each and staggered, with the terms of three members expiring on February 1 of odd-numbered years. (**More on the Board of Regents**.)

The University of Texas System Long Term Fund (LTF) - an internal U. T. System pooled investment fund of privately raised endowments and other long-term funds of the 15 institutions of the U. T. System. (**More on the Long Term Fund**.)

The University of Texas System Pooled Income Fund (PIF) - a trust maintained by the U. T. System in accordance with federal tax laws in order to obtain favorable tax treatment for donors to the Fund. It is designed to receive gifts of cash and readily marketable securities, paying the income from pooled gifts to persons designated by the donors during their lives. At the death of the life beneficiary, a proportionate part of the principal of the trust is severed and distributed to the U. T. System or institution as designated by the donor.

Website Solicitations:  Sponsorship Acknowledgments - a logo or identifier with a hypertext link to a person's or entity's website, placed on a U. T. web page to acknowledge the person's or entity's donation of services or products or financial or research support to U. T. System or to an institution or a college, school, department, unit, center, institute, or program of such institution.

**ACADEMIC INSTITUTIONS**

UT Arlington
UT Austin
UT Dallas
UT El Paso
UT Permian Basin
UT Rio Grande Valley
UT San Antonio
UT Tyler

**HEALTH INSTITUTIONS**

UT Southwestern
UTMB Galveston
UTHealth Houston
UT Health San Antonio
UT MD Anderson

**UT SYSTEM**

About
SmartBook
Office of the Chancellor
Board of Regents
Administration
Offices
Directory
UT4U
Outlook Web Access

**INFO CENTER**

COVID-19 Site
Policy Library
Regents' Rules & Regulations
Reports to the State
Audit Reports
Privacy Statement
Linking Notice
Copyright
Accessibility
Open Records

**RESOURCES**

Careers
Document Library
seekUT
UT System Dashboard
Contact UT System

**STATE LINKS**

State of Texas
Fraud Reporting
Texas Homeland Security
Texas Veterans Portal
Statewide Search



   

© 2023 The University of Texas System. 210 West 7th Street, Austin, Texas 78701-2982. (512) 499-4200