UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| RICHARD LOWERY,<br><br>    *Plaintiff*,<br><br>v.<br><br>LILLIAN MILLS, in her official capacity as Dean of the McCombs School of Business at the University of Texas at Austin; ETHAN BURRIS, in his official capacity as Senior Associate Dean for Academic Affairs of the McCombs School of Business at the University of Texas-Austin; and SHERIDAN TITMAN, in his official capacity as Finance Department Chair for the McCombs School of Business at the University of Texas-Austin,<br><br>    *Defendants*. | Case No. 1:23-cv-129-LY |

SUPPLEMENTAL DECLARATION OF RICHARD LOWERY
IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

I, Richard Lowery, declare the following:

1. I am an adult and competent to make this declaration. Its content is based on my personal knowledge or business records that are in possession or control.

2. Sometime in late August or September 2022, Sheridan Titman told me that Jay Hartzell had asked Sheridan if something could be done about my public statements criticizing Hartzell. I don't recall the exact words that Sheridan used,

1

but it was clear that Sheridan was conveying that Hartzell was not happy with what I had been saying and wanted something done about it. Sheridan did not tell me when Hartzell had contacted him.

3. I also recall Sheridan Titman telling me in the same conversation that Sheridan told Hartzell that nothing could be done about my speech. I appreciated that Sheridan had declined to take action against me at that time, but I also interpreted as a confirmation that Jay Hartzell was unhappy with me and my public statements about him and that Hartzell had asked others to deal with me and my speech.

4. While I do not believe that Sheridan Titman dislikes me personally or that he does not value my academic contributions to the Finance Department, I do believe that he wanted me to stop publicly tweeting opinions that were critical of Jay Hartzell, the GSLI program, or the ideological direction of UT, because my speech was creating a headache for Sheridan.

5. It is my inference, based on what Sheridan has said to me during the summer and fall of 2022, that he did not want to keep getting pressure from Hartzell, Mills, Kothare, or others to "do something" about my speech. As a result, I think he is happy that I decided to start self-censoring and stop tweeting and it was in fact his suggestion that I do so.

6. For example, in his August 22, 2022, email to me (Doc. #14-3 at 8), Sheridan wrote: "You will be more effective if you simply debate them in open forums – limiting discussion to 140 characters does not facilitate intellectual discourse." I

2

read that email as discouraging me from tweeting about UT or GSLI because the reference to 140 characters is a reference to the previous character limit of tweets (posts). That character limit had gone up and has since gone up significantly.

7. With regard to Sheridan's discussion with me over email (Doc. #14-3 at 9) where he stated "[i]t is probably in your interest to come up with a class for the Spring that is likely to be popular[;]" I interpreted that a warning from Sheridan that if my enrollment was low it could be used as a pretext by Mills or Burris to come after me. That is the context of the statement, coming immediately after "[y]ou don't seem to be making friends" and then having part of Meeta Kothare's email set out below. I believe Sheridan was acting as a messenger, but that he also genuinely wanted me to stop tweeting.

8. To me, my former (now self-censored) speech on Twitter served a different role than speech during debates or in academic papers. Twitter reaches a much wider audience that includes not just other academics, but also taxpayers, voters, and elected Texas officials who are in a position to put pressure on UT officials to correct the drift toward becoming a DEI-indoctrination factory.

9. I believe that it is precisely this feature of tweeting that makes it more effective and the Defendants' channeling me away from tweeting is designed to make it harder for me to express my views to a wider audience. I would like to start tweeting again, but do not want to risk losing my affiliation with the Salem Center.

10. From what Carlos conveyed to me, it was my appearance on the Hanania podcast on July 18, 2022, that also bothered Hartzell, Mills, and Burris. In that

podcast, which is publicly available, I repeatedly express my opinion that part of Jay Hartzell's job is to lie to republican legislators in Texas. Doc. #14-17 at 24–26, 41–42. I also explain my reasoning for this opinion. *Id.*

11. In my view, Hartzell acts as a buffer or front-man between the excessively left-wing UT faculty and the republican-dominated Texas state government that funds UT. My opinion is that it is part of Harzell's job is to ensure that Republican politicians do not cut-off funding for what is becoming a leftwing DEI-indoctrination factory at UT.

12. Of course, Jay Hartzell and others are free to disagree with me, but this is my opinion and it continues to be my opinion, although I have become reluctant to express it because of the threats against my Salem Center affiliation. This is also why Twitter is a useful way for me to speak about these issues; because it allows me to reach politicians and alumni who are otherwise hearing only what Jay Hartzell wants them to hear; that is, that everything is fine at UT and DEI is not a problem.

13. I can certainly understand why Jay Hartzell and others wouldn't want me to reach a wider audience, especially including politicians, but that is part of the audience I want to reach.

14. It is true that in my opinion, alumni should try to influence UT by withholding donations until the DEI-indoctrination stops. Like tax-payer funding, donations are something UT officials care about and I would hope that it could influence its officials to course-correct.

15. It is my understanding that UT has alleged that my advocacy that alumni stop giving is somehow undermining UT operations by impeding fundraising. It has never been part of my job description to engage in fundraising for UT. When I was hired in 2009 to be a finance professor, no one communicated to me that fundraising was part of the job.

16. A true and correct copy of the offer letter sent to me by UT is attached as Exhibit S. It makes no mention of fundraising requirements.

17. To the best of my recollection, in my 14 years working at UT, no one has ever suggested that fundraising was part of my job as a finance professor. It has never come up in any performance evaluation or discussion of job expectations. The first time this new idea has been communicated to me was after I sued the defendants in this case, alleging a violation of my civil rights.

18. I do not agree that I should have to censor my opinions about funding or donations just because UT wants to get as much funding as possible. UT is a public university, not a private business. Also, I could not imagine the current crop of UT officials saying that a left-wing DEI supporter on the faculty was not allowed to express their views to legislators or alumni.

19. I view my job as a finance professor to be truth seeking, not fundraising. I do that by teaching students and conducting research. I have also expressed my opinions about the ideological direction of UT, both as a citizen and a faculty member, in good faith and because I believe UT's ideological direction interferes

with that truth-seeking role. That is because merit and truth seeking are increasingly being subordinated to DEI goals.

20. I have reviewed the exhibits consisting of articles and transcripts filed by the Defendants in their response to my motion. The articles found in Doc. #14-19 are almost all from the time period before I began self-censoring in late August 2022, except for the last article, which quotes my comments at a Stanford conference on academic freedom that took place in November 2022. *Id.* at 111–115. While the quote selected by the author doesn't make it clear, I was careful at that conference to state that my remarks were limited to private universities. Doc. #14-11a at 4, 9–10, 33–34. That is because I didn't want to be seen as criticizing UT (a public university) or Jay Hartzell. This is consistent with what I stated in my first declaration. Doc. #8-1 at 15. But for Defendants' threats, I would have spoken about UT specifically at that Stanford conference.

21. As for the October 2022 event about "Reversing Ideological Capture of Universities" which took place in Washington DC, it remains accurate, as I stated in my first declaration, that I asked one of the conference's organizers not to make my statements at the conference public. It is evident that the message did not get passed on to the right people and that the video, with my comments in it, is available for public viewing. Docs. #14-13, #14-13a.

22. This publication of my remarks happened contrary to my wishes and if I had known they would become public, I would have withdrawn from the conference or softened my remarks. If anything, this experience will make me even more

reluctant to participate in future events like that because it could lead to my remarks getting publicized and UT taking negative action against me for supposedly "undermining" university operations or "defaming" Jay Hartzell.

23. It is my opinion that some of my tweets are being misread or mischaracterized by the Defendants in attempt to smear me or unfairly portray me as "dangerous." For example, my Aug. 22, 2022, tweet (Doc. #8-14) was making a point about viewpoint diversity. We at the Salem Center (and the tweet says "we" twice) had invited the editor of Jacobin Magazine, a hard-core leftist, to participate in a panel at one of our events.

24. A true and correct snippet of that tweet, which is also available at Doc. #8-14, is set forth below:



← Tweet

**Richard Lowery**
@RichardLoweryTX

**And yet we at @salemcenterUT are the ones who get attacked for not being balanced enough or whatever, even though we invite f\*\*\*ing communists who support the murder of the Romanov children to debate.**

25. The name of the Jacobin editor we invited to participate is Bhaskar Sunkara and he is somewhat notorious for having stated that he approved of the murder of the Romanov family during the Communist Revolution in Russia. Among other places, that information is documented online at: ORTHODOX CHRISTIANITY, *"Killing*

*little Romanov children was justified," says founder of Democratic Socialist Magazine* (Oct. 5, 2020). https://orthochristian.com/134391.html.

26. I happen to disagree with Mr. Sunkara about this historical event, but he is entitled to his opinion (which is probably shared by some on the UT faculty). I was making the point that we at the Salem Center, unlike GSLI, were not afraid to have competing viewpoints be part of the conversation. In fact, it usually makes the conversation more interesting.

27. But the censorship of competing ideas is a feature of DEI ideology, which opposes debate and competing viewpoints. It is also a feature of DEI ideology to feign offense in order to label competing ideas as dangerous, racist, or violent.

28. The histrionic overreaction to my Aug. 22, 2022, tweet is a perfect illustration of DEI ideology in action (also called DEI praxis). The idea that someone would contact the police over my speech is just disturbing to me. Learning about that request was additional confirmation to me that I needed to continue to self-censor and stay off Twitter.

29. Due to Defendants' threats causing me to self-censor, I have also passed on other opportunities to express my opinions about the ideological direction at UT, including co-authoring an opinion piece for the Wall Street Journal and passing on a potential opportunity to testify before the Texas legislature, which has finally taken a greater interest in the problem of DEI at UT.

30. Unfortunately, Defendants' threats seem to be paying off, because I'm not able to be part of that ongoing conversation.

8

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this date, March 19, 2023.

_____
Richard Lowery