UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| RICHARD LOWERY,<br><br>*Plaintiff*,<br><br>v.<br><br>LILLIAN MILLS, in her official capacity as Dean of the McCombs School of Business at the University of Texas at Austin; ETHAN BURRIS, in his official capacity as Senior Associate Dean for Academic Affairs of the McCombs School of Business at the University of Texas-Austin; and SHERIDAN TITMAN, in his official capacity as Finance Department Chair for the McCombs School of Business at the University of Texas-Austin,<br><br>*Defendants*. | Case No. 1:23-cv-00129-LY |

PLAINTIFF'S REPLY RE MOTION FOR PRELIMINARY INJUNCTION

### 1. Defendants have not denied that Jay Hartzell wanted Lowery silenced

Credible evidence suggests that UT President Jay Hartzell wanted Lowery silenced. First, Carlos Carvalho declared that Titman told him that Hartzell and Mills were upset about Lowery's speech. Doc. #8-02 at 3. Second, Lowery's supplemental declaration corroborates Carvalho by establishing that Titman also told Lowery that Hartzell was unhappy about Lowery's speech. Doc. #16-1 at 1–2. Third, Defendants have so far been silent about whether Hartzell talked to them about Lowery's speech. *See* Docs. #14-1–14-3. Finally, Hartzell's declaration is conspicuously absent. This Court should evaluate Defendants' claims that they did not threaten Lowery in light of this information. It is not surprising that a top manager would seek to silence inconvenient speech by subordinates, especially when his audience includes elected officials.

### 2. UT's pretextual arguments about disruption reveal viewpoint discriminatory motives

Although Defendants claim that they never threatened Lowery about his speech, they reveal their actual intentions by hinting that discipline is warranted for "disruption." Doc. #14 at 9–10. Those claims are threadbare—and a pretext for viewpoint discrimination.

"Speech by citizens on matters of public concern lies at the heart of the First Amendment[.]" *Lane v. Franks*, 573 U.S. 228, 235-36 (2014) (citation omitted). When public employees speak as private citizens on matters of public concern, the *Pickering* balancing test applies; that is, courts must balance the value of the speech

against the state's interest in promoting efficient public services. *Lane*, 573 U.S. at 236-37 (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).

The public concern inquiry turns on the content, form, and context of the speech. *Lane,* 573 U.S. at 241. Lowery's speech concerned affairs at a taxpayer-funded university, including his opinions about the use of public funds for ideological indoctrination, the hijacking of the Liberty Institute initiative, and his perception of UT President Jay Hartzell's role in covering up those events and convincing elected officials and donors that all was well. *See, e.g.,* Docs. #8-6, #8-7, #8-8, #8-10 (full transcript at #14-7), #8-11; Lowery Supp. Dec. ¶¶ 11-14. It is well established that speech exposing official misconduct, including the misallocation of public funds or cover ups, concerns matters in the public interest. *See, e.g, Lane,* 573 U.S. at 236-37 (corruption and misuse of state funds); *Branton v. City of Dall.*, 272 F.3d 730, 740 (5th Cir. 2001) (police misconduct); *Davis v. Ector Cty.*, 40 F.3d 777, 781-82 (5th Cir. 1994) (letter alleging officials' misbehavior and an cover up); *Brown v. Leflore Cty.*, 150 F. Supp. 3d 753, 759 (N.D. Miss. 2015) (letter to editor about emergency preparedness).

The form and context also show that Lowery repeatedly spoke online in the form of opinion articles and on Twitter, where he sometimes tagged elected officials; a feature that allowed him to reach a different audience than with purely academic speech. Lowery Supp. Dec. ¶¶ 8-9. He also voiced his opinions on the Hanania podcast. Thus, the form and context show that Lowery's speech was public, not private. *See Graziosi v. City of Greenville Miss.*, 775 F.3d 731, 739 (5th Cir. 2015)

(public post on mayor's Facebook page weighs in favor of finding matter to be of public concern).

And it appears that several elected officials have taken notice. *See* Jermiah Poff, *University of Texas System halts all DEI programs following backlash* (Feb. 24, 2023), bit.ly/3n5yohk (detailing pause of new DEI programming at direction of Gov. Greg Abbott); LT. GOV. DAN PATRICK, *Lt. Gov. Dan Patrick Announces Top 30 Priorities for the 2023 Legislative Session* (Feb. 13, 2023), http://bit.ly/3Ts0gbv (listing SB 16 [banning CRT in higher education], SB 17 [banning DEI policies in higher education], SB 18 [eliminating tenure at general academic institutions]); Kate McGee, *UT faculty members demand answers after Dan Patrick says Liberty Institute intended to fight critical race theory* (Feb. 16, 2022), http://bit.ly/42p4hBA ("I will not stand by and let looney Marxist UT professors poison the minds of young students with Critical Race Theory" Lt. Gov. Patrick wrote on Twitter). If both the Governor and Lt. Governor are voicing similar views, Lowery's speech obviously covered matters of public concern. Indeed, that is likely why Defendants are so keen to keep him quiet.

The greater the public concern evidenced by the speech, the greater must be the employer's showing of disruption. *Gonzalez v. Benavides,* 774 F.2d 1295, 1302 (5th Cir. 1985)*; Brown,* 150 F. Supp. 3d at 766; *Smith v. Coll. of the Mainland,* 63 F. Supp. 3d 712, 718 (S.D. Tex. 2014). Public employers must show evidence of "*actual or incipient* disruption to the provision of public services." *Grogan v. Lange*, 617 F. App'x 288, 292 (5th Cir. 2015) (emphasis added); *Brown,* 150 F. Supp. 3d at 766.

3

In the academic context, an employer must be prepared to tolerate greater employee criticism, because dissent is expected. *Smith,* 63 F. Supp. 3d at 718; *see also* Thomas Sullivan & Lawrence White, *For Faculty Free Speech, the Tide Is Turning,* Chron. of Higher Educ. (Sept. 30, 2013), http://chronicle.com/article/For-Faculty-Free-Speech-the/141951 ("Faculty members sometimes say intemperate things. Their tendency to express themselves forcefully and, on occasion, provocatively is one of the defining characteristics of university culture"). Speech by academics cannot be suppressed based on undifferentiated assertions of disturbances or a desire to avoid the discomfort that accompany the expression of unpopular viewpoints. *Johnson v. Lincoln Univ. of Commonwealth Sys. of Higher Educ.*, 776 F.2d 443, 453-54 (3d Cir. 1985) (citation omitted). "Speech that outrages or upsets co-workers without evidence of any actual injury to school operations does not constitute a disruption." *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 782 (9th Cir. 2022) (cleaned up) (no evidence MAGA-hat wearing teacher interfered with teacher training sessions).

Here Lowery spoke on matters of obvious public significance—ones he was particularly qualified to offer opinions about. And his opinions about the danger of DEI programs appear to be shared by prominent elected officials.

On its side of the ledger, UT has shown zero actual or imminent interference with its operations. UT has not alleged that Lowery's speech interfered with his teaching or scholarship. Instead, they have scraped together a speculative allegation that his speech "interfered" with UT's fundraising. Doc. #14 at 18. But

4

Defendants have offered no evidence of lost funding or shown that the loss of those funds has impacted UT operations in a material way.

And it has never been part of Lowery's job to raise funds for UT. Lowery Supp Dec. ¶¶ 15-19; Ex. S (offer letter). He is a scholar engaged in education and truth-seeking, not a member of the development office. UT's regulations provide that a faculty member's primary duties are teaching, research, administration (performing curricular tasks), and contribution to society. Doc. #14-7 at 2. Those regulations also provide that when a "faculty member speaks or writes as a citizen, he or she should be free from institutional censorship or discipline[.]" *Id.* Indeed, it is precisely because DEI interferes with the traditional truth-seeking function of scholars and universities that Lowery has spoken out. Lowery Supp. Dec. ¶ 19.

Prior to this lawsuit, no one had suggested that Lowery should censor his opinions because they might hurt UT's fundraising efforts. Adding this new job requirement now suggests it is motivated by a desire to suppress his viewpoint. *See Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 972 (9th Cir. 2002) (absence of danger evidence suggests real motive for restriction was the viewpoint expressed).

Moreover, speech advocating economic boycotts to encourage policy changes has long been recognized as constitutionally protected activity. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 911-12 (1982); *A & R Eng'g & Testing, Inc. v. City of Hous.*, 582 F. Supp. 3d 415, 430 (S.D. Tex. 2022). Opposing government sanctioned race discrimination, as Lowery has done, is no less worthy of legal protection today.

5

### 3. Lowery's opinions are protected speech even if they are offensive to some

Jarring or offensive speech conveys a constitutionally protected viewpoint. *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299–3000 (2019) (striking down regime that allowed "registration of marks when their messages accord with, but not when their messages defy, society's sense of decency or propriety"). "[A]s the Court made clear in *Tam*, a law disfavoring 'ideas that offend' discriminates based on viewpoint, in violation of the First Amendment." *Id.* at 2300–01 (citing *Matal v. Tam,* 137 S. Ct. 1744, 1751 (2017)). Similarly, Defendants "may not insulate a law from charges of viewpoint discrimination by tying censorship to the reaction of the speaker's audience." *Tam,* 137 S. Ct. at 1766 (Kennedy, J., concurring). Even racist and hateful speech, however distasteful, is protected by the First Amendment so long as it does not rise to a direct threat or fighting words. *See Brandenburg v. Ohio,* 395 U.S. 444, 447-48 (1969) (per curiam) (racist advocacy by Klan); *Collin v. Smith*, 578 F.2d 1197, 1205-06 (7th Cir. 1978), *cert. denied,* 439 U.S. 916 (1978) (Nazi march in Skokie, IL). So is the profane or vulgar expression of political ideas. *Cohen v. California*, 403 U.S. 15, 25 (1971) (overturning conviction for wearing "fuck the draft" jacket in county courthouse)*; see also Gooding v. Wilson,* 405 U.S. 518, 518-20 (1972) (vulgar and offensive speech is protected by the First Amendment).

In seeking to avoid the obvious conclusion that Lowery's speech enjoys full constitutional protection, Defendants assert that he "disparaged" his colleagues and "defamed" UT's leaders. Doc. #14 at 3, 18; Doc. #14-2 at 3. But all assertions of

opinion are protected by the First Amendment. *Delta Air Lines v. Norris,* 949 S.W.2d 422, 426 (Tex. App. 1997); *see also* Lowery Supp. Dec. ¶¶ 11-14. Moreover, "[i]f a statement is not verifiable as false, it is not defamatory." *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 624 (Tex. 2018); *see also Delta Air Lines,* 949 S.W.2d at 427 (non-defamatory statements cannot support a claim of business disparagement). And to establish defamation, public officials must prove actual malice by clear and convincing evidence. *Long v. Arcell*, 618 F.2d 1145, 1147 (5th Cir. 1980). Defendants make no effort to meet the heavy burden of proving any unprotected, defamatory, or malicious speech.

Doubling down on their campaign to label Lowery "disruptive," Defendants inaccurately assert that he "accused the organizers of a UT conference of knowingly inviting 'F***ing communist' speakers who support murdering children[.]" Doc. #14 at 8. But Lowery did no such thing.

Lowery's tweet referenced the Salem Center's invitee, making a point about *his* center's comparative openness to viewpoint diversity, and *his* willingness to invite speakers he disagrees with. Lowery Supp Dec. ¶¶ 23–28. The plain text of his tweet discusses the Salem Center inviting a "communist," not the GSLI. To suggest the opposite, or to suggest that the tweet is confusing, is not a fair reading of it. Misconstruing speech containing disfavored ideas as "dangerous" or "violent" and then asserting offense is illustrative of DEI praxis. Lowery Supp. Dec. ¶¶ 27-28. But the First Amendment protects Lowery's right to craft and express his own message.

7

Edgy and provocative political speech has a long history in America. If Paul Cohen can wear a vulgar jacket in a courthouse to make a point about the Vietnam War in 1968, then Richard Lowery can use similar vocabulary to advocate for viewpoint diversity in 2022. Both are protected speech.

### 4. Imperfect self-censorship does not establish the absence of ongoing harm

Defendants incorrectly claim that Lowery's self-censorship rings hollow, because he participated in two academic conferences after he started self-censoring. Doc. #14 at 23–24; Docs. #14-11, #14-13. But at one conference he spoke only about private universities, and at the other he asked that his comments not be made public, but they mistakenly were anyway. Lowery Supp. Dec. ¶¶ 20-22; Doc. #14-11 at 4, 9–10, 33–34. If anything, that experience will only make Lowery more reluctant to participate in future events discussing academic freedom. Lowery Supp. Dec. ¶ 22.

The chilling of speech presents an ongoing, cognizable harm. *Speech First, Inc. v. Fenves,* 979 F.3d 319, 330-31 (5th Cir. 2020); *Jackson v. Wright*, No. 4:21-CV-00033, 2022 U.S. Dist. LEXIS 8684, at *17-18 (E.D. Tex. Jan. 18, 2022). Lowery's forward-looking chilled-speech claim is not dependent on the Defendants' implementation of their threats to remove his Salem Center affiliation. Nor have Defendants cited any authority for the proposition that self-censorship must be either perfect or absolute. Just recently, Lowery has had to pass on an opportunity to be published in the Wall Street Journal and the possibility of testifying before the Texas Legislature. Lowery Supp. Dec. ¶¶ 29-30.

8

### 5. *Burlington Northern*, not *Breaux*, defines "adverse employment action"

Defendants claim that because *Breaux v. City of Garland,* 205 F.3d 150 (5th Cir. 2000) has not been explicitly overruled, it controls Lowery's retaliation claim. But Supreme Court decisions can implicitly overrule Fifth Circuit precedent. *Gahagan v. United States Citizenship & Immigration Servs.*, 911 F.3d 298, 302-03 (5th Cir. 2018). And the Fifth Circuit has recognized that the applicability of *Burlington Northern* standard to free-speech retaliation cases is an open question. *Johnson v. Halstead,* 916 F.3d. 410, 421 n.5 (5th Cir. 2019). *Breaux*'s status is thus an open question, too. Accordingly, this Court can and should find that threatening to remove Lowery's affiliation with the Salem Center is a sufficiently adverse action to support a retaliation claim.

### 6. Requesting protection from threats by officials is not a prior restraint

Consistent with DEI praxis, Defendants recast themselves as the victims by suggesting that an injunction restraining their threats would constitute an illegal prior restraint on their speech. Doc. #14 at 22. But Lowery seeks to restrain the illegal conduct of threatening his affiliation with the Salem Center in order to censor his public criticism of Jay Hartzell and the ideological direction of UT; he has no problem with Defendants expressing their personal opinions about him or his speech, and would be happy to debate them, once a suitable injunction is in place. To the extent he is requesting relief from "labeling his criticism as violent or uncivil" (Doc. #1 at 25) that is limited to unfounded accusations in support of

9

disciplinary proceedings or police intervention and not general statements of opinion (however hyperbolic or unfounded). In any event, this Court can deal with this issue by clarifying the scope of any injunction. *Rest. Assocs. v. Bd. of Adjustment,* 91 F. App'x 958, 962 (5th Cir. 2004) (a prior restraint will be upheld if it has narrow, objective, and definite standards).

### 7. Sheridan Titman asked Lowery to stop tweeting

Defendants claim that Titman's Aug. 22, 2022 email exchange with Lowery was *"actually a conversation intended to help Lowery."* Doc. #14 at 21 (emphasis in original). But looking at the full context shows Titman sought to persuade Lowery to self-censor. First, the exchange came only hours after both Meeta Kothare and Laura Starks emailed Titman, expressing unfounded safety concerns. Doc. #8-17 at 2-3. Second, Titman's initial email to Lowery led with a comment about "not making friends" before launching into a warning that it was in Lowery's "interest to come up with" a popular spring class. Doc. #14-3 at 9. Third, Titman suggested Lowery should stop tweeting because the 140-character format "does not facilitate intellectual discourse." *Id.* at 8. Unsurprisingly, Lowery interpreted this email exchange as a warning and request that he stay off Twitter. Lowery Supp Dec. ¶¶ 6-9, 23-28. He got the message.

CONCLUSION

This Court should grant Lowery's motion for preliminary injunction, enjoining Defendants from threatening Lowery for his public speech criticizing Jay Hartzell or the ideological direction of UT.

10

Respectfully submitted,                              Dated: March 21, 2023

*s/Endel Kolde*                                      *s/Michael E. Lovins*
Endel Kolde                                          Michael E. Lovins
Stephanie M. Brown                                   State Bar No. 24032555
State Bar No. 24126339                               LOVINS | TROSCLAIR, PLLC
INSTITUTE FOR FREE SPEECH                            1301 S. Cap. Of Texas
1150 Connecticut Ave., NW                            Building A Suite 136
Suite 801                                            Austin, Texas 78746
Washington, D.C. 20036                               512.535.1649
(202) 301-1664                                       Fax: 214.972.1047
Fax: (202) 301-3399                                  michael@lovinslaw.com
sbrown@ifs.org
dkolde@ifs.org

*Attorneys for Richard Lowery*