```
 1                   UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
 2                         AUSTIN DIVISION

 3   RICHARD LOWERY                 :
                                    :
 4   vs.                            : Case Number:
                                    : AU:23-CV-00129-DAE
 5   LILLIAN MILLS, ETHAN BURRIS and :
     SHERIDAN TITMAN,               : Austin, Texas
 6   Defendants.                    : April 5, 2023
     *********************************************************
 7              TRANSCRIPT OF MOTION HEARING
            BEFORE THE HONORABLE DUSTIN M. HOWELL
 8             UNITED STATES MAGISTRATE JUDGE

 9   APPEARANCES:
     FOR THE PLAINTIFF:
10     Endel Kolde, Esquire
       Stephanie M. Brown, Esquire
11     Institute for Free Speech
       1150 Connecticut Avenue, NW, Suite 801
12     Washington, D.C.  20036
       (202)301-1664; dkolde@ifs.org
13
       Michael E. Lovins, Esquire
14     Lovins Troslcair, PLLC
       12700 Park Central Drive, Suite 520
15     Dallas, Texas  75251

16   FOR THE DEFENDANTS:
       Joel R. Glover, Esquire
17     Matt Dow, Esquire
       Jackson Walker, LLP
18     1401 McKinney, Suite 1900
       Houston, Texas  77010
19     (713)752-4226; jglover@jw.com

20   COURT RECORDER:  FTR GOLD
     TRANSCRIBER:
21   Angela M. Hailey, CSR, CRR, RPR, RMR
     Official Court Reporter, U.S.D.C.
22   262 West Nueva Street
     San Antonio, Texas  78207
23   Phone(210)244-5048;angela_hailey@txwd.uscourts.gov

24   Proceedings reported by electronic sound recording, transcript
     produced by computer-aided transcription.
25
```

 1   *(April 5, 2023, 11:02 a.m.)*

 2                              *   *   *

 3          COURT SECURITY OFFICER:  All rise.

 4          THE COURT:  Thank you.  Y'all can have a seat.

 5          COURTROOM DEPUTY CLERK:  The Court calls the following

 6   case for a motion hearing.  1:23-CV-00129-DAE, Lowery versus

 7   Mills, et al.

 8          THE COURT:  Good morning.  Just a second here to get

 9   electronically situated.  Why don't we start by having counsel

10   for plaintiff and defendants state their names on the record

11   and who they represent.

12          MR. KOLDE:  Good morning, Your Honor.  Endel Kolde for

13   plaintiff, Richard Lowery.  Mr. Lowery is here present in the

14   courtroom.  If you could stand up, Richard, please?

15          THE COURT:  Good morning.

16          MS. BROWN:  Good morning, Your Honor.  Stephanie

17   Brown, counsel for Richard Lowery.

18          THE COURT:  Good morning.

19          MR. LOVINS:  Good morning, Your Honor.  Michael

20   Lovins, also counsel for Mr. Lowery.

21          THE COURT:  Good morning.

22          MR. GLOVER:  Good morning, Your Honor.  Joel Glover of

23   Jackson Walker, counsel for defendants, Dean Mills, Dean Burris

24   and Professor Titman.  We have in-house counsel with us, Joe D.

25   Biggs from the University -- excuse me, Adam Biggs from the

1   University, and Joe D. Hughes also from the University.  But

2   here making the trains run is Tim Herndon, he's our litigation

3   support specialist.

4           MR. DOW:  Your Honor, Matt Dow for the defendants.

5           THE COURT:  Good morning to all of you.  Welcome.  I

6   think we initially set this for one hour and I don't know that

7   we'll need much more time than that.  I did get a chance to

8   glance through your posed decs.  So on the defendant side looks

9   like there's 25 slides, but I imagine those will go pretty

10  quickly.

11          I want to kind of share some introductory remarks and

12  impressions with y'all and then I'll turn it over to the

13  plaintiffs to lead us off and hear argument from counsel for

14  the defense.  I'll have questions along the way, but I want to

15  start by framing this, I guess, or confirming what is the

16  limited scope of this particular hearing and my task here which

17  is to decide what, if any, discovery is necessary to give the

18  plaintiff an opportunity to make his case for a preliminary

19  injunction.  That's not the same as the overall -- the question

20  of what might ultimately be resolved in the merits in this case

21  or the scope of discovery should this case continue forward

22  past the motion to dismiss.  It really is a question of what is

23  the standard that the plaintiff has to establish at preliminary

24  injunction.  And again, what, if any, more is needed to afford

25  plaintiff an opportunity to meet that standard.

1          In terms of timing, I don't see on the docket that

2    Judge Ezra has set a hearing yet for the preliminary injunction

3    and I don't know whether Judge Ezra intends to decide the

4    motion to dismiss before setting the preliminary injunction

5    hearing or which is going to come first or when either of those

6    things will take place.  That doesn't prevent me from making a

7    decision in this case and setting a timeline that I think is

8    appropriate, but I just flag that that there are some unknowns

9    that has some bearing on the procedural posture of this case

10   and the preliminary injunction issue.

11          Going back to the framing issue, frankly, I see the

12   requests as they currently are, the document requests and the

13   depositions to encompass a large sloth of what seems to be --

14   what would ultimately be sought in full blown merits discovery.

15   So I can tell you my impression, and I'm open to being

16   convinced otherwise, is that the requests as they currently

17   stand are overbroad.  A question arose in my mind and it seemed

18   to be sort of hinted at in the briefing about whether if the

19   parties just had their 26(f) conference if we could just move

20   into merits discovery.  But I'm aware of the fact and I

21   anticipate that defendants might resist any merits discovery

22   pending a resolution of the motion to dismiss and so maybe that

23   doesn't solve the problem, but I am interested in knowing where

24   y'all stand with respect to a 26(f) conference if that's

25   happened at all.  I know in the plaintiff's briefing you

M O T I O N   H E A R I N G                5

1    mentioned that you had made some overtures about having that,

2    but it hadn't taken place as of when your reply was filed.

3            I can also tell you that as I sit here now I'm not

4    convinced that any discovery is necessary from nonparties, that

5    there might be some -- I'm potentially open to limited

6    discovery from the three named defendants at this point, but

7    again, I've not made up my mind and the order is not written

8    and I'm here to hear your argument.  That's kind of where my

9    head is at right now.  It's my custom to share my initial

10   impressions with counsel up front so you're not trying to guess

11   where my head is at coming into it.  I try not to prejudge

12   things, but I do want you to know what my thinking is so you

13   can tailor your arguments to it.  With that said, that's kind

14   of all of the -- and I will have questions as you go through,

15   so just expect to be interrupted.  That's just how it's going

16   to go.

17           That's all of my initial impressions that I had that I

18   wanted to share with y'all up front, so we'll start with Mr

19   Kolde.

20           MR. KOLDE:  Thank you, Your Honor.  I'm going to move

21   back and forth if that's all right.

22           THE COURT:  That's perfectly fine.

23           MR. KOLDE:  May it please the Court, as the Court

24   noted, this is a discovery motion.  We're not here to argue the

25   motion on the merits, but I do want to talk about one of our

1   central theories in the case in order to set the table and help

2   the Court understand why we need expedited discovery and what

3   we've asked for.  We're making two claims, a chilled speech

4   claim and a retaliation claim.  They are both directed at

5   counter and current ongoing harm, self-censorship.

6        One of our theories of the case, the one that matters

7   here today is that UT President, Jay Hartzell got upset when

8   Richard Lowery repeatedly publicly criticized him.  That

9   criticism took various forms, some variation of the following.

10  He promoted -- he is a promotor of DEI ideology, which is a

11  hotbed issue in Texas politics right now, frankly, in national

12  politics, that Jay Hartzell allowed and organized the

13  highjacking of the Liberty Institute Initiative at the

14  University of Texas Austin, and that he essentially acts as a

15  buffer or frontman for the mostly leftwing faculty at UT Austin

16  and sort of as a go-between for the Republican office holders

17  who are responsible for deciding on the funding for UT Austin.

18  He stated that publicly in various articles, other online

19  forums including a podcast.

20       One of our key theories, not the only theory, but one

21  of our key theories is that Hartzell got frustrated and asked

22  his subordinates to silence Richard Lowery.  They picked a

23  pressure point that didn't enjoy tenure protection, his

24  affiliation with the Salem Institute, and they threatened that.

25  And I want to be clear, he did get renewed this year, but the

1    threat was delivered, in essence, this way.  We're going to

2    renew you this year, but might not renew you in the future.

3    And it was delivered via Carlos Carvalho, that was sort of the

4    main point of contact of the defendants to the plaintiff and

5    the plaintiff's allies.

6            There's a whole bunch of evidence that's been entered

7    into this case, I'm not going to discuss all of it.  I would

8    like to discuss a few curated pieces.  I'll start by reviewing

9    two exhibits that illustrate the criticism of Hartzell and then

10   I'll be reviewing a very short timeline that illustrates the

11   timing because, as the Court knows, in censorship and

12   retaliation cases, timing matters, temporal proximity matters.

13   So this first document that we're looking at here is ECF 8-9,

14   it's a Martin Center article that was published and is publicly

15   available.  It was published July 1st.  It's about this

16   highjacking of the Liberty Institute and I'm not going to go

17   through the article in detail except that it's published by

18   Richard Lowery, it refers to UT Austin administrators and

19   throughout the article he is mentioning Richard Hartzell by

20   name and -- excuse me, Jay Hartzell by name, and referring to

21   the UT President essentially highjacking the process by

22   assigning his deputy, Richard Flores, who is a who is a CRT

23   adherent, according to Professor Lowery to essentially

24   orchestrate and manage the process.

25            THE COURT:  What is CRT?

 1         MR. KOLDE:  Critical race theory, Your Honor, which is

 2   one of the issues in this case.  It's also working its way

 3   through the Texas legislature right now, at least one proposal

 4   that focus on essentially banning or at least dealing with the

 5   issue of CRT in public universities.  So I won't go into this

 6   in detail that some of the criticism of Jay Hartzell is laid

 7   out in this July 1st article.

 8         Then later in July, Professor Lowery appeared on the

 9   Richard Hanania podcast, the CSPI, Center for Partisanship in

10   Politics, something like that, podcast.  It's also publicly

11   available, it's on YouTube, it's available from Apple podcast,

12   various download platforms.  And I'm going to play just a short

13   section.  This is in the record as ECF 8-10, there's also a

14   transcript that the defendants entered into the record.  The

15   timestamp I'm starting it at 23:57, I'm going to run it to

16   about a minute 27.

17         *(Audio recording playing.)*

18         *Speaker1: Basically just it's really a advocacy thing*

19   *and they've got close ties to people in the University*

20   *administration.  I don't know who planted it, but they came out*

21   *with this big exposé on the Liberty Institute and how all these*

22   *evil West Texas millionaires were interfering in the sacred*

23   *trust of the University of Texas and suddenly politics was*

24   *going to make its way into the University of Texas as if we*

25   *haven't converted ourselves entirely into a leftwing activist*

1    *machine for the past five years.  And so then the President --*

2    *now, it turns out the President had picked one of his deputies*

3    *to be sorting out how this stuff was going to work and he*

4    *picked a critical race theorist.  So one of the first things he*

5    *did was make like hard core critical race theorist who like*

6    *teaches Marxist stance and doesn't believe there should be a*

7    *single conservative voice on campus, he made him vice president*

8    *of academic priorities.  Now, this is a guy who's now in charge*

9    *of figuring out how to set up this new dissenting entity.  So*

10   *we've got a critical race theorist in charge, this article*

11   *comes out.  I don't know if that's a coincidence.*

12          *Speaker2:  Which came first, the article or the*

13   *critical race theorist?*

14          *Speaker1:  It turned out the critical race theorist*

15   *had been in charge for months that we didn't know about, and*

16   *then the article comes out, President is like, Oh, no, we can't*

17   *do what we used to do.*

18          *He calls in Carlos for this meeting, and then the*

19   *critical race theorist is sitting there dictating exactly how*

20   *the thing will be structured and the idea is, okay, Carlos*

21   *we'll let you run this as long as you just give money to*

22   *existing departments to hire people that we'll hire anyway.*

23   *And you can ask them to hire people, but you can't do anything.*

24   *So the whole idea of an independent group, you cannot hire a*

25   *sensible person with the assent of the anthropology or*

1   *sociology department, so the idea is like, okay, you've gotten*

2   *this money for this independent thing, instead we're just going*

3   *to use it to fund the wish lists of existing departments and*

4   *you just go around and tell all the conservative donors and*

5   *politicians that everything is fine and this is the right way*

6   *to do it.*

7   *Now, all of this is the plan of a critical race*

8   *theorist who has been trusted to bring dissenting non-leftist*

9   *thoughts.  At this point, obviously we're not going to go along*

10  *with that nonsense, we have better things to do with our time*

11  *than provide cover for the President to let critical race*

12  *theorists run the University of Texas.  So Carlos tells the*

13  *supporters, No, this isn't what we agreed to, we're not going*

14  *to do this.*

15  *And that's when the -- with the single exception, the*

16  *donors turned on us, the President starts doing his like -- the*

17  *people -- the sole qualification for being a President of a*

18  *university in a red state is that you're good at lying to*

19  *Republicans.  So he manages to get the donors convinced that we*

20  *are the problem, Oh, we won't play along with the critical race*

21  *theorist plan so we're putting the thing in danger.  The thing*

22  *is dead.*

23  *(Audio recording stopped.)*

24                          *   *   *

25              MR. KOLDE:  I stopped there and at 27, Your Honor, and

1    I'm just going to pull up my timeline here real quick.  All

2    right.  So this is our abbreviated timeline.  This is a shorter

3    version of what's in the defendant's Power Point.  I think it

4    illustrates sort of the connection of these events.  There are

5    other criticisms, there are other events that matter in this

6    case, but these are some of the key points.

7            In July, Richard publishes this story, this article,

8    opinion piece, it's publicly available.  On the 18th he goes on

9    the Hanania podcast.  Sometime in late July, early August,

10   Titman calls Carvalho, it's the We need to do something about

11   Richard conversation.  In that conversation, according to

12   Professor Carvalho, Titman says that Hartzell and Mills are

13   upset about Richard Lowery's political advocacy.  That is in

14   ECF 8-2, which is the Carvalho declaration.  That then leads to

15   a meeting on August 12th between Mills and Burris and Carvalho.

16           That meeting is described differently in the Carvalho

17   declaration than it is in the Mills and Burris declarations.

18   They agree on a few things.  They do agree that there was some

19   discussion of Lowery's speech.  Mills characterizes it as

20   disruptive.  I believe that Burris called it disparaging or

21   something like that, so it's clear they had a discussion about

22   Lowery's speech and they characterized it in a negative way.

23   They deny or don't remember saying various other things that

24   Carvalho said they said in the meeting, like Richard's speech

25   was crossing the line, that Carvalho essentially needed to

1   intervene and do something to reign Richard in and, very

2   importantly, that potentially Richard's affiliation with the

3   Salem Center was at risk of not being renewed as well as Carlos

4   Carvalho's own affiliation as a director of the Salem Center.

5   Those facts are disputed and that testimony is disputed and I'm

6   going to come back to this in a moment.  That's very important,

7   that August 12th meeting is very important.

8           THE COURT:  I've got some questions for you.

9           MR. KOLDE:  Yes.

10          THE COURT:  First of all, I understand that a fair

11  amount of your argument in your motion for discovery to be --

12  you know, when you point to this discovery or that, whether

13  it's the documents or depositions, that these matters might

14  clear up some disputed fact issues particularly where people's

15  versions of the stories or their recollections of these

16  conversations differ.  In terms of your entitlement to a

17  preliminary injunction, what's the standard in terms of

18  satisfying the likelihood of success on the merits prong?  It

19  can't be that you've got to prove that you are going to win

20  your case, right?  I mean, once you're at the stage that you've

21  got disputed facts, haven't you at least satisfied that

22  preliminary prong?  I mean, because if you're right that, gosh,

23  we need to get into extensive discovery or even, you know, what

24  you might characterize as targeted discovery on -- to satisfy

25  our burden on likelihood of success on the merits, then it

1    seems like that would apply in every case in which a

2    preliminary injunction is sought, but the norm is that there's

3    not discovery before a PI.

4            So it seems to me that your argument that there are

5    disputed facts supports that you are in good shape on your

6    likelihood of success on the merits, right?

7            MR. KOLDE:  I like what you're saying, Your Honor, and

8    I wish that you in deciding this issue on the merits, I hope

9    that Judge Ezra would take the same position, but I would like

10   corroboration for the disputed facts on the merits.  Just to

11   state it quite simply and succinctly, part of our claim,

12   particularly the censorship, self-censorship claim, the chilled

13   speech claim depends on whether or not Mr. Lowery, Professor

14   Lowery is reasonably self-censoring based on a threat to his

15   career for his Salem Center affiliation.  That threat was

16   largely delivered in this conversation here on August 12th.

17   There are bits and pieces that came out in other conversations,

18   but this conversation is where that threat was delivered.

19   They're denying it and so they're disputing delivering that

20   threat.  Carlos Carvalho is saying the threat occurred.  When

21   facts are in dispute at the preliminary injunction stage,

22   District Courts are directed to have an evidentiary hearing,

23   Kaepa v. Achilles Court 76 F 3rd 624, 628.

24           THE COURT:  Well, that's another thought that came to

25   mind is I imagined, yes, that there might indeed be an

1    evidentiary hearing, and so if you're going to have Burris and

2    Carvalho and Titman and these people on the stand in a hearing,

3    why do you also need a deposition, a three-hour deposition?

4         MR. KOLDE:  Well, I could probably do it in less, Your

5    Honor, but I don't know -- I've had people run the clock out on

6    me before when I've had limited deposition do various things

7    to -- when I've had expedited discovery in similar cases, to

8    not allow me to get the questions in.  I understand that at

9    least in this District there are only objections to form

10   allowed, so there hopefully would not be any long-winded

11   speaking objections.  Can I do the deps in two hours, 90

12   minutes, maybe even 60 minutes?  Probably.  The part of it is

13   also not wasting the Court's time.  If I never talk to these

14   witnesses and potentially even for the other side with regard

15   to Lowery and Carvalho, we're going to be less efficient

16   presenting the case to the Court.

17        THE COURT:  What if then instead of live depositions,

18   you were given an opportunity to pose a set of, let's say, of

19   half a dozen or eight or ten deposition or written question

20   typo written requests.  They at least give you a preview of

21   what to expect and how to shape your questioning once you have

22   them on the stand.

23        MR. KOLDE:  I proposed that once when I was on the

24   defense side, but you know, that was vigorously opposed by the

25   other side and the judge didn't order it and I was representing

1    an Apex witness.  I think the problem with that is, Your Honor,

2    it's just like interrogatory answers, I think they're -- they

3    have some value in the discovery process, but we all know that

4    they're heavily lawyered.  They are going to not tell us a lot

5    of information.  And what makes depositions the gold standard

6    and the most effective work hunting down information like this

7    is the ability to ask necessary follow-up questions and to

8    probe the witness and to test their credibility.  Even if it's

9    just for an hour long deposition.

10          THE COURT:  So as I consider whether or not any

11   discovery is necessary here, I'm trying to use as my guiding

12   just practical principle here of what do you need at that

13   hearing.  Right?  And one of the framing aspects of the

14   preliminary injunction hearing is the terms of the preliminary

15   injunction itself that you're seeking?  And I read the motion

16   and the motion asks for a preliminary injunction to be granted,

17   but what are the exact terms of the preliminary injunction?  I

18   didn't see a proposed order in there.  How would your -- if you

19   were Judge Ezra and you presided over the evidentiary hearing

20   and concluded, yes -- and it could be that I overlooked the

21   docket, forgive me if I did, but what would be the terms of

22   your preliminary injunction?

23          MR. KOLDE:  Well, in terms of what we've asked for, I

24   believe there wasn't a proposed order required at the time we

25   filed the MPI that in our prayer for relief in docket entry

1    one, ECF 1, the Complaint, pages 24 and 25, we've asked for an

2    order preliminarily and permanently enjoining defendants, their

3    officers, agents, servants, employees and all persons in active

4    concert or participation with them who receive actual notice of

5    the injunction from threatening Lowery for protected speech or

6    from implementing those threats, including reducing his pay

7    removing his job responsibilities, removing his affiliation

8    with the Salem Center, reducing his access to research

9    opportunities, reducing his academic freedom, labeling his

10   criticism as violent or uncivil, asking any police agency to

11   surveil Lowery's speech, and engage in any other adverse

12   employment action or employment action designed to dissuade a

13   reasonable person in Lowery's position from engaging in

14   protected speech.

15            The defendants pushed back on some of the parameters

16   of that and, of course, they could work out some of the details

17   and titrate that further.  That's where our request is.  We're

18   essentially -- he is self-censoring today because of the

19   message that was delivered to him via Burris and Mills, and he

20   doesn't want to take a chance that he's going to lose the Salem

21   Center affiliation which is renewable annually and

22   discretionary, he feels he would lose $20,000 of pay, also the

23   prestige and access to research opportunities as a result of

24   that.

25            As the Court has seen, he's obviously an opinionated

1    person.  He's a dissenting voice within the UT and academic

2    community, but that voice has been silenced because, like many

3    people who have mortgage to pay and family to support, he's not

4    willing to run the risk of having his speech offend people.  It

5    is possible that Mills and Burris and Titman are acting for

6    their own regard, I guess, what they suppose might be Jay

7    Hartzell's feelings, but it is also very plausible and we would

8    argue credible that the message came from the top, from Jay

9    Hartzell that he was upset by the criticism and the fact

10   that -- he was upset by the fact that Richard Lowery was

11   reaching some people in elected positions in Texas government,

12   some of whom have reacted by introducing bills that go to some

13   of the issues that Richard Lowery has talked about and that are

14   legislative priorities in the Texas legislature.  And silencing

15   has been effective, lowery has been silenced.  So this is how

16   it's done.

17           Jay Hartzell has the motive.  That August 12th meeting

18   was the opportunity to censor and retaliate against Richard

19   Lowery.

20           THE COURT:  Are defendants correct that the main

21   issues at the PI hearing will be your client's subjective fear

22   of having his speech chilled and the objective reasonableness

23   of that fear?

24           MR. KOLDE:  I think it's one important issue, yes.

25           THE COURT:  Setting aside the fact disputes about who

1    said what when, what are the other matters that the Court is

2    going to have to decide in order to conclude that you're

3    entitled to a preliminary injunction?

4              MR. KOLDE:  Our position, Your Honor, is that the

5    Court will have to make some judgment what message was

6    delivered by Mills and Burris at that August 12th meeting.

7              THE COURT:  So I find myself -- in looking at this, so

8    the last date on your timeline there is August 24, 2022.  Today

9    is April 5th, 2023.  So however many days that is, 18 months,

10   roughly year and a half since the last -- more than 18

11   months -- I'm sorry, it's less than a year, but still several

12   months since this happened.  At most, you're going to get a

13   forward-looking injunction.

14             MR. KOLDE:  Of course, always.

15             THE COURT:  The Court is not going to have

16   jurisdiction to do anything more than that at a preliminary

17   injunction hearing anyway.  Right?  So you've got exhibits and

18   you've got declarations for both sides, you're going to have

19   live testimony at a hearing.

20             MR. KOLDE:  I don't know that, Your Honor.

21             THE COURT:  Well, maybe you do, maybe you don't, but

22   I'm still at a loss on if what you're seeking is a forward

23   looking injunction, what difference does it make about all

24   these conversations that happened eight months ago when the

25   question is really if you want an injunction that says,

1    University, stop chilling speech, that's a looking forward

2    thing.

3              MR. KOLDE:  Of course, but it matters when and how the

4    threat was delivered.  Yes, there was some delay in coming into

5    court, that's the nature of obtaining counsel.  We are a public

6    interest law firm.  We are doing this case on a pro bono basis.

7    There is not a lot of availability for people who do pro bono

8    civil rights litigation and we don't have enough lawyers to

9    handle all the cases that we have.  So that is part of the

10   reason why this case was not filed in the winter or in the fall

11   of last year, but we are talking about not that long of a

12   timeline, and the harm is ongoing.

13             Just recently Richard Lowery was asked to cosign an

14   editorial in the Wall Street Journal, he was also contacted

15   about the possibility of testifying about some of the issues

16   that he's been self-censoring before the Texas legislature.  He

17   declined both of those opportunities, so that harm of

18   self-censorship is ongoing and it's recent.  Again, it is about

19   delivering the threat and the message.

20             We are not asking for damages here.  I understand

21   counsel for the defense has made an argument that we're trying

22   to seek retrospective relief -- *(inaudible)* -- we're not doing.

23   But what happened in the past is relevant, the past is

24   prolonged.  It's relevant to the future, it's relevant with

25   regard to how they delivered the threat and why he's

1  self-censoring today.

2          Same thing, by the way, on the Verizon case on

3  standing where the Supreme Court acknowledged that it was

4  acceptable to look for -- or for Verizon to talk about past

5  action, regulatory action that had been taken because it was

6  relevant to the issue of forward looking -- of regulatory

7  action.

8          THE COURT:  With respect to the Apex deposition

9  argument that was made, I saw in your reply you cited a couple

10  cases addressing the propriety of deposing people at the top of

11  an organizational structure.  I'm curious, were those cases --

12  did those involve -- was that merits discovery or was that a

13  pre-preliminary injunction expedited discovery that was ordered

14  from an Apex witness?

15          MR. KOLDE:  I would have to double-check on that, Your

16  Honor, and I can do that while the other counsel is arguing.

17  But what I took away from those cases, the two cases that was

18  cited, one was when there is a theory of the case that posits

19  direct involvement by the Apex witness, getting a deposition of

20  the Apex witness is appropriate.  And the second case that we

21  cited had to do with the inadequacy of having a 30(b)(6)

22  witness essentially interpose themselves when the credibility

23  of the Apex witness or the top executive was at issue.  And

24  here it is about Jay Hartzell's credibility and his

25  involvement, because if he put an order out or a directive or a

 1  suggestion or expressed a concern to his underlings in what is

 2  essentially a corporate structure, that's the law at the

 3  University today, that makes it much more likely and credible

 4  that Carlos Carvalho's version of events of the August 12th

 5  meeting is more accurate and more credible than Mills and

 6  Burris's.

 7          THE COURT:  Well, I got a question about the document

 8  request you have because I had about 25 of your 30 minutes at

 9  this point and I do want to address this.  The document -- one

10  of the things the defendants complained about is that it's

11  vague or overbroad because it says, referring to Lowery's

12  speech, directly or indirectly.  And I can see how the "or

13  indirectly" sure seems to open up the scope of that document

14  request significantly.  What if that document request was

15  limited -- take out "or indirectly" all together and maybe just

16  search custodians who are parties to the case who -- and maybe

17  even further limit it to certain key words like Lowery,

18  Carvalho or Salem Center.

19          MR. KOLDE:  That would be a start, Your Honor.  I'm

20  concerned that they might have used code words or different

21  words to address those issues.  I used to be a defense attorney

22  for a large government entity.  These e-mail searches, they're

23  on Office 365 and they have Microsoft advanced E-discovery

24  tool, they could hire a competent person to do these searches

25  in about an hour, it wouldn't be very hard.  But part of what

1   we have here is also a history of Jay Hartzell texting people

2   who he used to work with in the business school.  And the text,

3   as is true in many organizations, they're not part of the

4   official record, they're not backed up onto UT's exchange

5   servers, those need to be gathered via custodial interviews.

6   That's not super hard, but it requires reaching out to each of

7   those six people individually, talking with them about whether

8   they sent texts related to Richard Lowery.  They might use the

9   word "Richard."  They might use the word "Lowery" or they might

10  not.  They just might refer to this problem that we're having

11  or something like that, and those would not be normally

12  gathered by downloading them.  I'm okay with screen shots as

13  long as people haven't been deleting them, that a false

14  pretentious setting on iPhones for iMessages is forever.  So

15  unless they've been changed to one year or 30 days, which is

16  possible and there are some interesting cases about that, you

17  know, those texts for a meeting that happened less than a year

18  ago would still potentially be around.

19          We would at least want the questions to be asked and

20  an attempt made to gather that information.  A lot of the

21  conversations that used to happen by e-mail that were sort of

22  unvarnished, unfiltered, now take place by text message.  And

23  organizations are not always very good about gathering those

24  text messages.  We want the question to be asked and we want to

25  know if there were text messages sent to or from those six

1   people which is a very small finite group of key players for a

2   very tight five-month period.  Talking to them, gathering the

3   screen shots is not a terribly involved process and this is a

4   very capable law firm here on my right.  They have the people

5   that can do that and help UT deal with those issues.

6   Internally gathering e-mails should be fairly easy.

7           I agree the search terms that are proposed by the

8   Court would be a good place to start, but I would ask that an

9   interview be had with the key witnesses that say, Well, did you

10  send e-mails about Lowery's speech that might have used other

11  terms or that might have referred to it in a different way?

12          I've been involved with the Sadona Conference for many

13  years, I've drank the Kool-Aid, I believe in cooperating with

14  discovery, but the defendants have the most information.  This

15  is asymmetric here, we're asking for information that they

16  have.  And I really want to emphasize this both as to the

17  documents we've requested, Your Honor, as I close out, and the

18  depositions.  Part of what I'd ask the Court to look at is what

19  they have not told us about because that speaks volumes.  There

20  is no declaration here from Jay Hartzell.  Look at these

21  brilliant, capable lawyers over here, how many resources UT has

22  thrown at this case to prevent discovery.  If Jay Hartzell

23  truly was not involved at all, they could have dealt with this

24  issue with a half-page declaration, saying, *I've never talked*

25  *to any of these people about any of this stuff.*  There is no

1    such declaration.  Nor do Mills, Burris or Titman say anything

2    about Jay Hartzell in their declarations.  That is what's so

3    telling here.  That tells me that UT is hiding something.  I

4    don't want to waste the Court's time with a -- I could do this

5    all day, I could be at an MPI hearing all day, but I assume

6    Judge Ezra has got a lot of other things to do.  If we're

7    allowed short depositions, even if they're not full three

8    hours, maybe an hour and 90 minutes apiece, we're going to know

9    a lot more information, we're going to be able to decide which

10   witnesses should be called, not called, maybe some witnesses we

11   could just present the deposition excerpts without taking up

12   the Court's time.  It would be a much more efficient process

13   and it will also be a much more fulsome record if either side

14   ends up appealing this case.

15          This is not like Speech First, where the policy at

16   issue and a lot of the allegations were all reduced to paper.

17   There is a factual dispute and we will be asking the Court to

18   make a credibility call.  I imagine the defense will also be

19   asking the Court to make a credibility call at the MPI hearing,

20   including in particular what happened at that August 12th

21   hearing.  That credibility call requires testimony from the

22   witnesses, that can be live testimony and it could be

23   depositions or it could be a combination of the two.  It would

24   be the most efficient and the best process if we're allowed to

25   do both.  I am cognizant of the need to save time and costs and

1    I'm willing to shorten the request for depositions if the Court

2    will give us a chance to take these deps.  I really do think --

3             THE COURT:  Mr. Kolde, you're out of time, you're

4    repeating yourself, message received.

5             MR. KOLDE:  Thank you, Your Honor.

6             THE COURT:  Mr. Glover.

7             MR. GLOVER:  Thank you, Your Honor.  I'm going to stay

8    here at the podium if that's okay with the Court.

9             THE COURT:  That's perfectly fine.

10            MR. GLOVER:  May it please the Court, Your Honor, this

11   motion for expedited discovery we view should be denied for two

12   reasons.  The first being that we have a fully developed

13   preliminary injunction record and anything beyond plaintiff's

14   perceptions, which we'll show you in a moment, Your Honor, are

15   in the record, is irrelevant to determining or determining the

16   outcome of the preliminary injunction motion.  And second, that

17   we don't have to get into it too in-depth today, there are some

18   significant jurisdictional issues that are fully briefed in our

19   pending 12(b)(1) motion that we believe should certainly be

20   resolved before any of the type of merits discovery that we

21   just heard about from the other side.

22            Your Honor, what do we mean when we say that the PI

23   recording fully developed?  There are over 500 pages of

24   documents in this record, 29 of those pages comes in the form

25   of testimony from three separate declarations from Professor

1    Lowery.  And that's important for the preliminary injunction,

2    for deciding whether the preliminary injunction should be

3    granted or not because what's relevant in that analysis is

4    Professor Lowery's perceptions, as Mr. Kolde pointed out,

5    around the time that he had those perceptions and around the

6    time that he was deciding whether he should self-chill whether

7    he perceived some sort of adverse employment event.  That's

8    what's relevant.  And who knows that beyond Professor Lowery

9    himself?  And without -- so if anything beyond that such as

10   communications that Professor Lowery wasn't a part of, doesn't

11   even know about yet, testimony about conversations that

12   Professor Lowery didn't know existed or only things might have

13   existed, or didn't for that matter, that would be irrelevant.

14   And if it's irrelevant, then in the preliminary injunction

15   context, there's no purpose for it.  And if there's no purpose

16   for additional evidence that would inform the Court in deciding

17   the preliminary injunction motion, then there's no good cause.

18   And when there's no good cause for deciding or for the

19   expedited discovery, then the expedited discovery is improper

20   in the preliminary injunction context.

21          We'd like to show the Court that we're not just

22   showing that the PI record is fully developed, we'd like to

23   show there's actually a lot that goes into what Professor

24   Lowery was aware of.  There are things that he knew, things

25   that he says were said, things that he says he heard about in

1    addition to actions that he took around this time.  We don't

2    dispute what Mr. Kolde said that Professor Lowery published an

3    article in early July.  We don't dispute, as Professor Lowery

4    has testified throughout the PI record, that he has a number of

5    articles that he's published leading up to the time at issue

6    here.  He did speak at this podcast on July 18th with Richard

7    Hanania.  Richard Hanania, I don't know if he got into it, is a

8    visiting scholar at the Salem Center where Professor Lowery is

9    the number two.  Professor Carvalho who's another declarant for

10   Professor Lowery heads the Salem Center.  In any event, there

11   are a number of these centers at UT and Professor Lowery was a

12   guest on this one podcast.

13           Tim, if you could please go to slide 20 for me.  He

14   said a number of things.  We're going to play shorter clips

15   hopefully than what we've seen, but there are some other

16   excerpts.  He didn't just say what Mr. Kolde said.  He talked

17   generally about UT leadership in July.  Go ahead, Tim.

18           *(Audio recording playing.)*

19           *Speaker1:  ... status quo came down to Republicans*

20   *voting large amounts of money to people to engage in communist*

21   *activism and that's just how -- that's just what's okay and now*

22   *it's worse.  Like, I'd go back to communism over let these*

23   *people --*

24           *Speaker2:  Good old days of communist --*

25           *Speaker1:  Back when the KGB was actually carefully*

 1  *controlling this stuff, it at least had some coherence to it.*

 2  *Now it's all gone so wild without those guys -- those guys got*

 3  *busy with other things and it just kind of had a -- took on a*

 4  *life of its own.*

 5          *(Audio recording stopped.)*

 6                      *   *   *

 7          MR. GLOVER:  So he said that he also spoke directly

 8  about Dean Mills, a defendant in this case who runs the McCombs

 9  School of Business.

10          THE COURT:  But these conversations happened before he

11  started self-censoring, right?

12          MR. GLOVER:  That's right, Your Honor.  That's before

13  the alleged self-censorship, but it's important to understand

14  that he's making these statements and not just any sort of

15  statement, but statements that are directly -- that are

16  directed at leadership for the University up to and including

17  President Hartzell where you saw some references on President

18  Hartzell on how the sole qualification is lying to Republican

19  politicians.  That's right.  But what happens after that?

20  Slide four please, Tim.

21          So what happens after this, in context, there's a

22  conversation between Professor Titman and Professor Carvalho

23  where Titman allegedly tells Carvalho, quote, *We need to do*

24  *something about Richard.*

25          So this is in the context of the first perceived

1  threat that Professor Lowery has.  Now, Professor Titman, as

2  the record shows, disputes exactly how that conversation

3  occurred or what was said, but for purposes of deciding this

4  motion, the motion for expedited discovery, what matters is

5  what Professor Lowery perceived.  What Professor Lowery

6  perceived was communicated to him by Professor Carvalho.  So

7  this is Professor Carvalho's version of what happened.  That's

8  what Professor Lowery perceived.

9         A couple weeks later, Dean Mills and Dean Burris have

10 a meeting, requested by Professor Carvalho, by the way, they

11 didn't seek him out.  And they say -- and Professor's

12 Carvalho's testimony is, quote, *Work with Richard about his*

13 *speech.*

14        Again, disputed by the defendants, but it doesn't

15 matter.  If this is what Professor Carvalho communicated to

16 Professor Lowery, that's what he knew as of August 12th,

17 August 15th.

18        Throughout the rest of the month of August, Your

19 Honor, he is tweeting, he tweets the Governor and the

20 Lieutenant Governor asking why the University is becoming

21 communist or full Mao, as a reference to Mao Zedong.  A few

22 days later, he tweets about another center within the McCombs

23 School and he says a number of things.  He's taking umbrage

24 with what that center is doing.  He says, quote, *Even though we*

25 *invite -- expletive -- communists who support the murder of the*

1    *Romanov children to debate.*

2            It's kind of confusing exactly what that tweet meant,

3    Your Honor, he had to explain it in contemporaneous e-mails

4    that are in the record.  He's also had to explain it in his

5    declarations which are also in the PI record, but in any event,

6    that's what he said.  That day he alleges and actually the

7    e-mails show that Titman said, quote, *You don't seem to be*

8    *making friends.*

9            Well, Professor Lowery has testified in his

10   declaration that that's what he perceived as a threat, so

11   that's already in the record.

12           The next perceived threat that Professor Lowery had

13   that's in the record, again from Professor Carvalho, is that

14   Dean Burris allegedly tells Professor Carvalho that he has,

15   quote, *The power to have Lowery not attached to the center,* end

16   quotes.  That's towards the end of August.  But what happens in

17   the next couple weeks?  First, he gets a 7,500-dollar

18   merit-based pay raise from the University making his salary

19   over $257,000, I believe.  That's in the record.  Couple weeks

20   later he is appointed to the Salem Center.  Well, what else

21   happens -- excuse me, reappointed to the Salem Center.  And for

22   the record, these are all reappointments made on an annual

23   basis for every center, certainly within the McCombs School,

24   but for sure across the entire University system.

25           September 10th, in between his 7,500-dollar

1    merit-based pay raise and his reappointment to the Salem

2    Center, Professor Lowery files a lawsuit against Texas A&M in

3    the Southern District, and he says in that lawsuit that he's

4    attempting to apply for a job at Texas A&M to become a

5    professor there, but he can't because he's being discriminated

6    against for a number of reasons, and that's pending somewhere

7    else.  But a couple things come out.  At that point, the

8    University knows, one, Professor Lowery is trying to apply

9    somewhere else, to another job, and two, that he's an active

10   litigant against another public university in front of a

11   federal judge in this state.  So that's going on.

12          Another perceived threat that Professor Lowery said he

13   has that's also in the record from the testimony of Professor

14   Carvalho is October 17th, Professor Carvalho says that Dean

15   Burris tells him that he might not approve of Lowery's

16   appointment in the future because of his speech.  So that's in

17   the record.  And again, Dean Burris disputes the contour to

18   that, but what matters is what Professor Carvalho communicated

19   to Professor Lowery that he knows.

20          THE COURT:  Well, isn't it those contours that

21   plaintiffs have a right to explore in some limited discovery

22   before the preliminary injunction hearing takes place to focus

23   the efforts of that hearing?

24          MR. GLOVER:  Well, certainly by exploring those

25   contours through communications with other people, that sort of

1    information might show up, but -- and we don't know if it does,

2    frankly, sitting here today.  But what it isn't going to change

3    and what it could not change is what Professor Lowery perceived

4    at the time that he decided to self-chill and at the time that

5    he perceived some sort of adverse employment event.

6           What we think he actually perceived at the relevant

7    time was there was no need to self-chill.  Why?  Because the

8    last threatened -- the last perceived threat was October 17th,

9    and what happens?  Two separate events that Professor Lowery

10   speaks at.  Can we go to slide -- actually, let me preface

11   this.

12          So October 21st, Professor Lowery travels to the East

13   Coast and speaks at a conference.  He's at a panel, sitting in

14   front of a microphone, clearly is speaking.  Remember, this is

15   after the last perceived threat.  We then excerpted from the

16   video that's in the record at 14-13.  Behind the podium, you

17   see there, McCombs School of Business.  It's one of those

18   vertical banners that can be raised up and easily traveled

19   with.  That is the logo for the Salem Center, and under that it

20   says Salem Center.  So Professor Lowery, as of October 21, is

21   not only not self-censoring, he's traveling and speaking under

22   the banner of the McCombs School and the Salem Center.

23          Now, slide 24 please, Tim.  And he's not saying

24   something different.  He's communicating exactly what was being

25   communicated in July of 2022.  Would you play that for us

1   please, Tim?

2            *(Audio recording playing.)*

3            *Speaker1:  Again, they love these people because these*

4   *people tell them optimistic stories.  These people go to the*

5   *football game with the President.  These people are very good*

6   *at one thing and one thing only which is convincing people that*

7   *everything is actually not that bad and as long as I get enough*

8   *resources, we'll do good.  And every single time I have looked*

9   *at so many of these attempts and I've been involved with them,*

10  *the grifter always wins.  And the grifter always wins, not*

11  *because of the University, but because of the donors, the*

12  *alumni, and the politicians, they'd always rather go with the*

13  *grifter.  And so that's why we're doomed.*

14            *(Audio recording stopped.)*

15                        *   *   *

16       MR. GLOVER:  Slide four please.  Your Honor, you heard

17  some laughter at the end, it's obviously a room full of people.

18  And the next slide you can see the backs of heads here.  This

19  is a room full of people he's speaking to, clearly has a

20  microphone so that he can be heard.

21       You heard the grifter claim in October 21st.  When

22  else did he say grifter?  In the July podcast where he's saying

23  UT leadership got money from taxpayers and it's now being

24  stolen by grifters.  So he's saying the exact same thing that

25  he was saying before he alleges he was self-chill, that's why

1    we were showing the Court the video that's already in the

2    record.

3           Moving forward, he's not done on this speaking tour,

4    Your Honor.  He goes coast to coast, travels from the East

5    Coast to Stanford and speaks on another panel.  You can see him

6    here communicating a message with a number of people.

7    Professor Lowery will tell you, *Oh, well, I know I did that, I*

8    *know I spoke to a room full of people and I know it's publicly*

9    *available on the Internet* -- that's where we got it -- *but I*

10   *wasn't talking about public universities, I was only talking*

11   *about private universities.*

12          THE COURT:  These documents, communications, e-mails,

13   texts that plaintiff seeks, the deposition time the plaintiff

14   would like to have, maybe it shows, maybe it doesn't, this plan

15   to -- that University leadership is hatching, allegedly, right?

16   Hatching to shut down critical speech about the University.

17   And if both of y'all now have spent a decent amount of time

18   talking about the merits or the facts underlying these claims,

19   it doesn't seem to me, then, that the discovery side is totally

20   irrelevant, is it?  For the purpose of the preliminary

21   injunction determination and assessing credibility of the

22   witnesses?

23          MR. GLOVER:  Well, two answers to that, Your Honor.

24   First, the reason we're showing this and the reason that you

25   saw it from Mr. Kolde as well is so you could see the

M O T I O N   H E A R I N G          35

circumstances kind of surrounding what we're here to present to
the Court and why these facts matter for determination of the
instant motion.  We're saying there's nothing needed for,
whether it's you or Judge Ezra, when the preliminary injunction
motion is decided, beyond what Professor Lowery perceived and
what he did in response to his perceptions, and that's already
in the record.  What we could gain, and Your Honor keyed on it
with Mr. Kolde in part of your discussion here, was maybe there
was some plan to get Professor Lowery, maybe we need to learn
about that.  Despite the facts around the time of the events at
issue that we say warrant denying this motion, there's direct
testimony from the defendants about punishment, alleged
punishment that is going to happen against Professor Lowery,
and the answer is none.  The first piece of evidence --

          THE COURT:  Well, of course, that's what the defendant
is going to say.  Right?

          MR. GLOVER:  Well, sure, Your Honor, but it's backed
up by what?  Objective evidence that he received a merit-based
pay raise in September of 2022 in addition to reappointment to
the Salem Center after saying these things that he says he was
threatened about.  And I think it's worth looking at this
evidence because it wasn't mentioned by Mr. Kolde.  Dean Mills,
head of the business school, *I not had stopped to terminate,*
*demote or discipline Dr. Lowery because of his speech.*
*Dr. Lowery is a tenured professor.*  Jay goes through what is

1  necessary to remove a tenured professor.  On the fourth line

2  down, she said, *Nobody has triggered this time-consuming*

3  *process, nor is she aware of anything he has done or been*

4  *accused of doing that would warrant his removal.  His tenured*

5  *position is secure.  Regarding his speech more specifically,*

6  *she has not censored discipline or otherwise punished*

7  *Dr. Lowery for his speech and has no plans to do so in the*

8  *future and she's not aware of any other University officials or*

9  *administrators who have done so or plan to do so in the future.*

10        So what would be asked beyond this about what the

11 plans are?  And she's already said under oath that there is no

12 plan to do that.  Dean Burris didn't say much different.  He's

13 never threatened Dr. Lowery --

14        THE COURT:  And I guess that goes to when I asked the

15 question about a deposition on written questions and whether

16 it's interrogatories or DWQ, that sort of testimony is not the

17 same -- eliciting that sort of testimony isn't the same as

18 having the witness in the hot seat squirming and giving the

19 lawyer the opportunity to ask pointed questions and ask

20 follow-up questions.  Right?  So shouldn't plaintiff have an

21 opportunity to explore some of these statements a little bit

22 before the preliminary injunction hearing?

23        MR. GLOVER:  Your Honor, we would respectfully

24 disagree that he needs that opportunity.  The reason being is

25 twofold.  One, as we've said, nothing matters beyond what

1    Professor Lowery's perceptions were that he says caused him to

2    self-chill, that he says caused him to perceive an adverse

3    employment event.  And then the indisputable evidence in the

4    record that, one, he has not self-chilled, we saw at the end of

5    the timeline from the plaintiffs that he stopped speaking all

6    together.  That's clearly not the case.  And number two, there

7    has been no adverse employment event such that there's a

8    retaliation event.  He received a merit-based pay raise shortly

9    after the -- I think the key meeting that Mr. Kolde referred to

10   was in August 12th.  Well, within a month of that, he had a

11   7,500-dollar merit-based pay raise and reappointment to the

12   Salem Center.  So both the subjective perceptions of Professor

13   Lowery which must be analyzed under an objective standard done

14   by the Court as a matter of law, in addition to the

15   indisputable evidence in the record so as that anything that we

16   ask the defendants about this wouldn't change the Court's

17   decision, in our view.

18          Your Honor, I would like to proceed where there was

19   some mention of President Hartzell.  And we think the Court is

20   right, that -- first, there shouldn't be any discovery, of

21   course, that's our view.  But a third party such as President

22   Hartzell or anyone else is certainly out of bounds here.  And

23   why is that?  Because in the record, there's one -- excuse me,

24   there's only one individual who allegedly had any kind of

25   conversation with President Hartzell and that's a defendant in

1    the lawsuit, Professor Titman.  But even in that conversation

2    which is recanted from the testimony of Professor Lowery in a

3    couple different declarations, Professor Titman tells Professor

4    Lowery, *That in the same conversation that she already told*

5    *Hartzell that nothing could be done about my speech.*

6           So that's what Professor Titman told Professor Lowery.

7    Then after this conversation occurred is the merit-based pay

8    raise, is the reappointment to the Salem Center.  With that

9    said a couple times, there's one other instance where Professor

10   Hartzell is mentioned and that's in Professor Carvalho's

11   declaration.  It's along the same lines, so there's not much

12   difference there.

13          There's no alleged direct conversation, to be crystal

14   clear, between Professor Lowery and President Hartzell.  And

15   there's no direct allegation of a conversation between

16   Professor Carvalho and President Hartzell.  There's no

17   allegation that Dean Mills spoke to President Hartzell directly

18   about this or Dean Burris spoke to President Hartzell.

19          THE COURT:  Maybe they haven't alleged it because they

20   don't know because they haven't had a chance to explore those

21   e-mails and text messages.

22          MR. GLOVER:  The reason they might not know this, Your

23   Honor, is because it's irrelevant to what he perceived that

24   caused him to self-chill.  If he didn't know it, if he didn't

25   know that the President of the University and the dean of the

1   business school had some conversation or didn't, then that

2   wouldn't weigh on his decision, his subjective decision to

3   self-chill if he perceived some sort of adverse employment

4   event.  Instead, what we have is an inference from Professor

5   Lowery.  He says, *It is my inference based on what Sheridan has*

6   *said to me during the summer and fall of 2022, that he did not*

7   *want to keep getting pressure from Hartzell, Mills, Kothare or*

8   *others to do something about his speech.*

9          THE COURT:  How do you respond to plaintiff's argument

10  in their reply that you haven't satisfied your burden of

11  demonstrating that these requests -- referring specifically to

12  the document requests -- are overly burdensome because they're

13  to a set number of custodians, they're limited to five-month

14  timeframe in a specific subject matter, that being directly or

15  indirectly discussing speech?  Do you have a sense of how many

16  texts and/or e-mails that search would implicate?

17         MR. GLOVER:  We don't, Your Honor, but we're certainly

18  complying with our other discovery obligations under the

19  Federal Rules.

20         THE COURT:  Doesn't that undercut your argument that

21  this is overly burdensome if you can't articulate how big of a

22  body of work you're going to have to review that would be the

23  burden?  Or is it your argument they shouldn't get anything

24  and, therefore, anything that we have to produce would be

25  overly burdensome?  I guess that's what I'm trying to

 1   understand.  Because it's something I got to consider is how

 2   burdensome is it for you to comply with this request?

 3            MR. GLOVER:  Your Honor, certainly the first point is

 4   the key point, that there's nothing necessary, so anything

 5   beyond what Professor Lowery knows is an undue burden at the

 6   preliminary injunction phase under the rules and the case law

 7   interpreting expedited discovery motions and requiring good

 8   cause.  But second, as a practical matter, we don't have a set

 9   of discovery requests.  We don't have a set of search terms for

10   specific custodians.  Even as of Monday, we spoke with

11   Professor -- or excuse me, Mr. Kolde, and we appreciate him

12   saying that the set of draft discovery that he sent a while

13   back when he thought we were having a Rule 26(f) conference was

14   a guide to what we were getting at, but even with that, we

15   don't -- we're not able to go search for documents because we

16   haven't been tendered a request that we said are the active

17   requests that the Court must consider.

18            THE COURT:  What is the status of your 26(f)?  So

19   you've not done it yet?

20            MR. GLOVER:  That's right, Your Honor.  We have not

21   done that yet, Your Honor, under the authority in this Circuit

22   that allows us to push back on that while we have pending

23   threshold jurisdictional issues, and those being the ones that

24   are fully briefed as of yesterday under Rule 12(b)(1).

25            THE COURT:  Let's say that I disagree with you that --

 1   about their entitlement to at least some discovery.  How would

 2   you target their proposed requests?  And I get they've not --

 3   they've only filed this motion, but not actually tendered a

 4   discovery request to you.  But how would you pare back, for

 5   example, the document requests as it's currently worded?

 6          MR. GLOVER:  Well, certainly Your Honor keyed in on

 7   it, the "or indirectly."  Any defense lawyer has a hard time

 8   figuring out how to respond to a request for speech directly or

 9   indirectly, that's a difficult thing.  I think the first issue

10   that we would have is wondering if we go down this road and we

11   try to see what directly implicates Professor Lowery's speech,

12   then are we misinterpreting what a direct reference to

13   Professor Lowery's speech is?  And so do we need to revisit it

14   as Mr. Kolde comes to us and says, Hey, we need this kind of

15   document too, this kind of document too?  And at that point,

16   we're out of the expedited discovery in a preliminary

17   injunction context and we're in full blown merits discovery

18   getting ready for a trial on the merits and that's not what

19   expedited discovery for a Rule 65 preliminary injunction motion

20   allows to happen.  That's why it's a high good cause standard

21   for this discovery to occur, particularly when there are over

22   500 pages of evidence in the record and 29 pages of testimony

23   from the plaintiff whose perceptions matter.  That's what

24   matters for the Court's determination and we say the record is

25   complete as a result of that.  I see my time is running up,

 1    Your Honor, and I don't want to get busted here.

 2            THE COURT:  By my count you've got five minutes of

 3    your 30 remaining.  Let me make sure I don't have other

 4    questions for you though.

 5            What's your thoughts -- setting aside -- I get that

 6    you say no discovery is appropriate and I may agree with you,

 7    but for the sake of argument, let's say that I think some

 8    follow-up is merited or not completely out of the --

 9    unreasonable.  How would you -- what do you think about a

10    deposition on written questions submitted to the -- maybe the

11    three defendants limited to ten questions and subject to the

12    same rules about compound questions that govern

13    interrogatories?  Because I can see that as a potential

14    compromise that might not be totally satisfying, but at least

15    is something.  But also if I order that, I don't want the

16    serving party to get cute and say, Okay, you're going to give

17    me ten questions, well, I'm going to actually ask 30 and just

18    kind of craft them into -- number them one through ten.  What

19    do you think about a deposition on written questions as a

20    potential compromise on this?

21            MR. GLOVER:  You mean to the defendants themselves,

22    Your Honor?

23            THE COURT:  Just to the defendants, not to any

24    nonparties.

25            MR. GLOVER:  I think that's certainly less burdensome.

1    I think that's a better option than requiring three very busy

2    folks at the end of an academic year to sit for depositions.

3    Certainly less burdensome.  Of course, I say that without

4    waiving our belief as to --

5              THE COURT:  Understood.

6              MR. GLOVER:  And I don't know whether Mr. Biggs and

7    Mr. Hughes are burning holes in the back of my head at the

8    moment, but I think that is certainly less of a burden than any

9    of the other discovery that has been proposed today.

10             THE COURT:  Because obviously, I mean, some of what

11   they say, Hey, we should get a chance to explore this is -- you

12   said this in your declaration, our person says something --

13   sees it differently and maybe that at least is sort of gives an

14   opportunity for a follow-up question on some of it.  And it may

15   be that the response isn't any different than what they've

16   already said, but at least in that respect they get -- the

17   plaintiff does have an opportunity to ask a question as opposed

18   to just having to take your word for it as it was chosen to be

19   put into a declaration.

20             MR. GLOVER:  On that point, Your Honor, if we are --

21   that's what just came to mind, if we are posed a question like

22   that where one of our witnesses says I've already testified to

23   that in that declaration, we don't want anyone to be upset when

24   the answer is the same, because the facts are as they already

25   said they are.  If they perceived it one way -- if they

1    perceived a conversation in a certain way and that conflicts

2    with Mr. Carvalho, they've already set that out in a

3    declaration.  So as long as we understand that we wouldn't be

4    asked to change history and change our view of what happened, I

5    think that would be more acceptable than sitting for a

6    deposition.

7            THE COURT:  Well, I mean, the witness is under oath,

8    answer those questions truthfully.

9            MR. GLOVER:  Sure.

10           THE COURT:  Okay.  I don't think I have any more

11   questions for you right now.  I think there's one other -- oh,

12   sort of last question or request for alternative relief in your

13   response was, well, what's good for the goose is good for the

14   gander.  If they get to depose us, we should get to depose

15   them.

16           If what I order here is no additional document

17   production, but a 10 DWQs to the three defendants, I assume you

18   would want the opportunity to also submit a deposition on

19   written questions on the same terms to plaintiff?

20           MR. GLOVER:  Yes, Your Honor, we think it's only fair

21   that if they get some discovery, that we get reciprocal, so

22   that, as Mr. Kolde says, we get a more fulsome record.

23           THE COURT:  Okay.  Thank you, Mr. Glover.  I set y'all

24   30 minutes a side, but I'm sure, Mr. Kolde, you have something

25   you want to say in addition after having heard Mr. Glover's

1    argument.  And so I've got a hard stop at 12:30.  That's when I

2    want to be stating my ruling on the record.  And so you can

3    kind of tell sometimes my questions don't always preview where

4    my decision is heading, but that's sort of where I'm seeing

5    this going is ordering DWQs limited to the parties in ten

6    questions.  So that's where I'm kind of leaning right now.

7    I'll give you a few minutes to respond in whatever way you see

8    fit.

9            MR. KOLDE:  Thank you, Your Honor.  I'll try to keep

10   it brief.  One of their themes is clearly that only Lowery's

11   subjective perceptions matter.  But I would say why do they

12   keep focusing on the fact that we didn't threaten Lowery.

13   Their argument really is distilled down to We didn't threaten

14   Lowery and even if we did, we're allowed to threaten him.

15           So whether the threats occurred and whether there's

16   corroborating evidence threats occurred is important in this

17   case.  I would note without going into detail --

18           THE COURT:  Let's talk a little bit about that, right?

19   The purpose of this, this preliminary injunction is just going

20   to be directed at the allegedly chilling behavior.  Right?  And

21   so it seems they've got a pretty good point.  Right?  He

22   can't -- if you're self-censoring, that's something you're

23   doing in real time based on the knowledge you have in your

24   brain at that moment, your subjective awareness.  And

25   everything Professor Lowery knows about what he was thinking is

1  in his possession.  Right?  And then that subjective -- the

2  reasonableness of that subjective belief of a need to

3  self-sensor, right, is engaged against the objective

4  reasonableness of the reaction, his perception of reality.  So

5  I take it, then, is the discovery that you want to sort of set

6  up your argument at an evidentiary hearing, should one take

7  place, it's, I guess, to further prove the objective

8  reasonableness?

9          MR. KOLDE:  Absolutely, Your Honor.

10          THE COURT:  But objective reasonableness isn't

11  necessarily a factual issue, is it?

12          MR. KOLDE:  I do actually think that it's a component

13  of valuating the subjective belief in the censorship, whether

14  it's a reasonable decision to censor.  In looking at their

15  argument as a whole, they are arguing that we didn't threaten

16  him and, therefore, his belief that he feels threatened is

17  unreasonable.  That's part of their argument, so I really -- I

18  have to take issue with this argument, them saying it doesn't

19  matter.  Of course it matters.  That's why they keep saying we

20  didn't threaten him.  And that's why they haven't told us

21  anything about Jay Hartzell's role because probably they don't

22  have good things to say about Jay Hartzell's role.

23          Couple of other things that really kind of rub me the

24  wrong way, Your Honor, I want to just take a moment to address

25  them, this idea that somehow Jay Hartzell is a third party.

1   This is an official capacity suit only.  We have not made a

2   damages claim.  Official capacity suits, as the Court knows,

3   are under Ex parte Young, they are a way of suing the state

4   agency, okay.  The University of Texas is functionally a

5   defendant in this lawsuit.  That's why legal counsel's office

6   is in the courtroom today representing the University of Texas,

7   of which Jay Hartzell is the President.  So this notion that he

8   is not somehow involved in this suit or the entity that he's a

9   part of, that he sits atop of as the chief executive is not

10  part of this suit I think is a fiction and not accurate.

11          THE COURT:  Well, again, but in terms of the limited

12  task that Judge Howell is deciding today, right, for the

13  purposes of the preliminary injunction, I mean, what you're

14  talking about is kind of a fight for another day, right?

15  Whether he might have to sit for a deposition once this case

16  proceeds to the merits and whether or not you're entitled to a

17  permanent injunction, right?

18          MR. KOLDE:  Well, yeah, we'd like the deposition now

19  even if it's on written questions because he may use various

20  ways and go-betweens to get his message to the people.  This is

21  how you deliver threats, all right?  This is how the mafia does

22  it.  This is how it happens in the corporate world too and this

23  is how it happens in government.  I say that as an

24  ex-government lawyer, I spent a lot of time defending these

25  cases.  You always protect the king and you send intermediaries

1    to deliver the messages that you don't want the king to be

2    directly implicated in.  That's why we want to talk to Jay

3    Hartzell because that is the most efficient way of finding out

4    whether he was bothered by this and what he did about it.

5           I'm taking issue with the notion that characterized

6    him as a third party.  He is not a third party.  UT is part of

7    this lawsuit.  I also am, frankly, a little bit offended by

8    this position taken by the defense counsel that they don't need

9    to do anything to search their own records or that it's my job

10   to give them search terms.  One of the primary Sedona

11   principles is that defendants and producing parties are in the

12   best position to know what documents they have and how to go

13   about searching them.  This ingénue routine of, Oh, we don't

14   know, we don't know what they mean, they could do a search on

15   the search terms and get a search term report in about 20

16   minutes if they wanted to do it.  And they should have come to

17   court, they should have told me about them if they really are

18   about burdensomeness.  They've shown us zero about

19   burdensomeness.  They could have easily talked to Jay Hartzell

20   or any of the other five witnesses that we asked them -- asked

21   about and said, Did you send any text messages about Lowery or

22   his speech during that time period or do you think you might

23   have sent those?  Do you think you might still have those?

24   Five-minute conversation with each of those people potentially.

25   They would at least know what's out there to be gathered.  How

1   many do you think it might be?  Do you still have them.  Those

2   sort of thing.  They've done nothing to show that.

3           I've been on the defending side.  If you are going to

4   oppose discovery, you have some duty to come forward and show

5   that it's burdensome.  They have all the information.  I don't

6   have the information.  I've asked for it in a targeted manner

7   in accordance with the Sedona principles.  I've gotten zero

8   information from the other side except that We don't want to

9   give it to you.

10          And the reason they don't want to give it to us is

11  because they don't want that information in the record.  So

12  those are the main things that I'm concerned about, Your Honor.

13  You did ask me about the T.S. Burke and the Stevens, the Big

14  Springs cases.  It's true those were not expedited discovery

15  cases.  We say nevertheless the principles at issue there are

16  relevant.

17          You know, I understand this case may go into full

18  blown discovery at some point.  We don't know.  And as this

19  Court knows, either side could appeal the granting or denial of

20  the preliminary injunction.  This case may go to the Fifth

21  Circuit.  I think it presents very important issues about free

22  speech law, civil rights, potentially the future of retaliation

23  doctrine in the Fifth Circuit regarding First Amendment speech

24  and we would like the record to be as complete as possible so

25  that that issue could be presented to the Fifth Circuit, you

1    know, in a wholesome manner.  We don't think the discovery

2    we're asking for is actually that much work.  And while I can't

3    say that with certainty, look at how much effort and lawyer

4    resources they have expended resisting this motion.  They could

5    have probably produced this discovery to us or at least had

6    some of these depositions done if it was the same amount of

7    effort and expenditure of resources involved.  So we'd ask the

8    Court to please keep that in mind.

9          THE COURT:  Well, I shouldn't begrudge a defendant who

10   has a good faith reason to assert a challenge to the

11   jurisdiction of the Court to grant any of the relief that's

12   being sought by the plaintiff in the first place from resisting

13   discovery requests, should I?

14         MR. KOLDE:  They have a due process right, of course,

15   and a right for counsel to resist, but I think it's very

16   telling of what are they hiding?  If they don't have anything

17   to hide, Your Honor -- I say this again as a former government

18   attorney -- it's easier to just put your cards on the table

19   then if you don't have something to hide because you can just

20   say I've got nothing to hide and go into court based on that

21   evidence.  Of course, I didn't get paid by the hour either, so

22   I may not have had an incentive to engage in discovery battles,

23   but again, what's missing here and what they are fighting about

24   and trying to prevent us from getting at, to me is telling.

25   That is my argument to the Court.  They are hiding something.

1          THE COURT:  Let's be careful about casting aspersions

2    on counsel.  I think intimating or insinuating that they have a

3    financial incentive to be difficult to discovery just to

4    inflate their hours I think is unfair.

5          MR. KOLDE:  I did not say that, Your Honor.  The

6    financial incentive is there, it's very real.  That's true and

7    I think that's an unfortunate thing about our legal practice.

8    I haven't been paid by the hour in a long time, so I've

9    certainly seen that issue from the other side.  I don't know

10   that that's what's going on here.  And I think counsel on the

11   other side is very capable and they know what they're doing,

12   but I think the fact that they're fighting so hard about this

13   does tell the Court, tells us something about what's going on

14   here.

15          They are placing their resources this way for a

16   reason.  Because I would argue not to inflate the bills because

17   they don't want us to get at those resources.  They may be

18   worth every single penny of what they're expending here because

19   they don't want us to get at that evidence.  That's my argument

20   to the Court.  Thank you, Your Honor.

21          THE COURT:  Thank you, Mr. Kolde.  Any last words from

22   you, Mr. Glover?

23          MR. GLOVER:  Just briefly, Your Honor, again, I remind

24   the Court that as to President Hartzell, there's only one

25   instance in which a conversation with President Hartzell is

1   referenced in the record and that was communicated to Professor

2   Lowery and we certainly knew at the time.  He's not a defendant

3   in the lawsuit.  We talked about University is hiding

4   something, I feel like -- it's important to say not just cast

5   aspersions on defense counsel, including me, Mr. Dow, and

6   others who couldn't be here, but the University of Texas is a

7   public institution, so we need to be careful that we're not

8   saying that a public entity in the State of Texas is hiding

9   something.  That's certainly not the case.  How do we know

10  that?  Three defendants filed declarations, sworn testimony in

11  response to the preliminary injunction motion.  There is

12  certainly no hiding from this public entity.  That hasn't

13  happened.

14          The complaint is that we haven't searched our records

15  and we don't know what the -- what is out there.  The

16  instruction we've been given in the preliminary injunction

17  context is figure out what I'm asking you and go find it.  And

18  that's not an actionable discovery request and that's why we

19  haven't done any targeted discovery search.  So that's why we

20  are where we are, Your Honor.

21          THE COURT:  Thank you.

22          MR. GLOVER:  Thank you.

23          THE COURT:  I am prepared to rule on this from the

24  bench and I'll issue a written order memorializing this

25  decision, and I might seek your input on exactly how to phrase

1    it in an effort to avoid future dispute regarding what I meant

2    in my order, but I've also learned I can't just get wrapped

3    around the axle trying to stop people from fighting with each

4    other over things.  And so we'll do our best to craft a clear

5    order.  And so I agree that the -- well, as I said at the

6    outset, I see the scope of what's at issue in discovery, if any

7    of it's appropriate in this case, is limited because the scope

8    of what might be considered at a preliminary injunction hearing

9    is limited as is the relief that would be awarded.  And that I

10   agree with defendants that we do have an exceptionally well

11   developed record going into that hearing.

12        However, I understand plaintiff's concerns and desire

13   to try to suss out some of these disputed facts in advance of

14   the hearing in an effort to build their case, build the case to

15   prove their entitlement to a preliminary injunction and that

16   something more than what currently exists, what can be

17   appropriate and not overly burdensome.

18        As for the document requests, I do find the requests

19   for the e-mails and texts directly or indirectly related to

20   Professor Lowery's speech, I do find how that request is

21   phrased in the proposed relief to be unwieldy and while I've

22   given some thought to how I might narrow that, I'm not going to

23   engage in that process for you, and so I'm going to deny the

24   request for production of e-mails and texts.

25        As for the request for depositions, as I mentioned, I

1   think a deposition on written questions is a reasonable way to

2   give the plaintiffs to further explore some of these disputed

3   issues in the parties' declarations, and so what I intend to

4   order is that defendants and plaintiff, if defendants choose to

5   serve them, respond to 10 DWQ questions.  And I think I can

6   leave it up to the parties seeking discovery to decide to serve

7   those whenever they choose and that the more important deadline

8   is by when must the respondent respond.  So I'm open to a

9   suggestion on that.  Maybe a week is enough time or maybe two

10  weeks once the DWQ is served on the other side.  Is there any

11  comment from the parties on that?

12          MR. GLOVER:  Your Honor, we think two weeks is a

13  reasonable response then.

14          THE COURT:  Do you think that's enough time, Mr.

15  Kolde.

16          MR. KOLDE:  Well, I mean, shorter is better.  We can

17  maybe compromise on ten days or something like that.

18          THE COURT:  We'll say ten days, not including -- well,

19  if that ten day deadline falls on a weekend or a holiday, but

20  otherwise, ten days response time.

21          Anything else?  Any further clarity needed on that, on

22  the order in general?

23          MR. KOLDE:  So just to understand the Court's order,

24  Your Honor, we get ten questions per defendant for a deposition

25  on written questions and no other witnesses, is that correct?

1          THE COURT:  Yes, I'm sorry, I did not say that,

2     although I kind of talked about it earlier in the hearing, but

3     yes, per defendant.

4          MR. KOLDE:  Okay.  Thank you, Your Honor.

5          THE COURT:  And that's per defendant as of today.

6     There are three defendants, Mills -- I think we have Burris,

7     Mills and Titman.  Those are the three defendants who are

8     subject to this.  And then, of course, Professor Lowery, who is

9     also a party is subject to responding to the same thing from

10    the defendant, 10 DWQ questions.  Any further clarity or any

11    other questions?

12         MR. KOLDE:  Your Honor, I understand that -- and I

13    understand the Court's order.  Is there in the Court's role as

14    the go-to contact for discovery issues, is there any

15    instruction from the Court about the parties having their 26(f)

16    conference.  By my calculations, latest date it would have to

17    occur by would be before the May 1st deadline to file a report

18    with the Court.  So we're still about three and a half weeks

19    away from that.  We've been asking to schedule the 26(f)

20    conference for a number of weeks and the last time we tried to

21    hold it, they said, *Oh, we're not having the 26(f) conference.*

22    So we're trying to have it and we haven't made progress on

23    that.

24         THE COURT:  Well, if it's required by the Rules, I

25    guess you've got to seek relief from the Court to not meet

1    whatever deadline there is for the conference.  Right?  Is that

2    saved and sought.

3              MR. GLOVER:  No, we haven't sought relief from the

4    Rule 26(f) conference.  And if we're going to do that, Your

5    Honor, that's certainly something that we can work out.  And if

6    we're otherwise governed by the Rules, then it's for the

7    lawyers to work out, we think, when that Rule 26(f) conference

8    would occur.

9              THE COURT:  I don't intend to provide any more

10   guidance on that than what's provided by the rules.  Anything

11   else while we're all here together?

12             MR. GLOVER:  Nothing from the defendants, Your Honor.

13             MR. KOLDE:  Nothing, Your Honor.  Thank you.

14             THE COURT:  You're excused.  Thank you.

15             COURT SECURITY OFFICER:  All rise.

16             *(12:30 p.m.)*

17                            *   *   *

18

19

20

21

22

23

24

25

1                        *   *   *   *   *

2              I certify that the foregoing is a correct transcript

3    from the electronic sound recording of the proceedings in the

4    above-entitled matter.

5              I further certify that the transcript fees and format

6    comply with those prescribed by the Court and the Judicial

7    Conference of the United States.

8

9

10   Date:  May 8, 2023

11

12    /s/ Angela M. Hailey
     _____
13   United States Court Reporter
     262 West Nueva Street
14   San Antonio, Texas   78207
     (210)244-5048
15

16

17

18

19

20

21

22

23

24

25