IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| RICHARD LOWERY, | § | No. 1:23-CV-129-DAE |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| LILLIAN MILLS, in her capacity as | § | |
| Dean of the McCombs School of | § | |
| Business at the University of Texas at | § | |
| Austin, ETHAN BURRIS, in his official | § | |
| capacity as Senior Associate Dean for | § | |
| Academic Affairs of the McCombs | § | |
| School of Business at the University of | § | |
| Texas-Austin, SHERIDAN TITMAN, in | § | |
| his official capacity as Finance | § | |
| Department Chair for the McCombs | § | |
| School of Business at the University of | § | |
| Texas-Austin, | § | |
| | § | |
| Defendants. | § | |
| | § | |

ORDER (1) GRANTING IN PART AND DENYING IN PART MOTION TO
DISMISS; AND (2) DENYING WITHOUT PREJUDICE MOTION FOR
PRELIMINARY INJUNCTION

Before the Court are: (1) Defendants Lillian Mills, in her capacity as

Dean of the McCombs School of Business at the University of Texas at Austin

("McCombs"), Ethan Burris, in his official capacity as Senior Associate Dean for

Academic Affairs of McCombs, and Sheridan Titman, in his official capacity as

Finance Department Chair for McCombs' (collectively, "Defendants") Motion to

Dismiss the Complaint for Declaratory and Injunctive Relief (Dkt. # 15); and

(2) Plaintiff Richard Lowery's ("Plaintiff" or "Lowery") Motion for Preliminary

Injunction (Dkt. # 8).  The Court held a hearing on these matters on August 31,

2023.  After careful consideration of the memoranda in support of and in

opposition to the motions, and in light of the parties' arguments advanced at the

hearing, the Court, for the reasons that follow, **GRANTS IN PART** and **DENIES**

**IN PART** Defendants' motion to dismiss, and **DENIES WITHOUT**

**PREJUDICE** Plaintiff's motion for preliminary injunction.

<u>BACKGROUND</u>

This is a free speech case in which Plaintiff, a professor at the

University of Texas at Austin ("UT"), has used social media and online opinion

articles to publicly criticize university officials' actions, and has asked elected

state-governmental officials to intervene.  (Dkt. # 1.)  Among others, Plaintiff

alleges that he "dissents from the political and academic views held by most UT

faculty and administrators, often publicly, and sometimes uses pointed terminology

to get his points across."  (<u>Id.</u> at 4.)  He states that he makes his opinions known to

elected officials in Texas, including those who oversee UT's funding.  (<u>Id.</u>)

Plaintiff alleges that he "has a longstanding commitment to increasing

viewpoint diversity on the UT campus, through his speech on and off campus, and

his work as a Senior Scholar at the school's Salem Center for Public Policy." (Dkt. # 1 ¶ 13.) At the Salem Center, Plaintiff reports to business professor Carlos Carvalho, who serves as the Center's Executive Director. (Id. ¶ 14.) Plaintiff alleges that his affiliation with the Salem Center affords him additional pay, as well as access to research opportunities. (Id. ¶ 15.) In 2021, according to Plaintiff, he and Carvalho pursued funding for a new "Liberty Institute" at UT whose purpose is to study "classical-liberal, pro-free market viewpoints as a counterweight to the campus-dominated critical race theory and DEI-based ideology."[1] (Id. ¶ 16.)

To fund the Liberty Institute, Plaintiff and Carvalho enlisted the support of UT President Jay Hartzell and private donors, as well as the Texas State Legislature's 2022–23 budget which allocated $6 million in funding for the Liberty Institute. (Id. ¶ 18–19.) According to Plaintiff, however, the enabling legislation's "vagueness allowed President Hartzell and his UT Administration allies to hijack the project, remove its independence, re-direct[] its funding to existing personnel and programs, and change its title to 'Civitas.'" (Id. ¶ 19–20.)

Thereafter, Plaintiff alleges that he began to publicly criticize "the hijacking of the Liberty Institute, criticizing Hartzell's role and that of Richard Flores, an advocate of critical race theory and DEI-ideology." (Dkt. # 1 ¶ 21–27.)

---

[1] DEI stands for "diversity, equity, and inclusion." (Dkt. # 1 at ¶ 10.)

For example, Plaintiff was quoted in papers, appeared on podcasts, and posted on social media, sometimes tagging elected officials or social-media personalities, making those posts visible to those officials.  (Id.)

Plaintiff further alleges that UT's McCombs School hosts a Global Sustainability Leadership Institute ("GSLI") which promotes Environment Sustainability and Governance ("ESG") based viewpoints which are "consistent with UT's predominant DEI-ideology, but which are often at odds with free-market principles and Lowery's views."  (Dkt. # 1 ¶ 29.)  Plaintiff states that he has publicly criticized GSLI and its events on social media.  (Id. ¶ 32.)

Thereafter, Plaintiff alleges that his repeated criticisms of the UT Administration, their DEI initiatives, and GSLI "prompted Defendants to pressure Lowery [and] Carvalho, into censoring Lowery's speech."  (Dkt. # 1 ¶ 35.)  According to Plaintiff, in late July or August 2022, Defendant Sheridan Titman told Carvalho that "We need to do something about Richard."  (Id. ¶ 36.)  Plaintiff alleges that Titman told him also that President Hartzell and Defendant Dean Lillian Mills were upset about Plaintiff's political advocacy and wanted to know if "we can ask him to tone it down?"  (Id.)  Plaintiff contends that Carvalho understood the statement as an implicit threat but refused to do anything, explaining to Titman that Lowery has a First Amendment right to express his views.  (Id. ¶ 37.)

4

In mid-August 2022, Plaintiff alleges that Dean Mills and Defendant Ethan Burris, McCombs' Senior Associate Dean for Academic Affairs, met with Plaintiff for a routine discussion of the Salem Center.  (Dkt. # 1 ¶ 38.)  According to Plaintiff, about an hour later the tone shifted when Mills and Burris changed the subject to Plaintiff's speech.  (Id.)  Plaintiff contends that he was told his speech was "crossing the line" in his criticism of school officials, to the point where the UT legal department was concerned about his speech.  (Id. ¶ 39.)  Plaintiff also alleges that Defendants put pressure on Carvalho to reprimand Plaintiff for his speech, but that Carvalho again declined to do so.  (Id. ¶ 39–41.)  Because Carvalho declined to do so, Plaintiff asserts that Defendants threatened Carvalho's Executive Director position.  (Id. ¶ 41.)  According to Plaintiff, Carvalho nonetheless relayed Defendants' threats to Plaintiff.  (Id. ¶ 44.)

On August 22, 2022, Plaintiff alleges that GSLI's managing director Meeta Kothare emailed a copy of Plaintiff's social media post to Mills and GSLI's executive director Jeffrey Hales, writing about concern of the safety of GSLI's events.  (Dkt. # 1 ¶ 45–46.)  According to Plaintiff, Kothare's email was forwarded to other UT professors and officials, including Titman, who decided that a discussion with Plaintiff was needed to determine "what is appropriate on twitter" and that he "wanted to encourage intellectual discourse, but [he didn't] think rude comments [were] acceptable."  (Id. ¶ 47–48.)  Thereafter, Plaintiff alleges that

5

Titman ultimately forwarded him the email from Kothare and added that Plaintiff did not "seem to be making friends" and that it was "probably in [his] best interest to come up with a class for the Spring that is likely to be popular," and "[i]n any event, the appropriate response is to jointly sponsor a panel discussion on ESG." (Id. ¶ 52.)  Plaintiff alleges that he responded back, stating that he considered the email to him to be a threat and that he "can certainly criticize events."  (Id. ¶ 53.)

Subsequently, Plaintiff contends that he set his social media account to "private" and that only his followers and not the public can see his activity. (Dkt. # 1 ¶ 54.)  And, as of late August 2022, Plaintiff alleges that he stopped posting on his Twitter account, but has not deleted it and would like to resume "tweeting, re-tweeting, replying to other posts, and otherwise commenting on matters as before."  (Id. ¶ 55.)  Plaintiff further alleges that a GSLI employee forwarded his speech to UT police requesting that they survey his speech on social media.  (Dkt. # 1 ¶ 56.)  Plaintiff states there is no indication that this request for surveillance has been withdrawn.  (Id. ¶ 59.)

On February 2, 2023, Plaintiff filed suit in this Court alleging two claims against Defendants for violations of his First Amendment Right of Free Speech pursuant to 42 U.S.C. § 1983 for Chilling of Free Speech by State Actors and Retaliation for his Protected Speech.  (Dkt. # 1.)  Plaintiff believes that UT officials have attempted to silence his speech by threatening his job, pay, institute

affiliation, research opportunities, academic freedom, and labeled his behavior as inviting violence or lacking in civility.  According to Plaintiff, he fears that if he continues to be critical and express his speech concerning UT Administration and its policies, his appointment to the Salem Center will not be renewed, costing him the $20,000 stipend and access to research opportunities.  (Id. ¶ 61.)  Plaintiff alleges that "he is not free to speak on campus affairs on terms equal to his peers." (Dkt. # 8 at 15.)

On February 17, 2023, Plaintiff filed a Motion for Preliminary Injunction.  (Dkt. # 8.)  Defendants filed a response on March 14, 2023 (Dkt. # 14), and Plaintiff filed a reply on March 28, 2023 (Dkt. # 23).  On March 14, 2023, Defendants filed a Motion to Dismiss.  (Dkt. # 15.)  Plaintiff filed a corrected response to that motion on August 8, 2023 (Dkt. # 43), and Defendants filed a corrected reply on August 15, 2023 (Dkt. # 48).  Both motions are ripe.  Because it is jurisdictional, the Court will first consider the motion to dismiss.

I.    Motion to Dismiss

Defendants move to dismiss Plaintiff's suit pursuant to both Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (Dkt. # 15.)

A.    Applicable Law

1.    Rule 12(b)(1)

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure challenges a federal court's subject matter jurisdiction.  See Fed. R. Civ. P. 12(b)(1).  Under Rule 12(b)(1), a claim is properly dismissed for lack of subject matter jurisdiction when a court lacks statutory or constitutional authority to adjudicate the claim.  Home Builders Assoc. of Mississippi, Inc. v. City of Madison, 143 F.3d 1006, 1010 (5th Cir. 1998).  When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, courts should consider the "jurisdictional attack before addressing any attack on the merits."  Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001).  The Court must first address subject matter jurisdiction because, without it, the case can proceed no further. Ruhrgas Ag v. Marathon Oil Co., 526 U.S. 574, 583 (1999); Ramming, 281 F.3d at 161.

In considering a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, "a court may evaluate (1) the complaint alone, (2) the complaint supplemented by undisputed facts evidenced in the record, or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  Den Norske Stats Oljeselskap As v. HeereMac Vof, 241 F.3d 420, 424 (5th Cir. 2001) (citation omitted).

8

Standing and ripeness are required elements of subject matter jurisdiction and are therefore properly challenged in a Rule 12(b)(1) motion to dismiss.  See Xerox Corp. v. Genmoora Corp., 888 F.2d 345, 350 (5th Cir. 1989).  A court must dismiss a case for lack of subject matter jurisdiction under Rule 12(b)(1) where it lacks the statutory or constitutional power to adjudicate the case.  Home Builders Ass'n of Miss., Inc. v. City of Madison, 143 F.3d 1006, 1010 (5th Cir. 1998).

2.     Rule 12(b)(6)

Rule 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted."  Review is limited to the contents of the complaint and matters properly subject to judicial notice.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).  In analyzing a motion to dismiss for failure to state a claim, "[t]he court accept[s] 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"  In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007) (quoting Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit, 369 F.3d 464, 467 (5th Cir. 2004)).

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

    B.    <u>Analysis</u>

        Defendants assert that Lowery's claim that he fears speculative

injuries in the future is not ripe and that he cannot create standing by voluntarily

redacting his speech based on an unreasonable fear of harm.  (<u>Id.</u> at 12–13.)

Additionally, Defendants contend that sovereign immunity bars Plaintiff's

retaliation claim because he seeks retrospective relief to address threats from the

past.  (<u>Id.</u> at 14.)  Finally, Defendants argue that Plaintiff fails to state a claim upon

which relief can be granted.  (<u>Id.</u> at 15.)

        1.    <u>Standing</u>

        "Under Article III of the Constitution, the federal courts have

jurisdiction over a claim between a plaintiff and a defendant only if it presents a

'case or controversy.'"  <u>Okpalobi v. Foster</u>, 244 F.3d 405, 425 (5th Cir. 2001)

(quoting <u>Raines v. Byrd</u>, 521 U.S. 811, 818 (1997)).  "In this way, the power

granted to federal courts under Article III 'is not an unconditioned authority to

determine the constitutionality of legislative or executive acts.'"  <u>Id.</u> (quoting

<u>Valley Forge Christian Coll. v. Am. United for Separation of Church and State,

Inc.</u>, 454 U.S. 464, 471 (1982)).  One limitation requires that a plaintiff show he

has standing sufficient to establish a case or controversy.  See Stringer v. Whitley,

942 F.3d 715 (5th Cir. 2019).

To satisfy standing requirements under Article III, a plaintiff must

show an injury in fact that is fairly traceable to the challenged action of the

defendant and likely to be redressed by the plaintiff's requested relief.  Id. (citing

Lujan v. Defs. of Wildlife, 504 U.S. 555 (1992)).  To meet this threshold, the party

seeking to invoke federal jurisdiction bears the burden of establishing three

elements: injury in fact, causation, and redressability.  Stringer, 942 F.3d at 720.  A

plaintiff "need show that only one of his alleged injuries would be redressed by a

favorable ruling."  Cramer v. Skinner, 931 F.2d 1020, 1028 (5th Cir. 1991).

However, the Supreme Court has explained that standing

requirements are somewhat relaxed in First Amendment cases:

> Even where a First Amendment challenge could be brought by one
> actually engaged in protected activity, there is a possibility that, rather
> than risk punishment for his conduct in challenging the statute, he will
> refrain from engaging further in the protected activity. Society as a
> whole then would be the loser. Thus, when there is a danger of chilling
> free speech, the concern that constitutional adjudication be avoided
> whenever possible may be outweighed by society's interest in having
> the statute challenged.

Sec'y of State of Md. v. Joseph H. Munson Co., Inc., 467 U.S. 947, 956 (1984).  In

Laird v. Tatum, the Supreme Court noted it had, in recent years "found in a

number of cases that constitutional violations may arise from the deterrent, or

'chilling,' effect of governmental regulations that fall short of a direct prohibition

11

against the exercise of First Amendment rights."  408 U.S. 1, 11 (1972); see, e.g.,

Baird v. State Bar of Ariz., 401 U.S. 1 (1971); Keyishian v. Bd. of Regents, 385

U.S. 589 (1967); Lamont v. Postmaster Gen., 381 U.S. 301 (1965); Baggett v.

Bullitt, 377 U.S. 360 (1964); see also Michael N. Dolich, Alleging A First

Amendment "Chilling Effect" to Create A Plaintiff's Standing: A Practical

Approach, 43 Drake L. Rev. 175, 176 (1994) ("[A]n official action may abridge

First Amendment rights without directly proscribing a protected activity. This is

the so-called 'chilling effect.'").  Three circuit courts have noted that "when a

challenged statute risks chilling the exercise of First Amendment rights, the

Supreme Court has dispensed with rigid standing requirements," Human Life of

Wash. Inc. v. Brumsickle, 624 F.3d 990, 1000 (9th Cir. 2010), in a way that "tilt[s]

dramatically toward a finding of standing."  Cooksey v. Futrell, 721 F.3d 226, 235

(4th Cir. 2013) (quoting Lopez v. Candaele, 630 F.3d 775, 781 (9th Cir. 2010));

see also Missourians for Fiscal Accountability v. Klahr, 830 F.3d 789, 794 (8th

Cir. 2016) (favorably quoting Ariz. Right to Life Pol. Action Comm. v. Bayless,

320 F.3d 1002, 1006 (9th Cir. 2003)).

        Here, Defendants maintain that Plaintiff cannot create standing by

self-censoring his speech because he interpreted statements allegedly made by

Defendants as threats to reduce his pay and strip him of his Salem Center

affiliation.  (Dkt. # 15 at 13.)  Thus, Defendants argue that Plaintiff lacks standing

12

to pursue any claims against them because he has suffered no cognizable injury that Defendants caused nor one this Court can redress.[2] (Id.) In response, Plaintiff argues that both the Supreme Court and the Fifth Circuit have recognized standing to bring pre-enforcement challenges to speech restrictions where there is a credible threat of enforcement. (Dkt. # 43 at 8.) He argues that he not challenging a statute or written policy, but challenging Defendants' actions seeking to prevent him from expressing his opinions in public. (Id. at 9.)

"To be an injury in fact, a threatened future injury must be (1) potentially suffered by the plaintiff, not someone else; (2) concrete and particularized, not abstract; and (3) actual or imminent, not conjectural or hypothetical." Stringer, 942 F.3d at 720 (internal quotations omitted). "The purpose of the requirement that the injury be 'imminent' is 'to ensure that the alleged injury is not too speculative for Article III purposes.'" Id. (first citing Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) and then quoting Lujan, 504 U.S. at 564 n.2). A litigant must demonstrate "a claim of specific present objective harm or a threat of specific future harm." Meese v. Keene, 481 U.S. 465, 472 (1987) (quoting Laird, 408 U.S. at 14 (internal quotations omitted)). "For a threatened future injury to satisfy the imminence requirement, there must be at

---

[2] Defendants challenge only the injury in fact requirement to standing in their motion to dismiss. (Dkt. # 15 at 13.)

least a substantial risk that the injury will occur." Id. (citing Susan B. Anthony
List v. Driehaus, 573 U.S. 149, 158 (2014) (quoting Clapper, 568 U.S. at 414 n.5)).

  "Requests for injunctive and declaratory relief implicate the
intersection of the redressability and injury in fact requirements." Id. "The
redressability requirement limits the relief that a plaintiff may seek to that which is
likely to remedy the plaintiff's alleged injuries." Id. "Because injunctive and
declaratory relief 'cannot conceivably remedy any past wrong,' plaintiffs seeking
injunctive and declaratory relief can satisfy the redressability requirement only by
demonstrating a continuing injury or threatened future injury." Id. (citing Los
Angeles v. Lyons, 461 U.S. 95 (1983)). "That continuing or threatened future
injury, like all injuries supporting Article III standing, must be an injury in fact."
Id. (citing Driehaus, 573 U.S. 149).

  The Supreme Court's "relaxed" standing requirement in First
Amendment cases "manifests itself most commonly in the doctrine's first element:
injury-in-fact." Cooksey, 721 F.3d at 235; see also Munson, 467 U.S. at 956. The
Fifth Circuit has consistently reasoned that "government action that chills
protected speech without prohibiting it can give rise to a constitutionally
cognizable injury." Glass v. Paxton, 900 F.3d 233, 238 (5th Cir. 2018) (quoting
Zimmerman v. City of Austin, 881 F.3d 378, 391 (5th Cir. 2018)); see also, e.g.,
Hous. Chronicle v. City of League City, 488 F.3d 613, 618 (5th Cir. 2007);

14

Freedom Path, Inc. v. I.R.S., 913 F.3d 503, 507 (5th Cir. 2019); Fairchild v. Liberty ISD, 597 F.3d 747, 754–55 (5th Cir. 2010); Ctr. for Individual Freedom v. Carmouche, 449 F.3d 655, 660 (5th Cir. 2006).

However, the chilling effect cannot "arise merely from the . . . individual's concomitant fear that . . . the [government] might in the future take some other and addition[al] action detrimental to that individual." Laird, 408 U.S. at 11.  In other words, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." Id. at 13–14.  Rather, governmental activity constitutes an injury in fact when "the challenged exercise of governmental power [is] regulatory, proscriptive, or compulsory in nature, and the complainant [is] either presently or prospectively subject to the regulations, proscriptions, or compulsions that he [is] challenging." Id. at 11.

The Fifth Circuit has expressly indicated that, in the First Amendment context, "[a] plaintiff has suffered an injury in fact if he (1) has an 'intention to engage in a course of conduct arguably affected with a constitutional interest,' (2) his intended future conduct is 'arguably . . . proscribed by [the policy in question],' and (3) 'the threat of future enforcement of the [challenged policies] is substantial.'" Speech First, Inc. v. Fenves, 979 F.3d 319, 330 (5th Cir. 2020) (quoting Driehaus, 573 U.S. at 161–64).

15

At this early stage of the proceedings, the Court finds that, given the relaxed standing requirements in First Amendment cases, Plaintiff has alleged a cognizable injury.  Plaintiff has alleged that he felt his appointment at the Salem Center, and associated stipend and research opportunities, were threatened by Defendants should he continue to speak out in the same manner.  Plaintiff alleges that he cannot engage in the speech he wishes to publicly express and decided to stop "using Twitter entirely and has curtailed his public speech critical of the UT Administration because of Defendants' threats."  (Dkt. # 1 ¶ 67.)

Thus, it appears to the Court that Plaintiff has sufficiently alleged that he suffers, at a minimum, chilled speech.  Specifically, Plaintiff has alleged that should he continue to post publicly on social media and speak in public forums in the same manner as before, he would face negative consequences imposed by UT Administrators.  Plaintiff has therefore met the first inquiry recognized by the Fifth Circuit in chilled speech cases—an intention to engage in a course of conduct arguably affected with a constitutional interest.

Regarding the second inquiry—the intended future conduct is "arguably proscribed, or at least arguably regulated, by the University speech policies," Speech First, 979 F.3d at 330, Plaintiff has not specifically alleged a UT policy or code prohibiting or regulating Plaintiff's speech.  (See Dkt. # 1.)  Plaintiff argues however that "[a]n unwritten code threatens to chill speech even more than

16

a written one, because its meaning is even more subjective." (Dkt. # 43 at 11.)  For instance, Plaintiff asserts that Titman's statements in an email that he did not believe Plaintiff's "rude comments" were acceptable, demonstrates that there is some unwritten code on what speech is acceptable to UT officials.  (Id.)  In any case, Plaintiff argues that even rude comments are protected speech.  (Id.)

The Court recognizes that there is no unequivocal policy in this case proscribing Plaintiff's intended conduct.  However, based on Plaintiff's allegations in his complaint, the Court finds that he has sufficiently alleged an implicit policy on what speech is allowed by employees of the Salem Center.  This implicit policy alleged by Plaintiff arguably proscribes Plaintiff's intended conduct, which appears to be all the standard that is required in the Fifth Circuit.  See Jackson v. Wright, No. 4:21-CV-00033, 2022 WL 179277, at *7 (E.D. Tex. Jan. 18, 2022) ("The Court recognizes, though, in this case, there is no unequivocal policy proscribing his intended conduct.  But the implicit policy creating the stagnant Journal arguably proscribes Plaintiff's intended conduct, which is all the standard requires.") (citing Dolich, supra p. 10 at 176 ("[A]n official action may abridge First Amendment rights without directly proscribing a protected activity. This is the so-called 'chilling effect.'")).

The Court also finds that Plaintiff has sufficiently alleged the third inquiry—the threat of future enforcement of the proscribed policy is substantial.

17

Plaintiff has alleged that Defendants have exhibited authority over Plaintiff throughout this controversy.  For instance, Plaintiff has alleged that Titman told Carvalho that "[w]e need to do something about Richard," and that President Hartzell and Dean Mills were about upset about Plaintiff's "political advocacy," and asked Carvalho if "we can ask him to tone it down?"  (Dkt. # 1 ¶ 36.)  Plaintiff further alleges that Mills and Burris were concerned Plaintiff was "crossing the line" in his criticisms of school officials and that the UT legal department was concerned about his speech.  (Id. ¶ 39.)   Additionally, Plaintiff has alleged that Carvalho was told that he has "the power to have him not be attached to the center" and that Burris told Carvalho that "he might not approve Lowery's appointment to the center in the future because of his speech."  (Id. ¶ 43.)

        Thus, given the foregoing—at this stage of the case—Plaintiff has stated an injury in the First Amendment context.  "It is not fatal that [UT] never explicitly stated that disciplinary charges would be brought if [Plaintiff] continued to voice his views.  It is the chilling effect on free speech that violates the First Amendment, and it is plain that an implicit threat can chill as forcibly as an explicit threat."  Levin v. Harleston, 966 F.2d 85, 89–90 (2d Cir. 1992) (citing Trotman v. Bd. of Trustees of Lincoln Univ., 635 F.2d 216, 228 (3d Cir. 1980)), cert. denied, 451 U.S. 986 (1981).  The Court thus finds that Plaintiff has standing to assert his First Amendment claims.

2.      <u>Ripeness</u>

Defendants also argue that Plaintiff's claim that he fears Defendants will punish him for his speech by removing him from his position at the Salem Center is not ripe.  (Dkt. # 15.)  Defendants assert that Plaintiff himself admits that he was reappointed to his position as Associate Director of the Salem Center in September 2022, which is just a few weeks after the August 2022 emails and meetings upon which Plaintiff complains.  (<u>Id.</u> at 12.)

Ripeness is "a question of timing."  <u>Thomas v. Union Carbide Agr. Prod. Co.</u>, 473 U.S. 568, 580 (1985) (quoting <u>Blanchette v. Conn. Gen. Ins. Corps.</u>, 419 U.S. 102, 140 (1974)).  "[I]ts basic rationale is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements."  <u>Id.</u> (quoting <u>Abbott Lab'ys v. Gardner</u>, 387 U.S. 136, 148 (1967)).  "The ripeness inquiry reflects 'Article III limitations on judicial power' as well as 'prudential reasons for refusing to exercise jurisdiction.'"  <u>DM Arbor Ct., Ltd. v. City of Houston</u>, 988 F.3d 215, 218 (5th Cir. 2021) (quoting <u>Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.</u>, 559 U.S. 662, 670 n.2 (2010)).

The standard for constitutional ripeness mirrors the injury-in-fact requirement for standing.  <u>See Driehaus</u>, 573 U.S. 149, 157–58 n.5 (2014).  Both stem from "Article III's case-or-controversy requirement, which mandates that an 'actual controversy' exist between the parties."  <u>DM Arbor Ct., Ltd.</u>, 988 F.3d at

218 n.1 (quoting <u>Campbell-Ewald Co. v. Gomez</u>, 577 U.S. 153, 160 (2016)).  An

actual controversy exists when the injury alleged is "actual or imminent rather than

conjectural or hypothetical."  <u>Miss. State Democratic Party v. Barbour</u>, 529 F.3d

538, 545 (5th Cir. 2008).  "An allegation of future injury may suffice if the

threatened injury is 'certainly impending,' or there is a 'substantial risk' that the

harm will occur."  <u>Driehaus</u>, 573 U.S. at 158 (quoting <u>Clapper v. Amnesty Int'l</u>

<u>USA</u>, 568 U.S. 398, 414 n.5 (2013)).

   As discussed above, Plaintiff has adequately alleged that he is being

harmed by Defendants' threats to remove his Salem Center affiliation should his

speech continue as before he self-regulated it.  Plaintiff has also alleged a

substantial risk that this harm will occur if he continues to post his criticisms of the

UT Administration on social media and in public platforms.  The Court therefore

finds that Plaintiff's claims are ripe for adjudication.

   3. <u>Sovereign Immunity</u>

   Defendants also move to dismiss Plaintiff's First Amendment

retaliation claim on the basis that sovereign immunity bars his ability to seek

retrospective relief to address threats from the past.  (Dkt. # 15 at 14.)  Defendants

contend that Plaintiff's retaliation claim alleges that he was threatened in the past

and there is nothing ongoing about those alleged past threats on which he can

presently seek relief.  Because he was not terminated, demoted, or disciplined

Defendants maintain there is no ongoing harm, and the retaliation claim must be dismissed.  (Id.)

 "Pursuant to the Ex parte Young exception, the Eleventh Amendment is not a bar to suits for prospective relief against a state employee acting in his official capacity."  Nelson v. Univ. of Tex. at Dall., 535 F.3d 318, 321 (5th Cir. 2008).  Therefore, "prospective injunctive or declaratory relief against a state [official] is permitted . . . but retrospective relief in the form of a money judgment in compensation for past wrongs . . . is barred."  Id. (quoting Brennan v. Stewart, 834 F.2d 1248, 1253 (5th Cir. 1988)) (alterations in original).

 Here, Plaintiff does not seek retrospective relief in the form of a money judgment, but only prospective relief in the form of injunctive and declaratory relief.  (Dkt. # 1 at 24–25.)  Additionally, while Plaintiff alleges that retaliation may have occurred in the past, his allegations of such appear related to the present controversy and the relief he requests is all prospective.  Therefore, Plaintiff's First Amendment retaliation claim is not barred by sovereign immunity.

   4.   Whether Plaintiff Has Stated Claims Upon Which Relief Can Be Granted

 Defendants argues that Plaintiff's retaliation claim fails because he has not suffered any adverse employment action.  (Dkt. # 15 at 15.)  Defendants also contend that Plaintiff fails to adequately allege a chilled-speech claim.  (Id. at

17.)  Plaintiff responds that he has sufficiently alleged both a First Amendment chilled speech and retaliation claim.  (Dkt. # 43 at 16.)

### a. First Amendment retaliation

To establish a First Amendment retaliation claim, a plaintiff must allege: "(1) he suffered an adverse employment decision, (2) he spoke as a citizen on a matter of public concern, (3) his interest in the speech outweighs the government's interest in the efficient provision of public services, and (4) the protected speech motivated the adverse employment action."  Bevill v. Fletcher, 26 F. 4th 270, 276 (5th Cir. 2022) (citing Nixon v. City of Houston, 511 F.3d 494, 497 (5th Cir. 2007)).  Defendants dispute only the sufficiency of the first element.

Regarding adverse employment actions in a First Amendment retaliation context, Plaintiff advocates for the Court to use the application of a "material adverse" standard used in Title VII retaliation actions.  (Dkt. # 43 at 19.) Under that standard, an employee "must show that a reasonable employee would have found the challenged action materially adverse."  Burlington Northern & Santa Fe Railway Co v. White, 548 US 53, 68 (2006).  In other words, the question is whether the action "might have dissuaded a reasonable worker from" engaging in the protected conduct at issue.  Id. (quotation marks and citation omitted).

Notably, neither the Supreme Court nor the Fifth Circuit have spoken on whether that standard applies to First Amendment retaliation claims.  See Hous.

22

Cmty. Coll. Syst. v. Wilson, 142 S. Ct. 1253, 1261 (2022) (noting that "lower courts have taken various approaches" to distinguish material from immaterial adverse actions); Spears v. McCraw, No. 20-50406, 2021 WL 3439148, *2 (5th Cir. Aug. 5, 2021) (per curiam) (citing Johnson v Halstead, 916 F.3d 410, 422 n.5 (5th Cir. 2019)).  Regardless, the Fifth Circuit has consistently limited adverse employment actions to "ultimate employment decisions," such as "discharges, demotions, refusals to hire, refusals to promote, and reprimands."[3]  Foley v. Univ. of Hous. Sys., 355 F.3d 333, 341 (5th Cir. 2003); Breaux v. City of Garland, 205 F.3d 150, 157 (5th Cir. 2000) (quotation marks and citation omitted).

Indeed, the Fifth Circuit has "declined to expand the list of actionable" claims in the First Amendment context, "noting that some things are not actionable even though they have the effect of chilling the exercise of free speech." Benningfield v City of Hous., 157 F3d 369, 376 (5th Cir. 1998).  As explained in Breaux, "[t]he reason for not expanding the list of adverse

---

[3] The Court also takes notice of the Fifth Circuit's recent decision in Hamilton v. Dallas Co., --- F. 4th---, 2023 WL 5316716 (5th Cir. 2023), in which the standard for pleading "adverse employment action" changed regarding Title VII disparate treatment discrimination claims.  In that case, the Fifth Circuit determined that a plaintiff adequately alleges such a claim by pleading that he or she was discriminated against because of a protected characteristic, with respect to hiring firing, compensation, or the "terms, conditions, or privileges of employment."  Id. Without further guidance from the Fifth Circuit, the Court will not expand this definition to First Amendment retaliation claims such as pled here.

employment actions is to ensure that § 1983 does not enmesh federal courts in relatively trivial matters."  205 F.3d at 157 (quotation marks and citation omitted).

Given the above considerations and relevant Fifth Circuit precedent, the Court will not apply the materially adverse standard used in Title VII actions in this case.  Instead, the Court finds that adverse employment actions in the First Amendment retaliation context are restricted to ultimate employment decisions. See Foley, 355 F.3d at 341; Breaux, 205 F.3d at 164; see also Jackson v. Tex. Southern Univ., 997 F. Supp. 2d 613, 638 (S.D. Tex. 2014).

Here, Plaintiff alleges that he experienced an adverse employment action when Defendants threatened "to reduce [his] pay, involuntarily end his affiliation with the Salem Center, reduce his access to research opportunities, inquire about his tweets, labeling him, requesting that his speech be placed under police surveillance, or otherwise disciplining him."  (Dkt. # 1 ¶ 90.)  However, these allegations of threats are insufficient to establish an adverse employment action for a First Amendment retaliation claim in the Fifth Circuit.  See Breaux, 205 F.3d at 160.  The mere threat or potential of an ultimate employment decision will not suffice.  Id.  Because he has not sufficiently alleged an adverse employment action, the Court will dismiss without prejudice Plaintiff's First Amendment retaliation claim.

b.  <u>Chilled Speech</u>

To establish a chilled speech claim, a plaintiff must allege: "(1) [he was] engaged in constitutionally protected activity, (2) the defendants' actions caused [him] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiff['s] exercise of constitutionally protected conduct."  <u>Keenan v. Tejeda</u>, 290 F.3d 252, 258 (5th Cir. 2002). Defendants argue that Plaintiff cannot meet the second element because a person of ordinary firmness would not be chilled from engaging in a protected speech by Defendants' purported actions.  (Dkt. # 15 at 17.)

At this stage of the proceedings, the Court finds that Plaintiff has sufficiently alleged that Defendants' threats would chill a person of ordinary firmness from publicly criticizing UT Administration and programs.  Plaintiff has alleged that Carvalho—Plaintiff's supervisor at the Salem Center—was told that "[w]e need to do something about Richard," and that President Hartzell and Dean Mills were about upset about Plaintiff's "political advocacy," and asked Carvalho if "we can ask him to tone it down?"  (Dkt. # 1 ¶ 36.)  Plaintiff further alleges that Mills and Burris were concerned Plaintiff was "crossing the line" in his criticisms of school officials and that the UT legal department was concerned about his speech.  (<u>Id.</u> ¶ 39.)   Additionally, Plaintiff has alleged that Carvalho was told that

he has "the power to have him not be attached to the center" and that Burris told Carvalho that "he might not approve Lowery's appointment to the center in the future because of his speech." (Id. ¶ 43.)  The Court finds these allegations sufficiently allege the second element of a chilled speech claim, and it will not be dismissed on this basis.

C.    Conclusion

Based on the foregoing, the Court will **GRANT IN PART** and **DENY IN PART** Defendants' Motion to Dismiss the Complaint for Declaratory and Injunctive Relief (Dkt. # 15).  The motion is **GRANTED** as to Plaintiff's First Amendment Retaliation claim and it is **DISMISSED WITHOUT PREJUDICE**. The motion is **DENIED** in all other respects.

II.    Motion for Preliminary Injunction

Plaintiff has moved for a preliminary injunction, asking the Court to enjoin Defendants from threatening his affiliation with the Salem Center and associated stipend and research activities.  (Dkt. # 8.)  Plaintiff seeks relief to freely post as he did before he felt threatened.  (Id.)

A.    Applicable Law

"Rule 65 of the Federal Rules of Civil Procedure governs both preliminary injunctions and temporary restraining orders." Total Safety U.S., Inc. v. Rowland, Civil Action No. 13-6109, 2014 WL 793453, at *5 (E.D. La. Feb.

26

26, 2014); see also Fed. R. Civ. P. 65.  The grant of injunctive relief is an

extraordinary remedy which requires the movant to unequivocally show the need

for its issuance.  Opulent Life Church v. City of Holly Springs, Miss., 679 F.3d

279, 288 (5th Cir. 2012); Valley v. Rapides Parish Sch. Bd., 118 F.3d 1047, 1050

(5th Cir. 1997).

       "The prerequisites for preliminary injunctive relief are long-

established in this circuit."  Libertarian Party of Tex. v. Fainter, 741 F.2d 728, 729

(5th Cir. 1984).  A preliminary injunction should not be granted unless the movant

demonstrates by a clear showing: (1) a substantial likelihood of success on the

merits; (2) a substantial threat of irreparable harm if the injunction is not granted;

(3) that the threatened injury to the movant outweighs any harm that may result

from the injunction to the non-movant; and (4) that the injunction will not

undermine the public interest.  Lindsay v. City of San Antonio, 821 F.2d 1103,

1107 (5th Cir. 1987); Valley, 118 F.3d at 1051.  Accordingly, "[b]ecause a

preliminary injunction may only be awarded upon a clear showing that the plaintiff

is entitled to such relief," Barber v. Bryant, 860 F.3d 345, 352 (5th Cir. 2017)

(internal quotations and citation omitted), the "denial of a preliminary injunction

will be upheld where the movant has failed sufficiently to establish *any one* of the

four criteria."  Black Fire Fighters Ass'n v. City of Dall., 905 F.2d 63, 65 (5th Cir.

1990) (emphasis in original).

At the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence.  Sierra Club, Lone Star Chapter v. F.D.I.C., 992 F.2d 545, 551 (5th Cir. 1993).  However, even when a movant establishes each of the four requirements described above, the decision whether to grant or deny a preliminary injunction remains within the court's discretion, and the decision to grant a preliminary injunction is treated as the exception rather than the rule.  Miss. Power & Light Co. v. United Gas Pipe Line Co., 760 F.2d 618, 621 (5th Cir. 1985).

    B.    <u>Analysis</u>

Plaintiff argues that he is likely to succeed on the merits of his claim, he will suffer irreparable harm if Defendants' censorship continues, the balance of equities is in his favor, and that enjoining Defendants is in the public interest. (Dkt. # 8.)  Defendants oppose any injunction on the basis that Plaintiff misrepresents Defendants' speech and actions and that no First Amendment violation has occurred or is imminent to occur.  (Dkt. # 14 at 10.)  Moreover, Defendants argue that the relief Plaintiff seeks would be an unconstitutional restraint on Defendants' speech.  (<u>Id.</u> at 22.)

In the First Amendment context, the other three elements necessary for preliminary injunctive relief ordinarily rise and fall together with Plaintiff's

likelihood of success on the merits.  See Opulent Life Church v. City of Holly Springs, 697 F.3d 279, 295–98 (5th Cir. 2012).  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  Id. at 295 (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)).  And, a state "would need to present powerful evidence of harm to its interests" to show that the potential negative effects of an injunction would outweigh the infringement of a plaintiff's First Amendment rights.  Id. at 297.  Additionally, "injunctions protecting First Amendment freedoms are always in the public interest."  Id. at 298 (quoting Christian Legal Soc'y v. Walker, 453 F.3d 853, 859 (7th Cir. 2006)).

Even so, "invocation of the First Amendment cannot substitute for the presence of an imminent, non-speculative irreparable injury."  Google, Inc. v. Hood, 822 F.3d 212, 228 (5th Cir. 2018).  That is, "[a] preliminary injunction is not appropriate . . . unless the party seeking it can demonstrate that First Amendment interests are either threatened or in fact being impaired at the time relief is sought."  Id. (quoting Nat'l Treasury Emp. Union v. United States, 927 F.2d 1253, 1254 (D.C. Cir. 1991)) (citations and quotation marks omitted).  Furthermore, "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered."

29

11A Wright et al., Federal Practice & Procedure § 2948.1 (3d ed. 2020); see also

Winter v. Nat. Res. Defense Council, Inc., 555 U.S. 7, 22 (2008) (quoting 11A

Wright et al., Federal Practice & Procedure § 2948.1 (2d. ed. 1995)); Texas v.

United States, 86 F. Supp.3d 591, 674 (S.D. Tex. 2015) (same).

   In this case, while Plaintiff has certainly alleged that he felt his

affiliation with the Salem Center, and associated stipend and research abilities,

were threatened, the evidence that such threat is imminent or currently impaired to

warrant preliminary injunctive relief is lacking.  Plaintiff argues only that he has

been "self-censoring since August 22[, 2022]" in support of his contention that he

will suffer irreparable harm without an injunction.  (Dkt. # 8 at 25.)  However,

there is no evidence that any adverse employment action has yet befallen Plaintiff,

nor that any adverse employment action will imminently occur.  Plaintiff is a

tenured professor at UT which is protected under university policies.  (Dkt. # 14-

15; Dkt. # 14-16.)  Additionally, the evidence indicates that Plaintiff was

reappointed to his position at the Salem Center for a one-year term in September

2022—after the alleged threats occurred—and that he is currently still employed in

that capacity.[4]  Thus, because Plaintiff was reappointed to his position after the

---

[4] At the hearing, more evidence was presented that Plaintiff was in fact reappointed to his position at the Salem Center for a another one-year term in August 2023, and that he received a pay raise at the beginning of both the 2022–23 and the 2023–24 school terms.

alleged threats were made and before he chose to self-censor, the Court finds that he is not experiencing any ongoing or imminent harm at this time or in the near future.  In such case, the Court finds that even if Plaintiff could establish a clear likelihood of success on the merits, his request for preliminary injunctive relief is denied because he has not shown a likelihood of imminent, irreparable harm.[5]  See Hood, 822 F.3d at 228.

    C.    <u>Conclusion</u>

        Given the foregoing, because Plaintiff has failed to demonstrate irreparable harm, the Court finds that Plaintiff is not entitled to preliminary injunctive relief.  The Court will however deny the motion without prejudice subject to refiling should Plaintiff's circumstances change and should Defendant take different actions.  Plaintiff's Motion for Preliminary Injunction (Dkt. # 8) is therefore **DENIED WITHOUT PREJUDICE**.

CONCLUSION

        Based on the foregoing, the Court will **GRANT IN PART** and **DENY IN PART** Defendants' Motion to Dismiss the Complaint for Declaratory and Injunctive Relief (Dkt. # 15).  The motion is **GRANTED** as to Plaintiff's First Amendment Retaliation claim and it is **DISMISSED WITHOUT PREJUDICE**.

---

[5] Given this finding, the Court does not consider the other requirements—the balance of equities or whether an injunction would serve the public interest.

The motion is **DENIED** in all other respects. The Court will further **DENY WITHOUT PREJUDICE** Plaintiff's Motion for Preliminary Injunction (Dkt. # 8).  Additionally, the Court will **ORDER** the parties to submit their proposed scheduling orders **within 21 days of the date of this Order**.

        **IT IS SO ORDERED.**

        **DATED:** Austin, Texas, September 5, 2023.

_____
David Alan Ezra
Senior United States District Judge