UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

RICHARD LOWERY,

      *Plaintiff*,

v.

LILLIAN MILLS, *et al.*,

      *Defendants.*

Case No. 1:23-cv-00129-DAE

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR LEAVE TO AMEND COMPLAINT**

REPLY ARGUMENT

**1. UT has not rebutted the presumption in favor liberal amendment**

The Fifth Circuit recognizes "a presumption in favor of granting parties leave to amend." *Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 425 (5th Cir. 2004). Liberal amendment is federal policy. *Johnson v. Epps*, 479 F. App'x 583, 588 (5th Cir. 2012). Thus, district courts must permit amendment, unless the party opposing amendment meets its burden of demonstrating substantial reason to deny leave. *Dynamic CRM Recruiting Sols., L.L.C. v. UMA Educ., Inc.*, 31 F.4th 914, 924 (5th Cir. 2022). Courts may only deny leave to amend if five factors together weigh against amendment: "1) undue delay, 2) bad faith or dilatory motive, 3) repeated failure to cure deficiencies by previous amendments, 4) undue prejudice to the opposing party, and 5) futility of the amendment." *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004); *see also* Dkt. 113 at 5 ("Absent any of these factors, the leave sought should be 'freely given'") (citations omitted). Additionally, "[t]he court may weigh in the movant's favor any prejudice that might arise from denial of leave to amend." *Rolando Rodriguez-Meza v. Venegas*, Civil Action No. 2:17-CV-54-AM-CW, 2020 U.S. Dist. LEXIS 264151, at *3 (W.D. Tex. Jan. 10, 2020) (quoting *Chitimacha Tribe of La. v. Harry L. Laws Co.*, 690 F.2d 1157, 1163 (5th Cir. 1982)).

UT concedes that two of these factors—the lack of both undue delay and failure to cure—support Lowery's amendment. *See* Dkt. 113 at 3, 5 (asserting that the other three factors "weigh in favor of denying leave"). UT, therefore, must show that the other three factors outweigh the factors concededly favoring Lowery, as well as the prejudice to Lowery caused by denying amendment and the federal policy supporting liberal amendment—a burden UT does not satisfy. Lowery's proposed amendment is neither unduly prejudicial, nor dilatory, nor futile.

### 2. Amendment would not prejudice Defendants, who admit they have adequate time for discovery about the amended complaint

Lowery's proposed amendment comes well before the deadline to amend and will not unduly prejudice UT. Over two months remain until discovery closes, and trial remains unscheduled. Dkt. 57 at 2. UT still has "plenty of time" to conduct discovery and prepare for trial, *see* Dkt. 114 at 7:16-24, 95:23-96:6, because Lowery primarily seeks to add a new defendant—Jay Hartzell—and to allege additional facts about Hartzell's involvement in the underlying events already described in the original complaint. *See Salas v. City of Galena Par*k, Nos. 21-20170, 21-20333, 2022 U.S. App. LEXIS 12709, at *20-21 (5th Cir. May 11, 2022) (finding no prejudice).

This amendment will not significantly expand discovery. Lowery's original complaint and his proposed new complaint involve essentially all the same events, people, and theories—as UT seems to concede by insisting that Lowery should have "added Hartzell as a defendant [] earlier." Dkt. 113 at 2, 6. The parties tug-of-war about Hartzell's role—or lack alleged lack of role—has been extant since the early days of this case, and UT's counsel has attempted to conceal his involvement in order to run out the clock.

Moreover, UT recently appeared to admit that it has sufficient time between now and May 1 to investigate all of Lowery's proposed amendments, when UT stated to this Court less than two weeks ago that "[t]he current scheduling order protects the parties' ability to litigate this case . . . even if Lowery's motion for leave to amend the complaint is ultimately granted." Dkt. 104 at 4.

UT quarrels with this Court's recent order, more than it does with Lowery's motion. After all, UT prophesies that if leave is granted, Lowery will make a "sure-to-follow increase in discovery demands upon more and more uninvolved University personnel." Dkt. 113 at 3. Perhaps UT refers to the discovery Lowery requested from non-parties Kelly Kamm, Andres Almazan, and Aydogan Alti, whom UT

argued were uninvolved and thus should not have to produce documents. *See, e.g.*, Dkt. 99; Dkt. 76. This Court, however, rejected UT's contention and held that all three professors were sufficiently connected to the events of this case and must answer reasonable discovery requests. *See* Dkt. 110 at 3-5; Dkt. 114 at 12:1-5. UT's true fear, then, is that this Court will permit Lowery to obtain the discovery that proves his case. If Jay Hartzell was not involved in the campaign to silence Lowery, then discovery will support his defense. But if, as UT's president, he urges administrators below him in the "Chain of Command" to take action to muzzle an "annoying" critic like Lowery, then he has not right to insulate himself from responsibility.

### 3. Discovery uncovered evidence revealing UT's unwritten speech code and Jay Hartzell's direct involvement in UT's silencing of Lowery

Lawsuits evolve as new evidence emerges. Lowery moved to amend in February 2024 because he learned the facts underlying his amendments, largely in the last two months, through discovery. This was no tactical maneuver to delay or bad-faith intentional deception. *Cf. Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 141 (5th Cir. 1993); *SMH Enters. v. Krispy Krunchy Foods*, 340 F.R.D. 554, 561 (E.D. La. 2022). Lowery did not know "from the outset of the litigation about the facts which formed the basis for his motion." *Wimm*, 3 F.3d at 140. Rather, Lowery "conscientiously relied on [his] findings during the course of discovery to refine the complaint." *Estate of Potter v. Bexar Cnty. Hosp. Dist.*, 195 F. App'x 205, 209 (5th Cir. 2006). He should not be punished for acting responsibly in gathering direct evidence linking Hartzell to the campaign to silence Lowery before adding Hartzell as a party. That is the opposite of bad faith.

Lowery believed even before filing this case that UT President Jay Hartzell was a central figure in the campaign to silence him. *See* Dkt. 8-1, ¶¶ 27, 43, 60. But

Lowery only recently acquired *evidence* of Hartzell's direct involvement in the silencing campaign from December 2023 onward. *See* Dkt. 94 at 8-9. Depositions in January, UT's belated completion of its first document production in December, and UT's conveyance of three different versions of its privilege log transformed Lowery's knowledge about Hartzell's role. In the last few months, plausible suspicions hardened into actual evidence.

Evidence now demonstrates, for instance, that all three original defendants communicated with Hartzell about UT's problems with Richard Lowery's speech shortly before the August 2022 events that caused Lowery's self-censoring. Sheridan Titman, for example, testified that on July 19—the day after Lowery's interview on the Hanania podcast, where he opined that Hartzell was good at lying to Republicans—Hartzell told Titman that he was "annoyed" with Lowery, "grumble[d] [to Titman] about something that Richard said," and "mention[ed] that Richard was being a pain." Dkt. 94-2, 100:11-102:14, 113:2-14.

Likewise, although UT concealed this information for eight months, on the morning of August 5, Jay Hartzell initiated a series of texts with defendants Mills, Burris, and two other UT leaders about negative "media coverage of [the] new [Civitas] institute" that Lowery had "induced." Kolde Supp. Dec. ¶¶ 2-4, Ex. A (Second Amended Log) at 4-5; Dkt. 61-2, ¶ 5. That same evening, after receiving Hartzell's text, Burris watched segments of the Hanania podcast, including the section when Lowery joked that "the sole qualification for being a president of a university in a red state is that you're good at lying to Republicans." Kolde Supp. Dec. ¶ 5, Ex. B (Burris Dep.) 62:8-21, 70:17-71:4. On August 9, Jeff Graves, a member of Hartzell's office, forwarded Kamm's then-anonymous complaint about Lowery's podcast interview to Mills and Burris for "review and handling" as a "personnel matter." Dkt. 69-3.

A few days after that, on August 12, Burris and Mills met with Carlos Carvalho, with the "goal" of convincing Carvalho to "counsel" Lowery so that he would no longer make "factually inaccurate and disruptive" comments such as that "the president is paid to be good at lying to conservative donors and politicians[.]" *Id.* at 154:12-23, 156:22-157:19; *cf.* Dkt. 94-2 at 112:16-20 (Defendant Titman agreeing with Lowery that because Hartzell is "a president of the university in a red state," "[i]t certainly helps to be able to . . . bullshit the Republicans"). Hartzell's texts lie at the beginning of a temporally proximate sequence events that led to Lowery's self-censorship.

Dean Mills's notes of the August 12 meeting with Carvalho describe Lowery's speech—including his podcast comment about Hartzell "lying" to conservatives—as disruptive and repeatedly refer to "Jay" and his "position" on Lowery's speech. Dkt. 83-3 at 2. At her deposition last week, Mills confirmed that Jay Hartzell came up at the meeting. Kolde Supp. Dec. ¶ 6; *cf.* Dkt. 8-2, ¶ 6 (stating that Titman told Carlos Carvalho around this time that "Lillian Mills, and University of Texas President Jay Hartzell, were upset with Lowery's political advocacy").

Additional evidence about UT's unwritten speech code also emerged in the last few months. Lowery, for instance, only obtained the text of the anonymous complaint asking UT's compliance office to investigate if Lowery violated the university's "standards of ethics and respect for faculty" on October 30, learned the identity of the complaint's author (Kelly Kamm) in December, and received follow-up emails between Kamm and a UT administrator about "the pertinent university policy" in January. *See* Dkt. 69-3; Dkt. 69 at 5-6; Kolde Supp. Dec. ¶ 7, Ex. C (UT-LOWERY-005307). Similarly, defendant Burris' notes for his August 26 meeting with Carlos Carvalho documented the allegedly "uncivil tone" and "uncivil rhetoric" of Lowery's tweets and "recommend[ed] that the tone and interactions could

5

improve in its civility." Kolde Supp. Dec. ¶ 9, Ex. E (notes) *see also* Ex. B at 204:22-205:3 (stating that Burris recommended "[i]n so many words" that Lowery's comments "improve in their civility").

And Sheridan Titman stated at his January deposition that "[a]s department chair, I have explicitly said to Richard to try not to be rude" although Titman knew "no written guidelines as to what constitutes a rude opinion" for the term is "subjective." Kolde Supp. Dec. ¶ 8, Ex. D (Titman Dep.) 110:15-111:3, 119:5-7. Titman "do[es]n't think rude comments are acceptable" and stressed that "if I have to evaluate somebody and he's on my faculty . . . if they are doing something that I find rude and potentially dangerous I will talk to them about that." Ex. D at 145:21-146:1, 212:21-213:1. Policies or practices that ban rude or offensive speech by public employees on matters of public importance are presumptively unconstitutional.

Discovery has brought to light new evidence, so Lowery wishes to amend his complaint to comport with that evidence. Relying on evidence, rather than speculation, is the opposite of bad faith or dilatory motive.

### 4. A facial and as-applied challenge to a speech code is legally distinct from a retaliation claim

Defendants conflate Lowery's speech-code challenge with his dismissed retaliation count, but they are fundamentally different legal claims. Retaliation necessarily involves an adverse employment action, while facial challenges do not require actual enforcement. *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161 (2014) (credible threat of enforcement sufficient for standing).

Far from futile, Lowery's new count—in slightly different form—already survived Rule 12(b) dismissal. Dkt. 51. A complaint is not futile if it "contain[s] sufficient factual matter to state a claim to relief that is plausible on its face," accepting "all well-pleaded facts as true and consider[ing] the complaint in the light

most favorable to the plaintiff." *SMH Enters.*, 340 F.R.D. at 562-63 (citations omitted). This Court previously held that Lowery's first complaint "sufficiently alleged an implicit policy on what speech is allowed by employees of the Salem Center" and that this policy "arguably proscribes Plaintiff's intended conduct." Dkt. 51 at 17.

Moreover, as this Court acknowledged, Lowery's second count—challenging UT's unwritten speech code facially and as-applied—is legally separate from his dismissed retaliation claim. Indeed, this Court scrutinized Lowery's allegations of an implicit speech policy as part of its analysis of Lowery's first claim for "chilling effect," not the retaliation claim. *Id.* at 16-17; *see also Jackson v. Wright*, Civil Action No. 4:21-CV-00033, 2022 U.S. Dist. LEXIS 8684, at *19-20 (E.D. Tex. Jan. 18, 2022) ("The harm from which Plaintiff continues to suffer constitutes, at a minimum, chilled speech" because defendant university's "implicit policy . . . arguably proscribes Plaintiff's intended conduct").

A First Amendment retaliation claim requires proving that a plaintiff "suffered an adverse employment decision." Dkt. 51 at 22. As a result, this Court dismissed without prejudice Lowery's retaliation claim, concluding that under Fifth Circuit precedent "allegations of threats are insufficient to establish an adverse employment action" as "mere threat or potential of an ultimate employment decision will not suffice." *Id.* at 24. Lowery's retaliation claim was dismissed as a matter of law; it was not based upon a finding of fact. *Contra* Dkt. 113 at 7 (falsely asserting this Court found that UT's misconduct "has not occurred").[1]

---

[1] Lowery maintains that the Supreme Court has implicitly overruled the Fifth Circuit's old standard for what constitutes an adverse employment action in the First Amendment context, but that is an issue to be re-visited later, on appeal.

In contrast, facial challenges, by definition, do not require proving an adverse action or, indeed, any past application to the plaintiff. Such challenges often sound in pre-enforcement. *See Netchoice, L.L.C. v. Paxton*, 49 F.4th 439, 449-50 (5th Cir. 2022). To plead a facial attack on a university policy deeming some speech "'rude,' 'uncivil,' or 'offensive,'" a plaintiff only needs to allege that his "speech [is] deterred, *by the prospect* of adverse application of the policies. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020) (emphasis added). Lowery easily clears that hurdle.

Even as-applied challenges can proceed before the challenged statute or policy has been applied to the plaintiff, because of third-party standing and similar doctrines. *See Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 659 & n.3 (5th Cir. 2006). "Whereas there must be some evidence that a rule would be applied to the plaintiff in order for that plaintiff to bring an as-applied challenge, that is not the case for facial challenges" which only require that a policy "facially restrict[s] expressive activity by the class to which the plaintiff belongs." *Id.* 979 F.3d at 335 (cleaned up).

In addition, the existence of an unwritten speech policy that is selectively applied to disfavored speakers is distinct from the question of whether Defendants acted to chill Lowery by asking Carvalho to "counsel" Lowery or threatening Lowery's Salem-Center affiliation. Legally actionable chilling can be a stand-alone, one-off event, without an unwritten policy or practice. Thus, breaking Lowery's remaining count into two related—but distinct—claims serves a practical purpose.

Lowery's new second count, moreover, seeks relief unavailable under either his original chilling count or his dismissed retaliation count. Plaintiff asks this Court to declare that UT's unwritten speech code is selectively enforced and to enjoin UT from labelling Lowery's speech "uncivil" or "rude," from preventing him from calling

for boycott of donations or funding to UT, and from "acting *in any way* to enforce UT's unwritten speech code or practice." Dkt. 94-4 at 34-35 (emphasis added).

Lowery, therefore, requests an injunction against the unwritten speech code on its face. This injunction would prohibit UT from enforcing its unconstitutional speech code against anyone (not merely against Lowery). This relief was not part of Lowery's original complaint. Naming President Hartzell as a defendant helps ensure effective declaratory and injunctive relief against UT's administration as a whole, not just those who administer the McCombs School. *Contra* Dkt. 113 at 3, 6.

Lowery's proposed complaint alleges that his First Amendment rights are facially deterred by the prospective enforcement of UT's unwritten speech code, that this speech code likely would be enforced against him in the future, and that the code already has been enforced against him in the past. *See, e.g.*, Dkt. 94-4, ¶¶ 118-29. Lowery does not need to allege an adverse employment action as part of his facial and as-applied challenge.

### 5. This Court's order regarding discovery into nepotism allegations—if reversed—supplies an additional reason to amend

Finally, this Court recently granted, without prejudice, UT's motion for a protective order preventing discovery into allegations "that [Jay] Hartzell improperly helped his son gain admission to a graduate program" at UT. Dkt. 88 at 3. Although this Court allowed Lowery potentially to "re-rais[e] these topics as appropriate for discovery" if his motion for leave to amend is granted, Dkt. 110 at 4, Lowery will appeal the protective order. If the protective order is reversed and lifted, Lowery will have even more reason to amend. Hartzell's nepotism is relevant both to his motive to chill Lowery's speech and to whether Lowery's speech about Hartzell's honesty was protected opinion as opposed to an unprotected intentional "disparagement" or even "defamation," as Defendants allege. *See, e.g.*, Dkt. 103 at 6;

Dkt. 14 at 18. Defendants have not withdrawn their arguments that Lowery's speech is factually inaccurate, so Lowery should be allowed to develop evidence to the contrary.

Although Lowery's proposed complaint never mentions nepotism at UT nor Jay Hartzell's putative misuse of state resources to benefit his son's admission, *see* Dkt. 77-1, the amendments do allege that Lowery publicly criticized Hartzell's honesty and the hypocritical behaviors that UT administrators perform to demonstrate "allyship." Dkt. 94-4, ¶¶ 12, 17-19, 31, 100, 118. Moreover, these amendments state that "Lowery's comments about Hartzell's honesty and hypocrisy personally irritated and offended Hartzell and he wanted them to stop because Lowery was 'being a pain.'" *Id.* at ¶¶ 106-07.

If Lowery had received the documents on Hartzell's alleged nepotism that he requested over a month ago and had been allowed to ask about these allegations at the depositions of Carlos Carvalho and Lillian Mills last week, he likely would have significantly more information to support this motion to amend. *See* Dkt. 110 at 4; Dkt 95. The current protective order hampers Lowery's ability to probe Hartzell's involvement in the silencing campaign, by making one potential motive for this silencing undiscoverable. Thus, if this protective order is reversed on appeal, as Lowery will urge, this Court should permit Lowery to conduct full discovery of these nepotism allegations to gather evidence in support of his amendments.

## CONCLUSION

This Court should grant Lowery leave to amend his complaint and to join Jay Hartzell as a defendant.

Respectfully submitted,

   *s/Endel Kolde*
Endel Kolde
Washington Bar No. 25155
Courtney Corbello
Texas Bar No. 24097533
Nathan J. Ristuccia
Virginia Bar No. 98372
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW
Suite 801
Washington, D.C. 20036
Tel: (202) 301-1664
Fax: (202) 301-3399
dkolde@ifs.org
ccorbello@ifs.org
nristuccia@ifs.org

*Counsel for Richard Lowery*

Dated: February 23, 2024

   *s/Michael E. Lovins*
Michael E. Lovins
Texas Bar No. 24032555
LOVINS | TROSLCAIR, PLLC
1301 S. Cap. Of Texas
Building A Suite 136
Austin, Texas 78746
Tel: (512) 535-1649
Fax: (214) 972-1047
michael@lovinslaw.com

[Pursuant to Fed. R. Civ. P. 5(d)(1)(B) and Section 14(c) of the current Administrative Policies and Procedures for Electronic Filing, no certificate of service is required for this filing because all parties' counsel are registered for ECF service]