UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

RICHARD LOWERY,

    *Plaintiff,*

v.

LILLIAN MILLS, *et al.,*

    *Defendants.*

Case No. 1:23-cv-00129-DAE

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................... ii

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION ............................................................................................... 1

STATEMENT OF FACTS .................................................................................... 2

ARGUMENT ..................................................................................................... 9

    I.  BASIC DISCOVERY INTO THE CHILLED-SPEECH CLAIM IS INCOMPLETE ................ 9

    II. UT THREATENED ACTIONS AGAINST LOWERY THAT WOULD CHILL A PERSON OF ORDINARY FIRMNESS FROM SPEAKING ............................................................ 11

        A.  Lowery has already provided evidence demonstrating all three elements of the *Keenan* test .................................................................... 11

        B.  UT threatened to take adverse employment actions against Lowery if he continued to speak freely ................................................................. 15

        C.  UT's threats would chill a person of ordinary firmness .......................... 18

CONCLUSION ................................................................................................. 20

TABLE OF AUTHORITIES

## Cases

*Alvarado v. Tex. Rangers,*
    492 F.3d 605 (5th Cir. 2007) ................................................................. 15

*Am. Freedom Def. Initiative v. King County,*
    904 F.3d 1126 (9th Cir. 2018) ............................................................... 14

*Austin Legal Video, LLC v. Deposition Sols., LLC,*
    No. 1:23-cv-00421-DAE, 2023 U.S. Dist. LEXIS 232404 (W.D. Tex. Nov. 16,
    2023) .......................................................................................................... 10

*Bailey v. KS Mgmt. Servs., L.L.C.,*
    35 F.4th 397 (5th Cir. 2022) ................................................................. 10

*Benison v. Ross,*
    765 F.3d 649 (6th Cir. 2014) ............................................................... 19

*Burlington N. & Santa Fe Ry. v. White,*
    548 U.S. 53 (2006) ................................................................................. 19

*Burnside v. Kaelin,*
    773 F.3d 624 (5th Cir. 2014) ............................................................... 15

*Cohen v. California,*
    403 U.S. 15 (1971) ................................................................................. 14

*Cooksey v. Futrell,*
    721 F.3d 226 (4th Cir. 2013) ............................................................... 20

*Couch v. Bd. of Trs. of the Mem'l Hosp.,*
    587 F.3d 1223 (10th Cir. 2009) ............................................................ 19

*Dorsett v. Bd. of Trs. for State Colls. & Univs.,*
    940 F.2d 121 (5th Cir. 1991) ............................................................... 16

*Ellis v. Crawford,*
    Civil Action No. 3:03-CV-2416-D, 2005 U.S. Dist. LEXIS 3457 (N.D. Tex.
    Mar. 3, 2005) ............................................................................................ 15

*Harrington v. Harris,*
    118 F.3d 359 (5th Cir. 1997) ............................................................... 16

*Hill v. Lappin,*
  630 F.3d 468 (6th Cir. 2010) .................................................................................. 19

*Iancu v. Brunetti,*
  139 S. Ct. 2294 (2019) ........................................................................................... 14

*Jackson v. Wright,*
  82 F.4th 362 (5th Cir. 2023) ................................................................................... 19

*Jackson v. Wright,*
  Civil Action No. 4:21-CV-00033, 2022 U.S. Dist. LEXIS 8684 (E.D. Tex.
  Jan. 18, 2022) ......................................................................................................... 19

*Keenan v. Tejeda,*
  290 F.3d 252 (5th Cir. 2002) ........................................................... 10, 11, 18, 19

*Kubala v. Smith,*
  984 F.3d 1132 (6th Cir. 2021) ................................................................................ 18

*Laredo Fraternal Order of Police v. City of Laredo,*
  2008 U.S. Dist. LEXIS 19001 (S.D. Tex. Mar. 12, 2008) ..................................... 19

*Levin v. Harleston,* 966 F.2d 85 (2nd Cir. 1992) ....................................................... 20

*Lyons v. Katy Indep. Sch. Dist.,*
  964 F.3d 298 (5th Cir. 2020) .................................................................................. 12

*Matal v. Tam,*
  582 U.S. 218 (2017) ............................................................................................... 14

*Peyton v. City of Yazoo City,*
  764 F. Supp. 2d 831 (S.D. Miss. 2011) .................................................................. 19

*Serna v. City of San Antonio,*
  244 F.3d 479 (5th Cir. 2001) .................................................................................. 15

*Sharp v. City of Hous.,*
  164 F.3d 923 (5th Cir. 1999) .................................................................................. 15

*Thompson v. City of Waco,*
  764 F.3d 500 (5th Cir. 2014) .................................................................................. 15

*Wease v. Ocwen Loan Servicing, LLC,*
  915 F.3d 987 (5th Cir. 2019) .................................................................................. 14

**Other Authorities**

Keith E. Whittington, *What Can Professors Say on Campus? Intramural
     Speech and the First Amendment* (August 2, 2023) (forthcoming Journal of
     Free Speech Law) (available at https://ssrn.com/abstract=4551168)..................12

# INTRODUCTION

The University of Texas's (UT's) goal is to protect its "Chain of Command"—and especially the top of the chain, President Jay Hartzell—from the consequences of UT officials' active measures to silence Richard Lowery's public speech criticizing both Hartzell and UT. To that end, UT has for months hampered Lowery's ability to obtain basic evidence about his case, all the while obtaining what its officials wanted: Lowery's silence about what is really happening on campus. Every month that this case drags on magnifies the harm to Lowery.

UT's latest stratagem uses a discovery abatement—agreed to in order to give time for this Court to resolve a motion to dismiss—to pursue summary judgment on Lowery's chilled-speech claim. Evidently, UT hopes that it can keep President Hartzell from ever sitting for his deposition. Summary judgment is premature, since Lowery has not yet had the opportunity to complete important discovery.

Moreover, even were this case ready for resolution, UT is not entitled to summary judgment. Through the discovery to date, Lowery has gathered significant evidence that would permit a factfinder to rule for him. Genuine disputes of material fact exist on issues such as Hartzell's involvement, Defendants' motive, and the threats that Defendants made to pressure Lowery into silence. Moreover, UT insists that it could not only threaten Lowery, but actually remove him from his Salem Center position, harm his career advancement by denying him research opportunities, "counsel" him in preparation for other discipline, and cut his salary by $20,000, based on his speech.

UT officials behave as if they are brand managers for a private corporation who are permitted to instruct employees to avoid "offensive" or "uncivil" speech; or avoid airing dirty laundry that makes the CEO uncomfortable. But they are state officials who are constrained by the First Amendment. It may be understandable that they

would seek to chill Lowery into silence, but that is also why their efforts are illegal. The First Amendment protects Lowery's whistleblowing speech precisely because UT officials do not want his opinions to see the light of day.

This Court should deny UT's motion for partial summary judgment or, at least, defer ruling on this motion until discovery in the case is complete.

## STATEMENT OF FACTS

Plaintiff Richard Lowery, a professor at UT's McCombs School of Business and Senior Scholar at McCombs' Salem Center for Policy, has a history of speaking and publishing on controversial public topics such as DEI (diversity, equity, and inclusion), affirmative action, academic freedom, and free market capitalism. Dkt. 8-1, ¶¶ 1-15.[1] Lowery dissents from the political and academic views held by most UT faculty and administrators, and he has publicly criticized UT President Jay Hartzell and other university leaders for their support of DEI ideology. *See id.*, ¶¶ 9-11; Dkt. 77-1, ¶¶ 12-14. Lowery has made his positions known to university donors and to elected officials in Texas, including those who oversee UT's funding. Dkt. 8-1, ¶¶ 10, 31-34; Dkt. 17-1, ¶¶ 8-14.

In 2021, Lowery and his friend Carlos Carvalho, the Executive Director of the Salem Center, worked to create "The Liberty Institute," a proposed institute at UT-Austin dedicated to increasing intellectual diversity and promoting classical liberalism. *Id.*, ¶¶ 17-20; Dkt. 8-2, ¶ 4. Hartzell and other UT officials eventually took control of the Liberty Institute, redirected its funding, and established "The Civitas Institute," with a very different vision, instead. Dkt. 8-1, ¶ 21; Dkt. 8-2, ¶ 5; *see also* Ex. A (Titman Dep.) 47:9-49:21 (former defendant Sheridan Titman

---

[1] Plaintiff has included a timeline of events as an illustrative exhibit to this motion. Kolde Dec. ¶ 25, Ex. P (timeline).

testifying that "there's been a change" as the Civitas Institute lacks the "clear vision" that Carvalho and Lowery developed for the Liberty Institute.)

Lowery responded to these events by speaking and publishing articles criticizing Hartzell, other UT administrators, and the new Civitas Institute. Dkt. 8-1, ¶¶ 22-25; Dkt. 8-2, ¶ 5. For instance, in July 2022, Lowery gave a podcast interview in which he discussed the Liberty Institute fiasco and opined that Jay Hartzell was good at lying to Republicans. Dkt. 62-6 at 22-26, 60; Dkt. 8-1, ¶¶ 26-27; *cf.* Ex. A at 112:16-20 (Titman agreeing that because Hartzell is "a president of the university in a red state," "[i]t certainly helps to be able to . . . bullshit the Republicans").

Beginning in the summer of 2022, UT officials threatened and pressured Lowery to keep him from publicly criticizing the university and its leaders. *See* Dkt. 8-1, ¶¶ 43, 46, 60. For example, Titman—the chair of Lowery's department and formerly an official-capacity defendant—testified that on July 19, the day after Lowery's podcast interview, Jay Hartzell spoke with Titman at a reception celebrating the hiring of Justin Dyer as Executive Director for the new Civitas Institute. Ex. A at 99:16-100:13. Hartzell was "annoyed" with Lowery, "grumble[d] [to Titman] about something that Richard said," and "mention[ed] that Richard was being a pain." *Id.* at 100:11-102:14, 113:2-14.

A week or two later, in late July, Titman told Carvalho on the phone that "Jay [Hartzell] and Lil [Mills] want us to do something about Richard" because they "were upset about Lowery's political advocacy" and wanted Titman and Carvalho to "ask [Lowery] to tone it down." Ex. B (Carvalho Dep.) 151:10-152:24. Carvalho has the power to terminate Lowery's position at the Salem Center, thus costing Lowery $20,000 in salary as well as prestige and research opportunities. Dkt. 8-1, ¶¶ 5-7, 61-62. But Carvalho "refused to do anything" about Lowery, although he understood Titman's statement to be "an implicit threat." Dkt. 8-2, ¶ 6.

Approximately a month later, Titman told Lowery that Hartzell "was not happy with what [Lowery] had been saying" and had asked Titman "if something could be done about [Lowery's] public statements criticizing Hartzell." Dkt. 17-1, ¶¶ 2-5. Titman does not dispute that this conversation occurred. Ex. A at 104:14-105:18. Lowery interpreted it as a "suggestion" from Titman that Lowery "stop tweeting" because of "pressure from Hartzell, Mills, Kothare, or others." Dkt. 17-1, ¶ 5.

On the morning of August 5, Jay Hartzell initiated a series of texts with Defendants Lillian Mills and Ethan Burris, and two other UT leaders about negative "media coverage of [the] new [Civitas] institute" that Lowery had "induced." Dkt. 119-1 at 4-5; Dkt. 61-2, ¶ 5. That night, Burris watched portions of Lowery's July 18 podcast interview, including the part about Hartzell being "good at lying to Republicans." Ex. C (Burris Dep.) 61:16-62:21, 70:4-71:4. Burris "disagreed with some of the tenor" of the podcast concerning "criticisms about the university and diversity, equity and inclusion policies" and "had to stop watching" after "five [or] six minutes." *Id.* at 62:15-63:10. Around this time, Mills also had several phone calls with Justin Dyer, the Civitas director, regarding statements Lowery made about Civitas on the Hanania podcast and elsewhere. Dkt. 132-6 at 9.

Four days later, Jeff Graves, a high-level executive in the President Hartzell's Office, forwarded to Mills and Burris an anonymous complaint asking UT to investigate if Lowery's podcast interview violated UT's "standards of ethics and respect for faculty." Kolde Dec. ¶ 14, Ex. E (Graves email). Graves stated that he sent the complaint to the two deans for their "review and handling" as a "personnel matter" about "whether Professor Richard Lowery crossed any lines regarding ethics or compliance" and that "Legal will provide advice." *Id.* Graves's email did not indicate that no action should be taken or that Lowery's conduct was fine. *Id.*

Mills met with UT Legal about Graves' email sometime between the day Graves sent his email and August 12, the day she and Burris met with Carvalho. Ex. D (Mills Dep.) 151:6-152:25; *cf.* Dkt. 119-1 at 7, 9-10 (listing three emails regarding Lowery and "First Amendment issues" between Mills and UT's General Council on August 11 and 12). Also, between August 9 and August 12, Mills, Burris, and Titman repeatedly communicated with each other about Lowery's speech and an upcoming meeting with Carvalho. *See, e.g.*, Dkt. 132-6 at 5; Ex. D at 134:11-135:9; Ex. A at 63:1-25.

One week after Hartzell texted Mills and Burris (August 12) and three days after a high-ranking official (Graves) from Hartzell's office emailed the anonymous complaint to them for handling, Mills and Burris met with Carvalho with the admitted "goal" of getting Carvalho to "counsel" Lowery to "stop making comments that are factually inaccurate and disruptive to operations" such as "asking people not to donate to UT" or opining that "the president is paid to be good at lying to conservative donors and politicians[.]" Ex. C at 154:12-155:5, 156:22-157:17; Ex. D at 199:4-14, 210:22-211:11. Mills highlighted statements from the July 18 podcast interview, an August 5 article, and various "public tweets" as examples of comments that Lowery should stop making. Kolde Dec. ¶ 15, Ex. F (meeting notes) at 1-2. Mills was "offended" by Lowery's speech, which she found "inappropriate." Ex. D at 87:6-14, 166:20-22, 171:4-14, 208:14-209:20.

During the August 12 meeting, Mills and Burris echoed language from Graves's email instructing them to follow-up, saying that Lowery's criticisms were "crossing the line." Dkt. 8-2, ¶ 7. They also pointed out that Carvalho, as Executive Director of the Salem Center, had "the power to have [Lowery] not be attached to the center." Carvalho. Ex. B at 192:4-193:6; Dkt. 8-2, ¶¶ 7-8. When Carvalho resisted their pressure, Dean Mills "stressed" that Salem's "directors served at the pleasure of the

dean" and that money donated to Salem—regardless of who raised it—belonged to McCombs. Ex. F at 1; Ex. D at 189:15-190:8. [2] Carvalho understood this as a threat to end Lowery's affiliation with the Salem Center or even to remove Carvalho as Executive Director if he did not pressure Lowery into changing his speech. Ex. B at 159:8-162:10, 163:16-164:20; Dkt. 8-2, ¶¶ 8, 10. Carvalho later recorded his memory of this conversation and the "threat" Mills made when he "rejected her request . . . to silen[ce] my colleague." Kolde Dec. ¶ 16, Ex. G (Carvalho notes).

Two weeks later (August 26), at a follow-up meeting between Burris and Carvalho, Burris complained that Lowery's "uncivil rhetoric in communications" and the "uncivil tone of [his] tweets" were "damaging to the school" and harmful to "staff and other faculty who are not tenured." Kolde Dec. ¶ 17, Ex. H (meeting notes); *see also* Dkt. 8-2, ¶ 9. Burris cited tweets critical of UT's Global Sustainability Leadership Institute (GSLI) as key examples. Ex. C at 190:8-191:16, 194:7-16. These tweets were the same ones that, a few days earlier, two leftwing GSLI faculty members—Meeta Kothare and Laura Starks—complained about to Titman and Mills. Dkt. *See* 8-16; Dkt. 8-17; Kolde Dec. ¶ 18, Ex. I (Starks email).

And at a third meeting, on or around October 17, Burris again threatened Lowery's Salem Center position, stating that, although Burris had just renewed Lowery's annual appointment, he might not renew it in the future because of Lowery's speech. Ex. B at 207:17-208:24; Dkt. 8-2, ¶ 9; *see also* Dkt. 132-4 (September 19, 2022 renewal letter). Carvalho refused to try to change Lowery's speech, but he relayed these conversations with Mills, Burris, and Titman to

---

[2] Although Richard Lowery's title at the Salem Center is "Senior Scholar," UT's system codes him as a "director" for salary purposes. *See* Ex. B. at 171:14-172:12. Mills admits to using both titles when referring to Lowery. Ex. D at 196:19-24, 200:9-11, 210:6-11. Plaintiff disputes that he ever spoke as a UT administrator.

Lowery, as Defendants "requested and [] must have expected." Dkt. 8-2, ¶ 11; *see also* Dkt. 8-1, ¶¶ 43-45.

On August 22—a few days before the second of the three Carvalho meetings—Lowery posted on his Twitter account a tweet criticizing an event hosted by GSLI for its lack of viewpoint diversity. *Id.*, ¶¶ 41-42. This tweet (referred to as the "Romanov tweet") was used by Defendants as one basis to counsel Lowery about his speech. Some suggested his tweet was "unsafe" or "offensive." Dkt. 8-17 (Starks: "… this is not acceptable and is potentially quite dangerous") (Kothare: "These tweets are typically incoherent, but clearly offensive").

Lowery's twitter criticism contrasted Salem's willingness to invite people who disagree with free market principles to debate (in this case, a communist), while GSLI invites only like-minded speakers who support ESG or "sustainability." Specifically, Lowery's tweet alluded to an obscenity as a means of emphasis ("f***ing") and mentioned the Communists' 1918 murder of the Romanovs—the imperial house of Russia—during the Russian Revolution. Dkt. 8-14; Dkt. 17-1 at 7-8 (¶¶ 24-26) (citing Orthodox Christianity, *"Killing little Romanov children was justified," says founder of Democratic Socialist Magazine* (Oct. 5, 2020), https://orthochristian.com/134391.html). For historical context, the Communists had seized power and proceeded to liquidate the Russian imperial family (including children) to ensure they could never return to power. *Id.* (quoting Jacobin founder/Salem panelist's tweet: "History has absolved me. No more tsars.").

Properly read, Lowery's tweet pointed out the hypocrisy of people who condemn the Salem Center as too right-leaning (even though the Salem Center invites socialists to speak, even ones who condone child murder) while never demanding leftwing groups on campus seek ideological balance. Ex. B at 213:1-214:14; Dkt. 17-1, ¶¶ 23-28. But some UT faculty and administrators interpreted the tweet as rude,

unacceptable, and potentially dangerous. Ex. A at 136:4-137:15, 145:18-146:9; Dkt. 8-17.

In addition to complaining to Titman and Mills about Lowery's tweets, GSLI officials arranged for UT police to open a "threat mitigation investigation" into Lowery. *See* Dkt. 8-19; Kolde Dec. ¶ 19, Ex. J (email on police investigation). Although Mills was aware of the controversy around the tweet, she does not remember taking steps to protect Lowery's speech rights and thinks GSLI's request to UT police about Lowery was "appropriate." Ex. D at 82:10-23, 88:18-89:21. Indeed, concurring with Kothare's view, Dean Mills also found Lowery's Romanov tweet "incoherent, but clearly offensive" and worried that it could affect "the UT brand." Ex. D at 87:6-14, 93:2-23.

Similarly, around this same time, Titman forwarded to Lowery an email from the same GSLI faculty complaining about the tweet and told Lowery "You don't seem to be making friends. It is probably in your interest to come up with a class for the Spring that is likely to be popular" and that he should limit himself to "the appropriate response" of sponsoring academic panels, rather than tweeting, in the future. Dkt. 8-18; Dkt. 8-1, ¶¶ 46-47. Although Titman "didn't read the tweet very carefully," he reached out to Lowery because Titman "do[es]n't think it's good to have faculty sending out tweets talking about fucking communists and killing children" and tweeting "to 10,000 people . . . isn't the way that we should be having intellectual discourse." Ex. A at 147:5-24. According to Titman, this conversation with Lowery was part of his duty as chair "to evaluate somebody . . . on my faculty" as Titman is "in charge of . . . making suggestions on what they are doing." Ex. A at 212:19-213:22.

Lowery understood Titman to be warning him to stop tweeting lest Mills or Burris cut Lowery's pay or otherwise discipline him. *See* Dkt. 17-1, ¶¶ 4-7; Dkt. 8-1,

¶¶ 46-50. Because of this pressure from UT administrators and faculty, Lowery began to self-censor in late August 2022, eventually stopping his tweets all together and no longer writing or speaking in public on UT issues. Dkt. 8-1, ¶¶ 58-60, 63-67; Dkt. 17-1, ¶¶ 20-22; Dkt. 64-2, ¶¶ 16-17. It was only after Lowery began self-censoring in late August that Burris renewed his Salem Center appointment, *see* Dkt. 132-4, and that Lowery's annual pay raise was approved, *see* Dkt. 132-9.

Lowery brought this lawsuit in defense of his First Amendment rights on February 8, 2023. *See* Dkt. 1. Discovery is not yet complete. *See, e.g.*, Dkt. 122; Dkt. 121 at 1-2. In March 2024, this Court granted Lowery leave to amend his complaint. *See* Dkt. 123; Dkt. 120 at 5-7. Although the amendment primarily joined Hartzell as a defendant and added a second speech-code claim, it also revised Lowery's chilled-speech claim. *Compare* Dkt. 126, ¶¶ 99-115 *with* Dkt. 94-4 at 27-30. At the time of this amendment, discovery was—and remains—paused during the resolution of a motion to dismiss. Dkt. 122. As a result, Lowery never had the opportunity to conduct discovery about some of the new allegations in his amended complaint.

## ARGUMENT

### I.   BASIC DISCOVERY INTO THE CHILLED-SPEECH CLAIM IS INCOMPLETE

This Court should deny Defendants' motion as premature, because discovery is incomplete and at least two major depositions—of defendant Jay Hartzell and of UT's 30(b)(6) representative—have not yet occurred. In addition, Lowery plans to depose Meeta Kothare, the GLSI administrator who denounced Lowery's tweets to Mills and Titman, and may seek follow-up documentary discovery.

This Court held that Lowery's complaint stated a chilled-speech claim. Dkt. 51 at 16-18, 25-26. To prove chilled speech, Lowery must show that "(1) [he was] engaged in constitutionally protected activity, (2) the defendants' actions caused [him] to suffer an injury that would chill a person of ordinary firmness from

continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiff['s] exercise of constitutionally protected conduct." *Id.* at 25 (quoting *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th C. 2002)). UT claims that Lowery cannot supply evidence demonstrating the second or third elements of this test. *See* Dkt. 131 at 6-7.

Summary judgment is inappropriate until "the plaintiff has had a full opportunity to conduct discovery." *Bailey v. KS Mgmt. Servs., L.L.C.*, 35 F.4th 397, 401 (5th Cir. 2022) (citation and internal quotation marks omitted). "[W]hen basic discovery has not been completed, particularly when the moving party has exclusive access to the evidence necessary to support the nonmoving party's claims," summary judgment must be refused as "premature and improper." *Austin Legal Video, LLC v. Deposition Sols., LLC*, No. 1:23-cv-00421-DAE, 2023 U.S. Dist. LEXIS 232404, at *6 (W.D. Tex. Nov. 16, 2023) (citations omitted).

Lowery has sought to depose Hartzell since the start of this lawsuit, although UT systematically opposed this deposition. *See* Dkt. 16; Dkt. 19 at 6, 10-11. On March 26, this Court granted Lowery leave to amend and to add Hartzell as a defendant. Dkt. 123. The amended complaint and its revised chilled-speech claim both contain many allegations about Hartzell's role in the campaign to silence Lowery's speech. *See, e.g.*, Dkt. 126, ¶¶ 4, 10, 17-19, 27, 44-50, 66-67, 100, 106-07, 112-14.

Plaintiff, however, never had the opportunity to depose Hartzell about his role in the chilling of Lowery's speech. When counsel for the parties conferred on March 11, UT's counsel stated that Hartzell would agree to sit for a deposition if this Court denied its (then not-yet-filed) motion to dismiss but would oppose any deposition prior to resolution of this motion. Kolde Dec. ¶ 2. The parties also agreed to schedule at least two other depositions—of Lowery himself and of UT's 30(b)(6)

10

representative—sometime after the motion to dismiss was decided—but did not discuss seeking an early summary judgment. *Id.*, ¶¶ 2, 4.

The parties filed a joint motion to abate discovery, Dkt. 121, and discovery has been paused since mid-March, *see* Dkt. 122. Since then, Plaintiff has not requested additional documents, submitted interrogatories, or scheduled new depositions, nor could he. Lowery agreed to this abatement to give time for this Court to resolve UT's motion to dismiss, see Dkt. 121, but it appears that UT sought the abatement to attempt to prevent President Hartzell from ever being deposed.

Summary judgment is premature and improper, until Lowery has had the opportunity to gather evidence necessary to support his chilled-speech claim by deposing Hartzell, Kothare, and UT's 30(b)(6) representative and by seeking other documentary discovery related to these depositions.

II.   UT THREATENED ACTIONS AGAINST LOWERY THAT WOULD CHILL A PERSON OF ORDINARY FIRMNESS FROM SPEAKING

A.   Lowery has already provided evidence demonstrating all three elements of the *Keenan* test

Even were discovery complete, this Court should deny UT's motion, because Lowery already possesses abundant evidence that supports a reasonable factfinder ruling for him about all elements of his chilled-speech claim. *Cf.* Dkt. 51 at 25. UT cannot meet its high burden of showing that it is entitled to summary judgment.

UT does not even attempt to show that Lowery's speech was not constitutionally protected. *See* Dkt. 132 (never mentioning the first element); Dkt. 131 at 6-7 (similar). Defendants complain about Lowery's speech on matters of public concern. At the August 12 meeting, for instance, Mills objected to Lowery's podcast interview, an August 5 article, and "public tweets" criticizing GSLI and discouraging university donations. Ex. F at 1-2; Ex. D at 199:4-14, 208:14-209:20.

Likewise, Burris and Titman both highlighted Lowery's tweets about GSLI. Ex. H; Ex. C at 190:8-191:16, 194:7-16; Dkt. 8-1, ¶¶ 46-47. The interview, article, and tweets all discuss controversial public topics such as DEI, critical race theory, climate change, the funding and organization of public universities, and freedom of speech. *See, e.g.,* Dkt. 62-6 (interview); Kolde Dec. ¶ 20, Ex. K (August 5 article).

In commenting on these public matters, Lowery was exercising his right to speak, both as an American and as a UT faculty member with academic freedom. Dkt. 8-1, ¶¶ 68, 73; Dkt. 17-1, ¶¶ 20-22; *cf.* Keith E. Whittington, *What Can Professors Say on Campus? Intramural Speech and the First Amendment* 23-25 (August 2, 2023) (forthcoming Journal of Free Speech Law) (available at https://ssrn.com/abstract=4551168). UT's own rules state that "[w]hen the faculty member speaks or writes as a citizen, he or she should be free from institutional censorship or discipline[.]" Dkt. 14-7 (UT Regents' Rule 31004(3); *cf.* Kolde Dec. ¶ 21, Ex. L (compilation of tweets by UT faculty stating provocative opinions regarding UT and Texas politics); Kolde Dec. ¶ 22, Ex. M (UT admission that leftwing faculty was not disciplined for these provocative opinions).

Kelly Kamm, Meeta Kothare, Laura Starks, and other faculty who disapprove of Lowery's speech have a right to voice their personal opinions about Lowery's speech. But UT's administration cannot seize on their complaints as a pretext to justify silencing Lowery and selectively enforcing its "civility" policies against him. Both the close temporal proximity and Defendants' repeated reference to these complaints while threatening Lowery indicate that Defendants did exactly this. *Cf. Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 305 (5th Cir. 2020) ("a six-and-a-half-week timeframe is sufficiently close," even without other evidence, to establish causal connection).

12

As for the third element—the motive for UT's adverse actions—Lowery has demonstrated that Defendants were upset and offended by his speech, *see, e.g.*, Ex. A at 100:11-102:14, 113:2-14, 212:19-213:22; Ex. D at 87:6-14, 166:20-22; that Hartzell asked UT officials below him to silence Lowery, *see, e.g.*, Ex. B (Carvalho Dep.) 151:10-152:24; Dkt. 17-1, ¶¶ 2-5; Dkt. 119-1 at 4-5; and that Burris only renewed Lowery's Salem appointment once he began self-censoring, *see, e.g.*, Dkt. 132-4; Ex. B at 207:17-208:24.

Mills and Burris have openly admitted that their motive for meeting with Carvalho was to convince Carvalho to "counsel" Lowery so that Lowery would "stop making comments that are factually inaccurate and disruptive to operations." Ex. C at 154:12-155:5, 156:22-157:17; Ex. D at 199:4-14, 210:22-211:11.

> Q. Stated another way, your goal in asking Carvalho to counsel Lowery regarding making comments that taxpayer money was stolen by grifters or the president is to be paid to be good at lying to conservative donors and politicians was to get Lowery to stop making those kinds of comments, correct?
>
> A. Yes.

Ex. C (157:3-9); Ex. D (210:22-211:11).

Thus, Mills and Burris have admitted that their goal was to chill Lowery—to get him to speak differently or not at all. While Carvalho refused to "counsel" Lowery, he passed on their message as a warning to his friend, Dkt. 8-2, ¶¶ 8-11, who got the message and began self-censoring, Dkt. 8-1, ¶¶ 43-49, 58-60. Mills and Burris obtained the result that they (and likely Hartzell) had sought: Lowery's silence about Hartzell and UT's ideological direction, including speaking about those topics in a way they deemed was too provocative, "uncivil" or "offensive."

It is telling that Defendants seem to suffer from the misconception that state actors are entitled to restrict speech that is "offensive," "uncivil" or hurts UT's

brand. The First Amendment, however, contains neither a civility clause, nor a brand-protection clause. Offensive speech is legally protected speech. *See, e.g., Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019) (The bar thus violated the 'bedrock First Amendment principle' that the government cannot discriminate against 'ideas that offend'"); *Matal v. Tam,* 582 U.S. 218, 243-44 (2017) (plurality) ("Giving offense is a viewpoint."); *Cohen v. California*, 403 U.S. 15, 25 (1971) (wearing "Fuck the draft" on jacket in courthouse was protected speech); *Am. Freedom Def. Initiative v. King County*, 904 F.3d 1126, 1131 (9th Cir. 2018) ("Giving offense is a viewpoint"). Indeed, for over half a century, even the F-word is legally protected speech, when used as a means of emphasis to express a political idea. *Cohen,* 403 U.S. 15, 25-26 ("… much linguistic expression serves a dual communicative function: it conveys not only ideas capable of relatively precise, detached explication, but otherwise inexpressible emotions as well").[3] And this bedrock principle is sensible, because otherwise government officials would subjectively categorize a lot of speech they dislike as "offensive." The First Amendment is designed to protect citizens' right to criticize government officials, even in ways some might consider jarring, unpleasant, or unkind.[4]

Defendants' plan to chill Lowery was successful, because Lowery responded like most employees would respond to a superior's warnings, and just like Defendants expected he would respond. As a result, evidence already exists which, viewed in the light most favorable to Lowery with all reasonable inferences drawn, *see Wease v. Ocwen Loan Servicing, LLC,* 915 F.3d 987, 992 (5th Cir. 2019), establishes that UT's motive was to chill Lowery's protected speech.

---

[3] Thus, Lowery's use of the term "F***ing communists" in the Romanov tweet is unquestionably protected speech. *Cf.* Dkt. 8-17 at 4.
[4] The legal way for UT officials to respond would have been counter-speech. Instead they acted behind the scenes to chill Lowery into silence.

### B. UT threatened to take adverse employment actions against Lowery if he continued to speak freely

If Lowery continued to speak freely, UT threatened to harm him in ways that qualify as adverse employment actions under Fifth Circuit precedent. Contrary to UT's extreme claim, *see* Dkt. 132 at 14,[5] UT cannot legally retaliate against Lowery's protected speech by removing him from his Salem position, damaging his career prospects, "counseling" him in preparation for other discipline, and cutting his salary by $20,000.

"Adverse employment actions *can include* discharges, demotions, refusals to hire, refusals to promote, and reprimands" but the Circuit has "not held this list to be exclusive." *Sharp v. City of Hous.*, 164 F.3d 923, 933 & n.21 (5th Cir. 1999) (emphasis added). A retaliatory act is actionable if it is "equivalent to a discharge, demotion, refusal to hire, refusal to promote, or reprimand in its seriousness, causing 'some serious, objective, and tangible harm[.]'" *Ellis v. Crawford*, Civil Action No. 3:03-CV-2416-D, 2005 U.S. Dist. LEXIS 3457, at *27-28 (N.D. Tex. Mar. 3, 2005) (quoting *Serna v. City of San Antonio*, 244 F.3d 479, 482-83 (5th Cir. 2001)). A wide variety of punishments may meet this "equivalency" standard. *See, e.g.*, *Burnside v. Kaelin*, 773 F.3d 624, 627 (5th Cir. 2014) (transfer can be equivalent); *Thompson v. City of Waco*, 764 F.3d 500, 504 (5th Cir. 2014) ("change in or loss of job responsibilities" can be equivalent); *Alvarado v. Tex. Rangers*, 492 F.3d 605, 614 (5th Cir. 2007) (denial of transfer can be equivalent).

Lowery has offered evidence demonstrating that UT leaders threatened to discipline him in ways equivalent to a demotion and a formal reprimand. Most

---

[5] UT misrepresents this Court's September 2023 opinion. *See* Dkt. 132 at 14. The Court only held that "mere threat or potential of an ultimate employment decision will not suffice" for retaliation. Dkt. 51 at 24. That is, an employer can threaten an adverse employment action without the threat itself becoming an adverse action.

importantly, UT leaders threatened to cancel or refuse to renew Lowery's position as a Senior Scholar at UT's Salem Center, potentially costing him a $20,000 annual stipend. Dkt. 8-2, ¶¶ 8-10; Dkt. 8-1, ¶¶ 3-5, 49, 61-62.

Thus, Lowery's case is not analogous to *Dorsett* or *Harrington*, contra Dkt. 132 at 14-15, for neither case concerned loss of pay, and loss of pay is always an adverse action. Instead, those cases involved faculty complaining that their pay *increases* were slightly smaller than expected. *See Harrington v. Harris*, 118 F.3d 359, 366 (5th Cir. 1997) (noting that the court "might reach a different conclusion" "[i]f Plaintiffs had received no merit pay increase at all or . . . simply a token increase"); *Dorsett v. Bd. of Trs. for State Colls. & Univs.*, 940 F.2d 121, 123 (5th Cir. 1991).

Lowery is also in danger of losing his position at Salem's Policy Research Lab, which would decrease his prestige and academic freedom, as well as deny him opportunities to publish research that would advance his career. Dkt. 8-1, ¶¶ 3, 7, 62; *see also* Dkt. 132-2 (noting that Lowery supervises postdoctoral and undergraduate fellows). Similarly, UT leaders threatened to remove Lowery's friend and research collaborator, Carlos Carvalho, as Salem's Executive Director, which would further damage Lowery's ability to perform cutting-edge research. Dkt. 8-2, ¶¶ 8, 10; Dkt. 8-1, ¶¶ 7, 43, 62. Removal from the Salem Center is equivalent to a demotion, for it entails loss of pay, fewer and less interesting job responsibilities, loss of supervisory authority, worse career prospects, less use of Lowery's skills and experience, and less prestige.

Additionally, Defendants sought to "counsel" Lowery and, at a minimum acquiesced to, if not outright supported, his investigation by UT police in a way that is equivalent in seriousness to a formal reprimand. *See* Dkt. 8-1, ¶¶ 52-57, 63. This "counseling" served as a pre-disciplinary warning that harsh consequences would

come later if Lowery did not alter his speech. *See* Dkt. 8-2, ¶¶ 6-8; Dkt. 8-1, ¶¶ 49, 60.

Although Carvalho refused to "counsel" Lowery, he passed along the message, Dkt. 8-2, ¶¶ 6, 11, and Titman did "talk to" Lowery about his supposedly "rude and potentially dangerous" speech and described this conversation as part of his duty as chair "to evaluate somebody . . . on my faculty" and "mak[e] suggestions on what they are doing", Ex. A at 212:19-213:22; Dkt. 8-1, ¶¶ 47-49. As chair, Titman played a central role in Lowery's performance reviews and decisions on pay increases. *See* Dkt. 132-10. Only a fool would ignore these warnings.

Moreover, Lowery has testified that, because of Titman's counseling, Lowery fears "loss of pay or *other disciplinary consequences* if [he] continued criticizing GSLI and its events." Dkt. 8-1, ¶ 49 (emphasis added). UT has "a process for removing a tenured employee," although Defendants have not yet triggered this process against Lowery. Dkt. 132 at 16. But why would they? Lowery has self-censored since late August 2022, so UT's threats to "keep quiet or else" succeeded.

Only two weeks before Lowery self-censored, however, a high-level official from President Hartzell's office sent Mills and Burris a complaint against Lowery for their "review and handling" as a "personnel matter" about "whether Professor Richard Lowery crossed any lines regarding ethics or compliance." Ex. E; *see also* Ex. A at 199:6-8 (Titman interpreting "personal action" to mean disciplinary action). Lowery fears that UT's "counseling" laid the groundwork for more severe discipline that might bring "risk to [his] career," perhaps even tenure removal. Dkt. 8-1, ¶¶ 49, 60. Lowery, thus, shows that UT threatened him with punishments would constitute adverse employment actions if carried out.

17

C.  UT's threats would chill a person of ordinary firmness

Moreover, UT's argument about adverse employment actions is a non sequitur, because Lowery brings a chilled-speech claim, not a retaliation claim. The *Keenan* test does not require that an adverse employment action was threatened. To prove his chilled-speech claim, Lowery only must demonstrate that "the defendants' actions caused [him] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity." Dkt. 51 at 25.

Indeed, this Court has already held that Lowery suffered an objective chill if he could prove that Mills and Burris truly made the statements to Carvalho that Lowery alleges. *See id.* at 25-26 (concluding that the allegations in paragraphs 36, 39, and 43 of Lowery's original complaint would satisfy the second *Keenan* element if proven). Lowery has supplied evidence supporting all the allegations that this Court previously held were sufficient. *See, e.g.*, Ex. B at 159:8-162:10, 163:16-164:20; 192:4-193:6, 207:17-208:24; Dkt. 8-2, ¶¶ 7-11; Ex. F; Ex. H. This genuine issue of material fact defeats summary judgment.

UT concedes that the *Keenan* test governs Lowery's chilled-speech claim (indeed, UT proposed that test) and any attempt by UT to back away from that test now should be barred by judicial estoppel. *See* Dkt. 130 at 11-12; Dkt. 48 at 13; Dkt. 15 at 17. The *Keenan* test does not demand a retaliatory employment action. Rather, *Keenan* set a baseline of First Amendment protection for all citizens, regardless of whether they were employed by the government or not. *See* Dkt. 130 at 14-16.

In *Keenan*, the Fifth Circuit borrowed a standard for chilled speech from the Sixth and Tenth Circuits. 290 F.3d at 258. Those circuits expressly equate the chilled-speech standard adopted in *Keenan* with the Supreme Court's *Burlington Northern* standard used in the Title VII context. *See, e.g.*, *Kubala v. Smith*, 984 F.3d 1132, 1139 (6th Cir. 2021) (citing *Burlington N. & Santa Fe Ry. v. White*, 548 U.S.

53, 68 (2006)); *Benison v. Ross*, 765 F.3d 649, 659 (6th Cir. 2014) (similar); *Couch v. Bd. of Trs. of the Mem'l Hosp.*, 587 F.3d 1223, 1238 (10th Cir. 2009) (similar). Courts in the Fifth Circuit have also applied *Burlington Northern* to First Amendment claims. *See, e.g., Peyton v. City of Yazoo City*, 764 F. Supp. 2d 831, 840 (S.D. Miss. 2011); *Laredo Fraternal Order of Police v. City of Laredo*, 2008 U.S. Dist. LEXIS 19001, 2008 WL 678698 (S.D. Tex. Mar. 12, 2008).

*Burlington Northern* "separated significant from trivial harms" by requiring plaintiffs show that the challenged conduct "might have dissuaded a reasonable worker from" protected activity. 548 U.S. at 68 (cleaned up). This language mirrors the second element of the *Keenan* test. "This [*Burlington Northern*] standard is analogous to" and "consonant with" the chilled-speech standard in both employment and non-employment cases. *Couch*, 587 F.3d at 1238. When First Amendment rights are at stake, "threats alone can constitute an adverse action if the threat is capable of deterring a person of ordinary firmness from engaging in protected conduct." *Hill v. Lappin*, 630 F.3d 468, 475 (6th Cir. 2010).

Indeed, the Fifth Circuit has recently affirmed a district court that found that a professor stated a viable chilled-speech claim when university administrators investigated the professor, removed him as editor-in-chief at a journal he created, and left him unable to publish his research, even though that professor lost no salary and remained a tenured faculty member. *See Jackson v. Wright*, 82 F.4th 362, 366, 369 (5th Cir. 2023). The district court had recognized that there "was no unequivocal policy proscribing [the professor's] intended conduct," but found that the administration's "implicit policy" of creating a stagnant journal arguably proscribed plaintiff's intended speech. *Jackson v. Wright*, Civil Action No. 4:21-CV-00033, 2022 U.S. Dist. LEXIS 8684, at *19-20 (E.D. Tex. Jan. 18, 2022). The university never explicitly stated that the professor would be disciplined if he

continued to express his views. *Id.* at *24-25. But the district court held that "[i]t is the chilling effect on free speech that violates the First Amendment, and it is plain that an implicit threat can chill as forcibly as an explicit threat." *Id.* (cleaned up).

Similarly, in *Levin v. Harleston*, the Second Circuit found that a university president's criticisms of a professor's speech and suggestion that it might constitute "conduct unbecoming" were sufficient to credibly chill speech, even in the absence of an explicit threat of discipline. 966 F.2d 85, 89-90 (2nd Cir 1992). "It is not fatal that Harleston never explicitly stated that disciplinary charges would be brought if Levin continued to voice his views." *Id.*; *see also Cooksey v. Futrell*, 721 F.3d 226, 236-37 (4th Cir. 2013) (blogger chilled when "told, in effect, that he would remain under the watchful eye of [a] State Board").

Lowery was threatened with the loss of a valuable appointment at UT's Salem Center, which would have cost him $20,000 annually, ended his supervisory role over Salem's fellows, and hampered his research, to the detriment of his career advancement. *See* Dkt. 8-2, ¶¶ 8-10; Dkt. 8-1, ¶¶ 3-5, 47-49, 61-62.

Lowery was also investigated by UT police, "counseled," and labelled as rude, uncivil, and dangerous. *See* Dkt. 8-1, ¶¶ 49, 52-57, 60, 63; Ex. A at 136:4-137:15, 145:18-146:9. And Lowery—just like the professor in *Jackson*—has already lost a valuable right that other UT faculty members have—the right to comment on public affairs and UT-related matters. *See, e.g.*, Dkt. 14-7; Ex. L; Ex. M.

These threats and actions—both monetary and professional—would chill a person of ordinary firmness just as they chilled Lowery.

## CONCLUSION

This Court should deny Defendants' motion for partial summary judgment. In the alternative, this Court should defer ruling on UT's motion until discovery in the case is complete.

Respectfully submitted,

   *s/Endel Kolde*
Endel Kolde
Washington Bar No. 25155
Courtney Corbello
Texas Bar No. 24097533
Nathan J. Ristuccia[6]
Virginia Bar No. 98372
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW
Suite 801
Washington, D.C. 20036
Tel: (202) 301-1664
Fax: (202) 301-3399
dkolde@ifs.org
ccorbello@ifs.org
nristuccia@ifs.org

*Counsel for Richard Lowery*

Dated: May 31, 2024

   *s/Michael E. Lovins*
Michael E. Lovins
Texas Bar No. 24032555
LOVINS |TROSLCAIR, PLLC
1301 S. Cap. Of Texas
Building A Suite 136
Austin, Texas 78746
Tel: (512) 535-1649
Fax: (214) 972-1047
michael@lovinslaw.com

---

[6] Not a D.C. Bar Member but providing legal services in the District of Columbia exclusively before federal courts, as authorized by D.C. Ct. App. R. 49(c)(3).