IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| RICHARD LOWERY, | § | No. 1:23-CV-129-DAE |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| | § | |
| LILLIAN MILLS, in her capacity as | § | |
| Dean of the McCombs School of | § | |
| Business at the University of Texas at | § | |
| Austin, ETHAN BURRIS, in his official | § | |
| capacity as Senior Associate Dean for | § | |
| Academic Affairs of the McCombs | § | |
| School of Business at the University of | § | |
| Texas-Austin, CLEMENS SIALM, in his | § | |
| official capacity as Finance Department | § | |
| Chair for the McCombs School of | § | |
| Business at the University of Texas- | § | |
| Austin, and JAY HARTZELL, in his | § | |
| official capacity as President of the | § | |
| University of Texas-Austin, | § | |
| | § | |
| Defendants. | § | |
| | § | |

ORDER: (1) GRANTING MOTION TO DISMISS; (2) GRANTING MOTION
FOR PARTIAL SUMMARY JUDGMENT; (3) DENYING MOTION TO DEFER
RULING ON PARTIAL SUMMARY JUDGMENT; AND (4) DENYING AS
<u>MOOT MOTION TO DISSOLVE PROTECTIVE ORDER</u>

Before the Court are: (1) Defendants Lillian Mills, in her capacity as

Dean of the McCombs School of Business at the University of Texas at Austin

("McCombs"), Ethan Burris, in his official capacity as Senior Associate Dean for

Academic Affairs of McCombs, Clemens Sialm, in his official capacity as Finance

Department Chair for the McCombs School of Business at the University of Texas-Austin, and Jay Hartzell, in his official capacity as President of the University of Texas-Austin's (collectively, "Defendants") Motion to Dismiss Amended Complaint (Dkt. # 129); (2) Defendants' Motion for Partial Summary Judgment (Dkt. # 132); (3) Plaintiff Richard Lowery's ("Plaintiff" or "Lowery") Motion to Defer Consideration of Defendants' Motion for Partial Summary Judgment (Dkt. # 135); and (4) Plaintiff's Motion to Dissolve Protective Order re: Nepotism Allegations (Dkt. # 140).  A hearing was held on these motions on September 25, 2024.

After careful consideration of the memoranda in support of and in opposition to the motions as well as arguments of counsel at the hearing, the Court, for the reasons that follow, **GRANTS** Defendants' motion to dismiss, **GRANTS** Defendants' motion for partial summary judgment, **DENIES** Plaintiff's motion to defer consideration of motion for partial summary judgment, and **DENIES AS MOOT** Plaintiff's Motion to Dissolve Protective Order.

<u>BACKGROUND</u>

This is a free speech case in which Plaintiff, a professor at the University of Texas at Austin ("UT"), has used social media and online opinion articles to publicly criticize university officials' actions, and has asked elected state-governmental officials to intervene.  (Dkt. # 126.)  Among others, Plaintiff

alleges that he "dissents from the political and academic views held by most UT faculty and administrators, often publicly, and sometimes uses pointed terminology to get his points across." (Id. at 4.) He states that he makes his opinions known to elected officials in Texas, including those who oversee UT's funding. (Id.)

Plaintiff alleges that he "has a longstanding commitment to increasing viewpoint diversity on the UT campus, both through his work with the Salem Center [for Public Policy] and through his speech on and off campus." (Dkt. # 126 ¶ 20.) At the Salem Center, Plaintiff reports to business professor Carlos Carvalho, who serves as the Center's Executive Director. (Id. ¶ 21–22.) Plaintiff alleges that his affiliation with the Salem Center affords him additional pay, as well as access to research opportunities. (Id. ¶ 22.) In 2021, according to Plaintiff, he and Carvalho pursued funding for a new "Liberty Institute" at UT whose purpose is to study "classical-liberal, pro-free market viewpoints on a campus, as a counterweight to the dominant critical race theory and DEI-based ideology[1] that was metastasizing from its origins in the humanities into more evidence-based disciplines such as business, economics, and STEM disciplines." (Id. ¶ 23.) Plaintiff alleges that their goal for the Liberty Institute is "to remain independent within UT, without having to answer to the general faculty within existing schools" in order "to avoid becoming subject to the ideological bias inherent in most

---

[1] DEI stands for "diversity, equity, and inclusion." (Dkt. # 1 at ¶ 11.)

academic hiring decisions at UT, where DEI filtering mechanisms are applied," resulting "in the removal of candidates who dissent from DEI ideology and critical race theory."  (Id. ¶ 24.)

> To fund the Liberty Institute, Plaintiff and Carvalho enlisted the support of Defendant UT President Jay Hartzell and private donors, as well as the Texas State Legislature's 2022–23 budget which allocated $6 million in funding for the Liberty Institute.  (Id. ¶ 25–26.)  According to Plaintiff, however, the enabling legislation "was somewhat vague," allowing President Hartzell and his UT Administration allies "to hijack the project, remove its independence, re-direct its funding to existing personnel and programs, and change its title to 'Civitas.'"  (Id. ¶ 27.)

> Thereafter, Plaintiff alleges that he began to publicly criticize "the hijacking of the Liberty Institute, criticizing the role of UT President Hartzell and Richard Flores, who is an advocate of critical race theory and DEI-ideology."  (Dkt. # 126 at ¶ 29.)  For example, Plaintiff was quoted in papers, appeared on podcasts, and posted on social media, sometimes tagging elected officials or social-media personalities, making those posts visible to those officials.  (Id. at 28–35.)

> Plaintiff further alleges that UT's McCombs School hosts a Global Sustainability Leadership Institute ("GSLI") which promotes Environment Sustainability and Governance ("ESG") based viewpoints which are "consistent

with the predominant DEI-ideology at UT and are often at odds with free-market principles and Lowery's views." (Dkt. # 126 ¶ 36.)  Plaintiff states that he has publicly criticized GSLI and its events on social media.  (Id. ¶ 39.)

Thereafter, Plaintiff alleges that his repeated criticisms of President Hartzell, and the UT Administration, their DEI initiatives, and GSLI "drew the attention of Defendants who decided to pressure Lowery and his friend and ally, Carlos Carvalho, into censoring Lowery's speech." (Dkt. # 126 at ¶ 44.) According to Plaintiff, in late July or August 2022, Sheridan Titman, the former Chair of the Finance Department and to whom Lowery reported to,[2] told Carvalho that "We need to do something about Richard." (Id. ¶ 45–54.)  Plaintiff alleges that Titman told him also that President Hartzell and Defendant Dean Lillian Mills were upset about Plaintiff's political advocacy and wanted to know if "we can ask him to tone it down?" (Id. ¶ 54.)  Plaintiff contends that Carvalho understood the statement as an implicit threat but refused to do anything, explaining to Titman that Lowery has a First Amendment right to express his views.  (Id. ¶ 55.)

On August 12, 2022, Plaintiff alleges that Dean Mills and Defendant Ethan Burris, McCombs' Senior Associate Dean for Academic Affairs, met with Carvalho to discuss the Salem Center.  (Dkt. # 126 at ¶ 56.)  According to Plaintiff,

---

[2] Titman was previously a defendant in this case, but Plaintiff's amended complaint states that Titman is now a witness "because he no longer serves as the department chair." (Dkt. # 126 at ¶ 45.)

about an hour later the tone shifted when Mills and Burris changed the subject to Plaintiff's speech.  (Id.)  Plaintiff contends that Carvalho was told Lowery's speech was "crossing the line" in his criticism of school officials, to the point where the UT legal department was allegedly concerned about his speech.  (Id. ¶ 57.)  Plaintiff also alleges that Defendants put pressure on Carvalho to reprimand Plaintiff for his speech, but that Carvalho again declined to do so.  (Id. ¶ 57–58.)  Because Carvalho declined to do so, Plaintiff asserts that Defendants threatened Carvalho's Executive Director position.  (Id. ¶ 59.)  According to Plaintiff, Carvalho nonetheless relayed Defendants' threats to Plaintiff.  (Id. ¶ 62.)

On August 22, 2022, Plaintiff alleges that GSLI's managing director Meeta Kothare emailed a copy of Plaintiff's social media post to Mills and GSLI's executive director Jeffrey Hales, writing about concern of the safety of GSLI's events.  (Dkt. # 126 at ¶ 68–69.)  According to Plaintiff, Kothare's email was forwarded to other UT professors and officials, including Titman, who decided that a discussion with Plaintiff was needed to determine "what is appropriate on twitter" and that he "want[ed] to encourage intellectual discourse, but [he didn't] think rude comments [were] acceptable."  (Id. ¶ 70–72.)  Thereafter, Plaintiff alleges that Titman ultimately forwarded him the email from Kothare and added that Plaintiff did not "seem to be making friends" and that it was "probably in [his] best interest to come up with a class for the Spring that is likely to be popular," and

"[i]n any event, the appropriate response is to jointly sponsor a panel discussion on ESG." (Id. ¶ 75.) Plaintiff alleges that he responded back, stating that he considered the email to him to be a threat and that he "can certainly criticize events." (Id. ¶ 76.)

Subsequently, Plaintiff contends that he set his social media account to "private" and that only his followers and not the public can see his activity. (Dkt. # 126 at ¶ 78.) And, as of late August 2022, Plaintiff alleges that he stopped posting on his Twitter account, but has not deleted it and would like to resume "tweeting, re-tweeting, replying to other posts, and otherwise commenting on matters as before." (Id. ¶ 79.) Plaintiff further alleges that a GSLI employee forwarded his speech to UT police requesting that they survey his speech on social media. (Dkt. # 1 ¶ 56.) Plaintiff states there is no indication that this request for surveillance has been withdrawn. (Id. ¶ 59.)

On February 2, 2023, Plaintiff filed suit in this Court alleging two claims against Defendants for violations of his First Amendment Right of Free Speech pursuant to 42 U.S.C. § 1983 for Chilling of Free Speech by State Actors and Retaliation for his Protected Speech. (Dkt. # 1.) On September 5, 2023, the Court dismissed without prejudice Plaintiff's First Amendment Retaliation claim. (Dkt. # 51.) On March 28, 2024, Plaintiff filed an amended complaint which added UT President Hartzell as a defendant, and added a claim for Right of Free

Speech pursuant to § 1983 alleging that UT has an unwritten speech code or practice that allows administrators to label such speech as "disruptive to university operations," amounting to "a ban on calling for boycott of donations to UT."  (Dkt. # 126 at 30.)

Among others, Plaintiff believes that UT officials have attempted to silence his speech by threatening his job, pay, institute affiliation, research opportunities, academic freedom, and labeled his behavior as inviting violence or lacking in civility.  According to Plaintiff, he fears that if he continues to be critical and express his speech concerning UT Administration and its policies, his appointment to the Salem Center will not be renewed, costing him the $20,000 stipend and access to research opportunities.  (Id. ¶ 87.)

On April 11, 2024, Defendants filed a motion to dismiss Plaintiff's amended complaint.  (Dkt. # 129.)  On April 25, 2024, Plaintiff filed a response in opposition.  (Dkt. # 130.)  On May 2, 2024, Defendants filed a reply.  (Dkt. # 131.) On May 20, 2024, Defendants filed a motion for partial summary judgment.  (Dkt. # 132.)  On May 31, 2024, Plaintiff filed a response in opposition to that motion. (Dkt. # 134.)  On June 7, 2024, Defendants filed their reply.  (Dkt. # 136.)  On May 31, 2024, Plaintiff filed a motion to defer the Court's consideration of Defendants' motion for partial summary judgment.  (Dkt. # 135.)  On June 7, Defendants filed a response in opposition to that motion.  (Dkt. # 136.)  On June

13, 2024, Plaintiff filed his reply.  (Dkt. # 137.)  On September 12, 2024, Plaintiff filed a motion to dissolve the protective order in this case regarding his nepotism allegations against President Hartzell.  (Dkt. # 140.)  On September 19, 2024, Defendants filed a response to the motion (Dkt. # 141); on September 21, 2024, Plaintiff filed his reply (Dkt. # 142).  All pending motions are ripe and ready for the Court's consideration.

I.      Motion to Dismiss

Defendants move to dismiss Plaintiff's suit pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (Dkt. # 129.)

A.      Applicable Law

Rule 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted."  Review is limited to the contents of the complaint and matters properly subject to judicial notice.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).  In analyzing a motion to dismiss for failure to state a claim, "[t]he court accept[s] 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"  In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007) (quoting Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit, 369 F.3d 464, 467 (5th Cir. 2004)).

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

B.    Analysis

Defendants move to dismiss both of Plaintiff's claims on the basis that his self-chill claim is essentially a rebranded retaliation claim and that he has failed to allege facts supporting the existence of an unwritten speech code or practice. (Dkt. # 129 at 6.)

1.    Chilled Speech

Defendants maintain Plaintiff's "chilled speech" claim is really a retaliation claim that is foreclosed for lack of any adverse employment action. (Dkt. # 129 at 6.) In response, Plaintiff contends that the Court has already determined that Lowery stated a viable chilled-speech claim in its prior order and thus reasserting dismissal of the claim on the same basis is barred by the law of the case doctrine. (Dkt. # 130 at 9.) Additionally, Plaintiff asserts that UT previously cited a different standard to apply to his chilled speech claim in its prior motion to

dismiss and therefore UT is judicially estopped from asserting that a different

standard applies now.  (Id. at 11.)

        In its Order on Defendants' motion to dismiss Plaintiff's original

complaint, the Court determined that:

> To establish a chilled speech claim, a plaintiff must allege: "(1)
> [he was] engaged in constitutionally protected activity, (2) the
> defendants' actions caused [him] to suffer an injury that would chill a
> person of ordinary firmness from continuing to engage in that activity,
> and (3) the defendants' adverse actions were substantially motivated
> against the plaintiff['s] exercise of constitutionally protected conduct."
> Keenan v. Tejeda, 290 F.3d 252, 258 (5th Cir. 2002).  Defendants argue
> that Plaintiff cannot meet the second element because a person of
> ordinary firmness would not be chilled from engaging in a protected
> speech by Defendants' purported actions.  (Dkt. # 15 at 17.)
>
> At this stage of the proceedings, the Court finds that Plaintiff has
> sufficiently alleged that Defendants' threats would chill a person of
> ordinary firmness from publicly criticizing UT Administration and
> programs.  Plaintiff has alleged that Carvalho—Plaintiff's supervisor at
> the Salem Center—was told that "[w]e need to do something about
> Richard," and that President Hartzell and Dean Mills were about upset
> about Plaintiff's "political advocacy," and asked Carvalho if "we can
> ask him to tone it down?" (Dkt. # 1 ¶ 36.)  Plaintiff further alleges that
> Mills and Burris were concerned Plaintiff was "crossing the line" in his
> criticisms of school officials and that the UT legal department was
> concerned about his speech.  (Id. ¶ 39.)   Additionally, Plaintiff has
> alleged that Carvalho was told that he has "the power to have him not
> be attached to the center" and that Burris told Carvalho that "he might
> not approve Lowery's appointment to the center in the future because
> of his speech." (Id. ¶ 43.) The Court finds these allegations sufficiently
> allege the second element of a chilled speech claim, and it will not be
> dismissed on this basis.

(Dkt. # 51 at 25–26.)  Although Defendants advocated for the standard above in

Keenan to apply to Plaintiff's chilled-speech claim in their original motion to

dismiss (Dkt. # 15 at 17), Defendants now argue that it is the wrong standard to apply in cases which concern public employees as opposed to ordinary citizens. (Dkt. # 129 at 6.)  Defendants assert that the standard cited above in <u>Keenan</u> applies only to ordinary citizens' allegations of chilled speech, but in cases where as here, public employees are challenging their alleged chilled speech by their employer, the Court must apply a different First Amendment retaliation standard which requires a plaintiff to show an adverse employment action.  (<u>Id.</u>)

Furthermore, Defendants argue that Plaintiff's first count in his amended complaint—chilling of free speech by state actors—is not a distinct cause of action separate from his now-dismissed First Amendment retaliation claim in his original complaint.  Instead, it is simply a type of injury-in-fact that provided standing for a retaliation claim.  (Dkt. # 129 at 8.)  In such case, Defendants assert that Plaintiff's "'self-chill' claim is simply a retaliation claim that disavows that label in an effort to avoid the adverse-employment action element."  (<u>Id.</u>)

Upon careful consideration, the Court agrees with Defendants' that a different legal standard is used in the Fifth Circuit for First Amendment retaliation claims brought by employees of governmental entities, but not without chiding Defendants for citing an incorrect standard to the Court in their original

motion to dismiss.[3]  The Fifth Circuit has repeatedly stated that in the employment context, "[t]o establish a § 1983 claim for *employment retaliation related to speech*, a plaintiff-employee must show: (1) he suffered an adverse employment action; (2) he spoke as a citizen on a matter of public concern; (3) his interest in the speech outweighs the government's interest in the efficient provision of public services; and (4) the speech precipitated the adverse employment action." Anderson v. Valdez, 845 F.3d 580, 590 (5th Cir. 2016) (emphasis added) (quoting Nixon v. City of Houston, 511 F.3d 494, 497 (5th Cir. 2007)); Wilson v. Tregre, 787 F.3d 322, 325 (5th Cir. 2015); Hawkland v. Hall, 860 F. App'x 326, 331 (5th Cir. 2021).

    In contrast, the Fifth Circuit has stated that when a First Amendment retaliation case "does not involve an employment or other contractual relationship between the plaintiffs and the government officials," a First Amendment retaliation claim against "*an ordinary citizen*," may be shown by demonstrating that: "(1) they

---

[3] The Court declines to consider the merits of Plaintiff's arguments concerning the law of the case and judicial estoppel; the Court will not purposefully apply an incorrect legal standard in this case.  The Court further notes that neither of the parties' briefing was particularly clear as to what standards they rely on for any of the claims in this case.  Even more baffling is Defendants' citation again to the Keenan standard in their response to Plaintiff's motion to dissolve the protective order even after they argued in their motion to dismiss and motion for partial summary judgment that a different standard for employment retaliation related to speech applies.  (See Dkt. # 141 at 5.)  In any case, this Court takes full responsibility for itself applying the incorrect standard in its previous order.

were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct."  Keenan, 290 F.3d at 258 (emphasis added).

In distinguishing between First Amendment retaliation claims in the employment context and those brought by ordinary citizens, the Fifth Circuit noted that, "[i]n the employment context, this court's requirement of an adverse employment action serves the purpose of weeding out minor instances of retaliation."  Id. at 258 n.4 (citing Colson v. Grohman, 174 F.3d 498, 510, 514 (5th Cir. 1999).  Regarding this, the Fifth Circuit determined that "some retaliatory actions—even if they actually have the effect of chilling the plaintiff's speech—are too trivial or minor to be actionable as a violation of the First Amendment."  Id. at 258; see also Breaux v. City of Garland, 205 F.3d 150, 160 (5th Cir. 2000) (noting "retaliatory threats are just hot air unless the public employer is willing to endure a lawsuit over a termination"); Thaddeus-X v. Blatter, 175 F.3d 378, 398 (6th Cir. 1999) ("[P]ublic employees . . . may be required to tolerate more than average citizens, before an action taken against them is considered adverse.").

The Court also agrees with Defendants that Plaintiff's allegations in his § 1983 First Amendment claim for "chilling of free speech by state actors" is in

essence a First Amendment retaliation claim.  Therefore, because Plaintiff was an employee of UT, the Court will consider whether Plaintiff has stated a § 1983 First Amendment retaliation claim pursuant to the standard cited above for use in the employment context, which requires a plaintiff to demonstrate an adverse employment action.  See Anderson v. Valdez, 845 F.3d at 590.  Defendants dispute only the sufficiency of the first element.

The Fifth Circuit has consistently limited adverse employment actions to "ultimate employment decisions," such as "discharges, demotions, refusals to hire, refusals to promote, and reprimands."  Foley v. Univ. of Hous. Sys., 355 F.3d 333, 341 (5th Cir. 2003); Breaux, 205 F.3d at 157 (quotation marks and citation omitted).  The Fifth Circuit has "declined to expand the list of actionable" claims in the First Amendment context, "noting that some things are not actionable even though they have the effect of chilling the exercise of free speech."  Benningfield v City of Hous., 157 F3d 369, 376 (5th Cir. 1998).  In Breaux, the Fifth Circuit specifically noted that the following are *not* adverse employment actions: (1) mere accusations or criticism; (2) investigations; (3) psychological testing; (4) false accusations; and (5) polygraph examinations that do not have adverse results for the plaintiff.  Breaux, 205 F.3d 150, 157–68 (citations omitted).  As explained in Breaux, "[t]he reason for not expanding the list of adverse employment actions is

to ensure that § 1983 does not enmesh federal courts in relatively trivial matters." 205 F.3d at 157 (quotation marks and citation omitted).

Here, Plaintiff alleges that Defendant Hartzell "asked directed, or suggested that Defendants Mills and Burris take action to cause Lowery to change the tone and content of his tweets and other public speech or stop speaking altogether." (Dkt. # 126 at ¶ 106.) Plaintiff further alleges that Hartzell's "directives, requests, hints, and suggestions were carried out by people down the chain of command, such as Mills and Burris." (Id. ¶ 107.) Additionally, Plaintiff asserts that Defendants' "*threats* to counsel Lowery about his speech, reduce [his] pay, involuntarily end his affiliation with the Salem Center, reduce his access to research opportunities, inquire about his tweets, label him, allow other McCombs faculty to request that his speech be placed under police surveillance, or otherwise discipline him are designed to silence" his criticisms or change the tone of his speech. (Id. ¶ 109 (emphasis added).)

Plaintiff's allegations of *threats* are insufficient to establish an adverse employment action for a First Amendment retaliation claim in the Fifth Circuit. See Breaux, 205 F.3d at 160. The mere threat or potential of an ultimate employment decision will not suffice. Id. Because he has not sufficiently alleged an adverse employment action, the Court will dismiss without prejudice Plaintiff's First Amendment retaliation claim for chilled speech.

16

Still, Plaintiff urges the Court to consider a chilled-speech claim separate from a retaliation claim, citing the Fifth Circuit's holding in <u>Jackson v. Wright</u>, 82 F.4th 362, 369 (5th Cir. 2023).  (Dkt. # 130 at 13.)  The district court below in <u>Jackson</u> noted the distinction between alleging a "First Amendment claim for *suppression of speech* with a retaliation claim for adverse action *following protected speech*," which utilizes a different standard.  <u>Jackson v. Wright</u>, No. 4:21-CV-00033, 2022 WL 179277 (E.D. Tex. Jan. 18, 2022) ("To establish a § 1983 claim for violation of the First Amendment right to free speech, [a plaintiff] must show that (1) they were disciplined or fired for speech that is a matter of public concern, and (2) their interest in the speech outweighed the university's interest in regulating the speech." (citing <u>Buchanan v. Alexander</u>, 919 F.3d 847, 853 (5th Cir. 2019))).

To the extent Plaintiff urges the Court to employ this standard in evaluating his "chilled speech" claim, he has not adequately alleged the elements of such—particularly he fails to allege any actual discipline or that he was terminated following his protected speech.[4]  For instance, in <u>Jackson</u>, a professor who made protected speech in a university journal in which he served on the editorial board was criticized for speaking by the university he worked for and

---

[4] <u>See also</u> the Court's analysis below in Plaintiff's second claim utilizing this standard.

others.  Id.  The professor was first asked to implement recommendations concerning the editorial nature of the journal; however, prior to his implementation of the recommendations, the professor was informed that he would be removed from the journal and that the university would eliminate the resources previously provided to the journal.  Id. at *2.  Although the plaintiff responded that he would not be forced to resign from the journal, no editorial board thereafter existed, and no one applied for the editor-in-chief position.  Id. at 3.  In such case, "[b]ecause of this indefinite suspension, [the p]laintiff ha[d] been de facto removed from the Journal."  Id.

Here, Plaintiff has not been removed from the Salem Center, and in fact was reappointed to his position at the Salem Center for another one-year term in August 2023, and he received a pay raise at the beginning of both the 2022–23 and the 2023–24 school terms.  (See Dkt. # 51 at 30 n.4.)  Therefore, even if the speech constitutes a matter of public concern, Plaintiff has not alleged that was disciplined or terminated for such.  And, even using this standard, Plaintiff has not properly alleged such claim to survive dismissal.  Thus, the Court finds that Plaintiff has not properly alleged a First Amendment violation—for either retaliation or for the unconstitutional stifling of speech under § 1983.

2.   <u>Unwritten Speech Code</u>

Defendants next move to dismiss Plaintiff's Free Speech claim based on an unwritten speech code or practice.  (Dkt. # 129 at 10.)  Defendants contend Plaintiff has failed to allege sufficient facts to support this claim.  (<u>Id.</u>)  Specifically, Defendants again assert that Plaintiff's allegations that UT maintains an "unwritten speech code" as applied solely against Lowery is "another recasting of his First Amendment retaliation claim," which again fails for lack of any adverse action.  (<u>Id.</u> at 11.)  Defendants further argue that UT is not a named defendant, and Plaintiff has not alleged that any of the named defendants created this purported speech policy or actually enforced it against Plaintiff.  (<u>Id.</u>)

In response, Plaintiff contends that he has sufficiently alleged facts which show that UT has an unwritten speech code or practice that forbids his public speech.  (Dkt. # 130 at 16.)  Additionally, Plaintiff asserts that he has alleged facts that Defendants enforced this speech code or practice against him in this case.  (<u>Id.</u> at 21.)

Plaintiff appears to allege both a facial and as-applied challenge to UT's alleged unwritten speech code or practice.[5]  (Dkt. # 126 at 29.)  In other words, Plaintiff appears to allege a facial challenge to an unwritten speech code or

---

[5] Plaintiff also apparently alleges a viewpoint discrimination claim, although only specifically references such in passing in his response to the motion to dismiss.  (<u>See</u> Dkt. # 130 at 20.)  To the extent, however, that this is a separate claim from

practice, and an as-applied challenge to the manner in which Defendants "applied" the alleged unwritten speech code or practice to Lowery.  (Id.)  See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494 n.5 (1982) (noting that, in contrast to an as-applied challenge, a "facial challenge means a claim that a law [or policy] is invalid in toto, and therefore incapable of any valid application").  "Although litigants are permitted to raise both as-applied and facial challenges, the lawfulness of the particular application of the law should ordinarily be decided first."  Roy v. City of Monroe, 950 F.3d 245, 251 (5th Cir. 2020).

To support these allegations, Plaintiff's amended complaint alleges that "UT maintains an unwritten speech code or practice that allows for administrators to counsel or discipline faculty for 'uncivil' or 'rude' speech," but those terms "are subjective and not defined in writing or limited by objective criteria and invite UT administrators to apply their own biases to determine when a faculty member has said something that is 'uncivil' or 'rude.'"  (Dkt. # 126 at 30.)  As applied to Plaintiff, he alleges that the "unwritten speech code or practice" forbids faculty member like himself "from advocating that donors stop donating to UT or that elected officials defund UT as a way of advocating for policy changes at UT."  (Id.)  Plaintiff contends that the result of this unwritten policy "allows

---

his as-applied challenge, the viewpoint discrimination claim fails for the same reasons discussed below.

administrators to label such speech as 'disruptive to university operations' and amounts to a ban on calling for a boycott of donations to UT." (Id.)

Furthermore, Plaintiff alleges that UT's "unwritten speech code or practice" fails to "sufficiently cabin official discretion and thereby invites selective enforcement against disfavored viewpoints or speakers." (Dkt. # 126 at 30.) Plaintiff thereafter cites examples of the conduct of other UT faculty members "expressing leftwing views" who "are not asked to tone-down their tweets or make them more civil and less rude." (Id.) As applied to him, Plaintiff contends that this unwritten speech policy was enforced against him because "it was embarrassing to [Defendants] and others in the UT administration and also because they feared the possibility of elected officials or the public scrutinizing their behavior." (Id.)

First, to the extent that Plaintiff's claim is essentially a first amendment retaliation claim, it fails for lack of any adverse action as described above. Plaintiff's allegations that "Defendants retaliated against [him] for his protected speech by seeking to have him 'counseled' over his speech, labeling his speech as 'uncivil' and 'disruptive,' threatening to reduce [his] pay, involuntarily end his affiliation with the Salem Center, reduce his access to research opportunities, inquire about his tweets, labeling him, requesting that his speech be placed under police surveillance, or otherwise disciplining him," (Dkt. # 126 at 31), are not sufficient adverse employment actions in the Fifth Circuit to support a

First Amendment retaliation claim.  See Foley, 355 F.3d at 341; Breaux, 205 F.3d

at 157.

To the extent the claim can be understood as alleging both as-applied

and facial challenges, it is unclear from the pleadings exactly what standard of

review Plaintiff relies on for this claim.  Even if Plaintiff has properly alleged the

existence of an unwritten speech code or practice as cited above, and which the

Court will take Plaintiff's allegations as true at this stage of the proceedings, he has

failed to adequately allege this claim.

Regarding Plaintiff's as-applied challenge, the Fifth Circuit has held

that to establish a § 1983 First Amendment right to free speech claim brought by a

public university professor, he must show that: (1) he was "disciplined or fired for

speech that is a matter of public concern," and (2) his "interest in the speech

outweighed the university's interest in regulating the speech."  Buchanan, 919 F.3d

at 853 (citing Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968).  Again, Plaintiff

has failed to sufficiently allege that he was disciplined or terminated pursuant to

either his speech or the University's alleged unwritten policy prohibiting his

speech.  As addressed above, Plaintiff has alleged that there were various threats

made to him regarding his speech, but not that he was actually disciplined for such,

especially where the record demonstrates that Plaintiff was reappointed to his

position at the Salem Center for another one-year term in August 2023, and that he

received a pay raise at the beginning of both the 2022–23 and the 2023–24 school

terms.  (See Dkt. # 51 at 30 n.4.)  Cf. Hiers v. Bd. of Regents of the Univ. of N.

Tex. Sys., No. 4:20-CV-321-SDJ, 2022 WL 748502 (E.D. Tex. Mar. 11, 2022)

(determining plaintiff properly pled elements to sustain as-applied challenge to

"Misconduct Policy" where he was terminated after his speech); Jackson, 2022

WL 179277, at *17 (determining plaintiff properly pled elements of

"unconstitutional stifling of speech" where professor was "de facto" removed from

journal in which he was a founding member following his protected speech in a

journal symposium).

        Regarding a facial challenge to the alleged unwritten policy, Plaintiff

has not clearly alleged such.  To the extent the Court can interpret the claim as an

overbreadth constitutional challenge, a plaintiff who invokes the overbreadth

doctrine is claiming that a statute, ordinance, or policy "is facially invalid" because

it "prohibits a substantial amount of speech."[6]  United States v. Williams, 553 U.S.

285, 292 (2008).  Such challenges "are allowed not primarily for the benefit of the

litigant, but for the benefit of society—to prevent the [policy] from chilling the

---

[6] Generally, a court should "proceed to an overbreadth issue" only if "it is
determined that the statute would be valid as applied."  Serafine v. Branaman,
810 F.3d 354, 362–63 (5th Cir. 2016).  Here, however the Court analyzes
Plaintiff's overbreadth claim out of an abundance of caution because it is unclear
exactly what type of challenge he is asserting.

First Amendment rights of other parties not before the Court." Sec'y of State of Md. v. Joseph H. Munson Co., 467 U.S. 947, 958 (1984).

The overbreadth doctrine is "strong medicine." Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973). It is "ordinarily more difficult to resolve" than an as-applied challenge because it "requires consideration of many more applications than those immediately before the court." Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 485 (1989). A policy may be facially invalidated based on the overbreadth doctrine only if "a substantial number of its applications are unconstitutional, judged in relation to the [policy's] plainly legitimate sweep." United States v. Stevens, 559 U.S. 460, 473 (2010). The litigant challenging the policy must show "a realistic danger that the [policy] itself will significantly compromise recognized First Amendment protections of parties not before the court." Hersh v. U.S. ex rel. Mukasey, 553 F.3d 743, 762 (5th Cir. 2008). Such facial challenges should be granted "sparingly and only as a last resort." Id. (quoting Broadrick, 413 U.S. at 613).

Here, Plaintiff has failed to state a plausible claim that UT's alleged unwritten speech code or practice is facially unconstitutional based on overbreadth. Plaintiff contends the policy "does not sufficiently cabin official discretion and thereby invites selective enforcement against disfavored viewpoints or speakers." (Dkt. # 126 at 30.) Plaintiff fails to sufficiently allege that the so-called unwritten

policy is overbroad, only that it is selectively enforced.  In other words, Plaintiff does not take issue so much with an unwritten speech code or practice, only that it was not fairly applied to him which the Court has already considered above in the as-applied challenge.

Accordingly, because Plaintiff has not sufficiently alleged a facial or as-applied First Amendment challenge to any unwritten speech code or practice, the Court will dismiss this claim without prejudice.[7]

### 3.   Conclusion

Based on the foregoing, the Court will **GRANT** Defendants' motion to dismiss Plaintiff's first amended complaint.  (Dkt. # 129.)  Plaintiff has failed to state claims upon which relief can be granted.

## II.   Motion for Partial Summary Judgment

Defendants' motion for partial summary judgment seeks judgment on Plaintiff's chilled speech claim in Count One to the extent that it is cognizable. (Dkt. # 132.)  As discussed, the Court has found that Plaintiff failed to properly allege that he suffered any adverse employment action to sustain such a claim.

---

[7] Because the Court finds Plaintiff's has failed to sufficiently allege this claim, the Court will decline to consider the merits of Defendants' alternative argument that Plaintiff has failed to name UT as a defendant.  (Dkt. # 129 at 14.)

However, even if Plaintiff could make out a plausible claim, he would not survive summary judgment.

Defendants move for summary judgment on Plaintiff's self-chill claim on the basis that he has no evidence of any adverse employment action, thus lacking the elements of a cognizable chilled-speech claim. (Dkt. # 132 at 11.) Defendants further maintain that Plaintiff has not alleged, nor has any evidence that any defendant threatened him with adverse employment action if he continued to speak. (Id. at 13.)

A.     Applicable Law

"Summary judgment is appropriate only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Vann v. City of Southaven, 884 F.3d 307, 309 (5th Cir. 2018) (citations omitted); see also Fed. R. Civ. P. 56(a).  "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Bennett v. Hartford Ins. Co. of Midwest, 890 F.3d 597, 604 (5th Cir. 2018) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986)).  "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'"  Nola Spice Designs,

LLC v. Haydel Enter., Inc., 783 F.3d 527, 536 (5th Cir. 2015) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating . . . that there is an issue of material fact warranting trial.'" Kim v. Hospira, Inc., 709 F. App'x 287, 288 (5th Cir. 2018) (quoting Nola Spice Designs, 783 F.3d at 536). While the movant must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. Austin v. Kroger Tex., L.P., 864 F.3d 326, 335 (5th Cir. 2017) (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1076 n.16 (5th Cir. 1994)). A fact is material if it "might affect the outcome of the suit." Thomas v. Tregre, 913 F.3d 458, 462 (5th Cir. 2019) (citing Anderson, 477 U.S. at 248).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." Jones v. Anderson, 721 F. App'x 333, 335 (5th Cir. 2018) (quoting Duffie v. United States, 600 F.3d 362, 371 (5th Cir. 2010)). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. Infante v. Law Office of Joseph Onwuteaka, P.C., 735 F. App'x 839, 843 (5th Cir. 2018) (quoting Willis v. Cleco Corp., 749 F.3d 314, 317 (5th Cir. 2014)). "This burden will not be satisfied by

'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" McCarty v. Hillstone Rest. Grp., Inc., 864 F.3d 354, 357 (5th Cir. 2017) (quoting Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005)).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  Wease v. Ocwen Loan Servicing, LLC, 915 F.3d 987, 992 (5th Cir. 2019).

Additionally, at the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form.  See Fed. R. Civ. P. 56(c); Lee v. Offshore Logistical & Transp., LLC, 859 F.3d 353, 355 (5th Cir. 2017).  However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment."  United States v. Renda Marine, Inc., 667 F.3d 651, 655 (5th Cir. 2012) (quoting Brown v. City of Houston, 337 F.3d 539, 541 (5th Cir. 2003)).

B.   Analysis

As stated above, "[t]o establish a § 1983 claim for employment retaliation related to speech, a plaintiff-employee must show: (1) he suffered an adverse employment action; (2) he spoke as a citizen on a matter of public concern; (3) his interest in the speech outweighs the government's interest in the

efficient provision of public services; and (4) the speech precipitated the adverse

employment action."[8] Anderson v. Valdez, 845 F.3d 580, 590 (5th Cir. 2016).

Again, Defendants challenge the first element—whether Plaintiff has

provided sufficient evidence that he suffered an adverse employment action.

Adverse employment actions are "discharges, demotions, refusals to hire, refusals

to promote, and reprimands." Breaux v. City of Garland, 205 F.3d 150, 157 (5th

Cir.), cert. denied, 531 U.S. 816 (2000). The Fifth Circuit has pointedly "declined

to expand the list of actionable actions," noting that "some things are not

actionable even though they have the effect of chilling the exercise of free speech."

Id. Among the type of actions held by the Fifth Circuit not to be adverse

employment actions are mere accusations or criticism, investigations,

psychological testing, false accusations, and polygraph examinations that do not

have adverse results for the plaintiff. Id. at 157–58. Importantly, verbal threats of

termination and criticism have been held not to rise to the level of an adverse

employment action. See id. at 159–60 (threats of termination alone do not

constitute an adverse employment action); Chandler v. La Quinta Inns, Inc.,

2008 WL 280880 at * 3 (5th Cir. Feb. 1, 2008) (threat of termination did not

amount to constructive discharge or adverse action). "Some benefit must be

---

[8] Plaintiff again encourages the Court to use the Keenan test discussed above to evaluate this claim. (Dkt. # 134 at 16.) For the reasons above, the Court declines to do so.

denied or some negative consequence must impinge on the Plaintiff's employment before a threat of discharge is actionable." Id. at 159.

Regarding academic settings, the Fifth Circuit has repeated on many occasions that decisions "concerning teaching assignments, pay increases, administrative matters, and departmental procedures" are not the kinds of adverse actions that "rise to the level of a constitutional deprivation." Dorsett v. Bd. of Trs. for State Colls. & Univs., 940 F.2d 121, 123 (5th Cir. 1991); see also Oller v. Roussel, 609 F. App'x 770, 773 (5th Cir. Apr. 7, 2015).

Plaintiff contends that UT "threatened to harm in ways that qualify as adverse employment actions under Fifth Circuit precedent." (Dkt. # 134 at 20.) For instance, Plaintiff asserts that his evidence shows that "UT leaders threatened to discipline him in ways equivalent to a demotion and a formal reprimand," including by threatening to cancel or refuse to renew his position as a Senior Scholar at the Salem Center, "potentially costing him a $20,000 stipend." (Id. at 20–21.) Plaintiff also cites evidence that he is in danger of losing his position at the Salem Center's Research Lab, which would "decrease his prestige and academic freedom, as well as deny him opportunities to publish research that would advance his career." (Id. at 21.) Plaintiff argues that removal from the Salem Center would therefore amount to a demotion.

30

Additionally, Plaintiff asserts that he received a formal reprimand when Defendants sought to "counsel" him and supported an investigation by UT police.  (Dkt. # 134 at 21.)  According to Plaintiff, the counseling "served as a pre-disciplinary warning that harsh consequences would come later if Lowery did not alter his speech."  (Id. at 21–22.)  Plaintiff also contends that Titman talked to him about his "rude and potentially dangerous" speech and because Titman "played a central role in Lowery's performance reviews and decisions on pay increases . . .[o]nly a fool would ignore these warnings."  (Id. at 22.)  Plaintiff argues that all of these actions "shows that UT threatened him with punishments" which would "constitute adverse employment actions if carried out."  (Id.)

Unfortunately, despite any evidence that the conversations and actions above occurred, Plaintiff's *fears* that he would be disciplined in ways that would amount to a demotion and formal reprimand are not actionable adverse employment actions in the Fifth Circuit, partially since there is little if any evidence beyond Plaintiff's own perceptions, that any such action took place. Plaintiff has not presented sufficient evidence that he suffered any "serious, objective, and tangible harm," amounting to a "change in or loss of job responsibilities," nor was denied a transfer.  See Serna v. City of San Antonio, 244 F.3d 479, 482–83 (5th Cir. 2001); Burnside v. Kaelin, 773 F.3d 624, 627 (5th Cir. 2014); Thompson v. City of Waco, 764 F.3d 500, 504 (5th Cir. 2014); Alvarado v.

31

Tex. Rangers, 492 F.3d 605, 614 (5th Cir. 2007).  Indeed, the Fifth Circuit takes a

"narrow view of what constitutes an adverse employment action[.]"  Breaux, 205

F.3d at 157.  Even if UT's actions here are unpleasant, the Fifth Circuit does not

consider them adverse employment actions. See id. at 157-58 (observing that Fifth

Circuit has held, inter alia, that false accusations, criticism, and investigations are

not adverse employment actions); see also Southard v. Tex. Bd. of Crim. Justice,

114 F.3d 539, 555 (5th Cir. 1997) ("Not every negative employment decision or

event is an adverse employment action that can give rise to a discrimination or

retaliation cause of action under 1983.").  And, "even the capacity of an action to

stigmatize an employee is inadequate to make it one."  Ellis v. Crawford, No. 3-03-

CV-2416-D, 2005 WL 2005 WL 525406, at *27–28 (N.D. Tex. Mar. 3, 2005)

(citing Breaux, 205 F.3d at 158 n.14 ("Stigma by itself, without an impact on one's

employment, does not constitute an adverse employment action."); see also

Blackburn v. City of Marshall, 42 F.3d 925 (5th Cir. 1995).

      "Instead, to qualify as an adverse employment action that will support

a First Amendment retaliation claim, the act taken must alter an important

condition of employment, result in the denial of an employment benefit, or have a

negative consequence on the plaintiff's employment."  Ellis, 2005 WL 2005 WL

525406, at *8 (citing Breaux, 205 F.3d at 159 & n.16 ("Some benefit must be

denied or some negative consequence must impinge on the Plaintiff's employment

before a threat of discharge is actionable.")).  The retaliatory act must also be more than a trivial one.  See Sharp v. City of Hous., 164 F.3d 923, 933 (5th Cir. 1999) (recognizing that, "[a]lthough the Supreme Court has intimated that the First Amendment protects against trivial acts of retaliation, this court has required something more than the trivial[.]").  "It must be equivalent to a discharge, demotion, refusal to hire, refusal to promote, or reprimand in its seriousness, causing 'some serious, objective, and tangible harm[.]'"  Ellis, 2005 WL 525406, at *8 (quoting Serna, 244 F.3d at 482–83).  Plaintiff has not adequately alleged, nor provided sufficient evidence, that any of these adverse actions have occurred, especially where the evidence demonstrates that Plaintiff was reappointed to his position at the Salem Center for another one-year term in August 2023, and that he received a pay raise at the beginning of both the 2022–23 and the 2023–24 school terms.  Nor is there any evidence that an adverse action has been taken against him since that time.  (See Dkt. # 51 at 30 n.4.)

After considering the record in this case, even if Plaintiff has alleged a plausible claim in his first count, the Court concludes that Plaintiff has failed to present sufficient evidence that he suffered any adverse action as recognized in the Fifth Circuit and the claim will be dismissed.  The Court therefore **GRANTS** Defendants' Motion for Partial Summary Judgment.  And, although Plaintiff requests additional fact discovered be allowed—specifically, that he be allowed to

take the deposition of President Hartzell—this would still not produce sufficient evidence to survive summary judgment that an adverse employment action befell Plaintiff.[9] Thus, the Court will **DENY** Plaintiff's motion to defer consideration of Defendants' motion for partial summary judgment (Dkt. # 135) and **DENY AS MOOT** Plaintiff's Motion to Dissolve Protective Order (Dkt. # 140).

<u>CONCLUSION</u>

Based on the foregoing, the Court will **GRANT** Defendants' Motion to Dismiss Amended Complaint (Dkt. # 129), **GRANT** Defendants' Motion for Partial Summary Judgment (Dkt. # 132), **DENY** Plaintiff's Motion to Defer Consideration of Defendants' Motion for Partial Summary Judgment (Dkt. # 135) and **DENY AS MOOT** Plaintiff's Motion to Dissolve Protective Order (Dkt. # 140). The Clerk's Office is **INSTRUCTED** to **ENTER JUDGMENT** and **CLOSE THE CASE**.

---

[9] This Court is compelled to follow Fifth Circuit precedent. However, this Court's order should not be read as sanctioning any of the Defendants' actions in this matter. While Plaintiff may have been zealous in his speech and writings, in the context of a world-class university like UT, different opinions should be welcomed or at least tolerated by those in authority, no matter that they are uncomfortable, so long as they do not incite violence or disrupt the school's ability to function as a teaching institution.

**IT IS SO ORDERED.**

**DATED:** Austin, Texas, October 2, 2024.

_____

David Alan Ezra
Senior United States District Judge